# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **STEVEN RAMSEY** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | |
| **JAY CASHMAN, INC.** | : | **NO. 04-CV-10699(RCL)** |
| | : | |
| **Defendant**. | : | |

## PLAINTIFF'S PRETRIAL MEMORANDUM

(a)     **Trial Counsel**

Samuel J. Rosenthal, Esquire
Rudolph V. DeGeorge, Esquire
**BARISH♦ROSENTHAL**
1601 Cherry Street, Suite 1320
Philadelphia, Pennsylvania 19102
(215) 923-8900
Counsel for Plaintiff

Ronald M. Davids, Esquire
**DAVIDS & SCHLESINGER**
40 Washington Street, Suite 250
Wellesley, Massuchusetts 02481
(781) 416-5055
Counsel for Plaintiff

Robert Murphy, Esquire
**Murphy & Holbrook**
15 Broad Street, Suite 900
Boston, Massachusetts 02109
(617) 428-1151
Counsel for Defendant

(b)     **Summary of Position**

Position of Plaintiff with respect to liability and relief sought.

## Liability

On or about April 5, 2001, the plaintiff, Steven Ramsey ("Plaintiff"), was employed by defendant, Jay Cashman, Inc., ("Defendant") as a mate/engineer aboard the cutter head dredge Wood I. On that date, plaintiff was working with the defendant on a project at Barnegat Inlet, New Jersey. The Wood I was moored approximately 75 to 100 feet off the south shore of Barnegat Inlet. Attached to the Wood I was the deck barge SEI-11. The Wood I was moored by two lines forward and two lines aft. Plaintiff was operating a steel skiff (work boat) carried by the Wood I to pick up parts for the cutter head from shore and deliver them to the Wood I. The skiff was approximately 18 feet long and powered by a single forty horsepower Mercury outboard motor. This work boat had been built by the defendant. (See copies of photographs attached as Exhibit "A") As plaintiff piloted the skiff from the shore toward the starboard side of the dredge, the skiff's motor stalled causing the skiff to drift to the stern of the dredge and under the mooring lines. Plaintiff was able to throw a line to a hand on the dredge who caught the line and held it. After a number of attempts, plaintiff was able to restart the motor on the skiff. Defendant's supervisor aboard the dredge, Kenneth King, then instructed plaintiff to bring the parts to the bow of the dredge where they would be used. As Mr. Ramsey attempted to maneuver the skiff away from the stern of the dredge, while trying to keep clear of the stern mooring lines in the swift current which exists at Barnegat inlet, the skiff stalled, either on its own or possibly due to contact with one of the mooring lines. The current trapped the stalled skiff and forced it against the rake of the material barge which was moored along side the dredge. Due to the low freeboard of the skiff and the high tidal current, the port side of the skiff was forced under water by the downward slope of the barge's rake and began to sink. Plaintiff abandoned the skiff and attempted to climb aboard the Wood I by means of fender tires which hung on the side of the dredge. As Mr. Ramsey clung to the tire, the sinking skiff struck Mr. Ramsey across his back, pining him to the hull and fenders of the dredge and pulling him under the surface. Two individuals aboard the Wood I were able to climb down and grab plaintiff and pull him free after much struggling. Plaintiff was then administered medical care and evacuated to Atlantic City for treatment of his injuries.

Approximately one month prior to this accident, the skiff had sunk in a storm. The skiff was raised and the outboard motor was taken to Hochstrasser's Marina for repair. Repair invoices show that the motor was flushed with fresh water, the carburetors and fuel lines cleaned and the lube oil replaced. The invoice contains a note that states "Stator, voltage regulator, switch boxes, starter solenoid were not changed. Advised doing so since it sank in salt water". Further notations states, "do not change any electronics, starter, etc.". In his deposition testimony, Supervisor King confirms that he knew the skiff had a stalling problem after the prior sinking and that he continued to keep the work boat in service. He acknowledged that he personally had problems with the boat stalling but continued to use it when he figured it how to keep it from stalling.

This accident was solely the result of the negligence of the defendant and the unseaworthiness of defendant's vessel. Plaintiff's liability expert, Arthur C. Sargent, Naval Architect and Marine Engineer, has opined that the stalling of the skiff, which directly lead to the skiff's contacting the dredge at the stern under the mooring lines and subsequently directly lead to the vessel being swept under the rake of the barge could have been caused by the failure of defendant to follow the recommendations of the marina mechanics and replace the electrical components on the motor. Further, Mr. Sargent has opined that the skiff, which based on Mr. Ramsey's estimate weighed 3000

pounds was too heavy for the forty horse power motor which was attached for operation in the swift currents that existed at Barnegat Inlet. (The actual skiff and motor involved in the accident were unavailable for inspection, weighing or measuring due to the fact that defendant contends that it subsequently sank yet again and was never recovered.) Defendant claims to have no blueprints or specifications available for the skiff. Further, testimony regarding the circumstances of the skiff capsizing and sinking suggests that the freeboard was too low to keep water out of the interior of the vessel after it had become pinned by the current. The testimony also suggests that the skiff did not possess reserve stability sufficient to keep it afloat should it become swamped. (See reports of Arthur C. Sargent attached as Exhibit "B")

Defendant's liability expert, David Dubois, contends that the accident was the fault of Mr. Ramsey because "In my opinion the sole cause of the vessel stalling immediately prior to Mr. Ramsey's injury, was Mr. Ramsey's negligence in allowing the outboard motor to strike the mooring line." This opinion totally ignores the fact that the supervisor, Kenneth King, should never have allowed the vessel to remain in service when he knew that it had a stalling problem and that the skiff would never have wound up in the dangerous position under the mooring lines at the stern of the dredge had it not initially stalled on Mr. Ramsey and drifted to that point. Mr. DuBois further opines that the condition of the unrepaired electronics had nothing to do with the stalling of the vessel because Mr. Ramsey testified that one of the things he attempted to get the motor running again was squeezing a ball on the fuel tank. Mr. DuBois opines that this is inconsistent with an electronic problem being the cause of the stalling. However, the fact that one of the things Mr. Ramsey attempted in order to get the engine running was squeezing the ball on the fuel tank, does not conclusively indicate that was the cause of the stalling. In fact, electrical problems can be an intermittent cause of stalling which would cause the motor to stop running at one point and be able to resume running at another time. Unfortunately, defendant failed to preserve the motor and skiff and, in fact, subsequently lost both in yet another sinking. Therefore, no expert examination of the boat or motor could take place to allow a conclusive physical and mechanical examination. Therefore, the experts can only rely on anecdotal evidence.

### Medical Treatment

On the date of the accident, April 5, 2001, plaintiff was airlifted to the Atlantic City Medical Center. He was noted to have a chief complaint of right flank, hip and right lower extremity pain. X-rays of the chest and pelvis were performed along with cat scan of abdomen and pelvis. He was discharged with prescriptions for Percocet and Vioxx. He returned to the room were he was staying in New Jersey and his pains became progressively worse with onset of severe back and neck pain. He was not able to work and was driven home to Massachusetts on or about April 7, 2001. Upon return to Massachusetts, plaintiff made an appointment with his primary care physician Dr. Stroud who was able to see him on April 12, 2001. Dr. Stroud noted complaints as previously set forth. Cervical x-rays were performed and physical therapy was prescribed. Through the course of therapy over several months, plaintiff's necks symptoms were now extending into the left upper extremity. Dr. Stroud ordered a cervical MRI on July 16, 2001 which showed a left para-central disc herniation at C5-6 and a right sided protrusion at C6-7. Plaintiff was referred to a spinal surgeon Dr. Leaver who reviewed the cervical MRI and recommended surgery to the C5-6 disc level. Dr. Leaver performed an anterior discectomy and interbody fusion at C5-6 on September 13, 2001. Plaintiff also continued to have lower

3

back pain and Dr. Leaver ordered an MRI scan which was performed on February 17, 2002. This MRI showed evidence of recurrent herniation of the L3-4 disc. It was also noted that at the L4-5 level the disc was bulging into the lower aspect of the left L4 neuro foramen. Dr. Leaver(who had treated Mr. Ramsey in the past and performed lumbar surgery in 1997) noted that the findings at the L3-4 level were new and that left leg pain was now plaintiff's major problem. In a note of December 12, 2002, Dr. Leaver noted that plaintiff "continues to have the lumbar problem, which I suspect will be a life long situation." Plaintiff came under the care of a pain specialist. Dr. Leaver suggested the possibility of a spinal cord stimulator implant. To date, plaintiff has not elected to have the simulator implanted. Plaintiff continues to have significant disabling pain in the neck and back. His was examined by medical expert Robert R. Pennell, M.D. on January 31, 2005. Dr. Pennell's diagnoses were as follows:

1.  Traumatic herniation of the left C5-6 disc with left radiculopathy;
2.  Status post excision of C5-6 disc with fusion;
3.  Residuals of numbers 1 and 2 with chronic neck pain and numbness left hand;
4.  Traumatic small recurrent disc herniation at the L3-4 level with low back and left lower extremity pain; and
5.  Crush injury of the pelvis and right lower extremity.

Dr. Pennell has opined that the diagnoses are the result of the work accident of April 5, 2001. Dr. Pennell states that plaintiff is totally disabled as a result of the accident of April 5, 2001, that his prognosis is poor and he must be presumed to be at a medical end result. (See report of Robert R. Pennell, M.D. attached as Exhibit"C").

Plaintiff has most recently undergone lumbar disk surgery on October 5, 2006.  Plaintiff is currently recuperating from this surgery and plaintiff reserves the right to provide supplemental medical information and expert opinion in relation to this additional treatment.

Plaintiff did suffer prior back injuries and undergo surgical procedures in 1991 and 1997 as set forth in the report of Dr. Pennell. Plaintiff had fully recovered from each of these prior conditions and returned to heavy duty work. Plaintiff performed heavy duty work with no problem for several years prior to his injury of April 5, 2001. Three supervisory employees of the defendant, Kenneth King, Nick Wagner, and Alex Dick have testified in deposition that Mr. Ramsey performed all of his duties as a mate/engineer and exhibited no signs of any physical impairment.

**Damages**

### Economic Damages

The plaintiff was evaluated by Emmanuel Green , Ph.D., a vocational expert, on March 30, 2005.  After conducting a vocational interview, and reviewing the medical records, Dr. Green concluded that as a result of the subject injuries, the Plaintiff was precluded from returning to his job as a dredge mate or dredge deck hand and is, in fact, totally occupationally disabled. (See vocational assessment of Emmanuel B. Green, Ph.D. attached as Exhibit "D"). An actuarial-economic expert, Royal A. Bunin, has opined that as a result of his disability, Plaintiff will sustain past lost earnings, loss of future earning capacity, and past and future loss of fringe benefits ranging from $1,490,688.00 to

$1,814,593.00. (See copy of Royal A. Bunin's report attached as Exhibit "E").

**Non-Economic Damages**

At the time of the accident, plaintiff was 36 years old. As a result of his injuries, he has required major neck and back surgery, treatment with powerful pain medications and been considered for implantation of a spinal stimulator. He is extremely limited in his ability to perform the active endeavors which he previously enjoyed including household tasks and recreational activities with his teenage children. Additionally, plaintiff has experienced irritability and anxiety as a result of his inability to go back to work. He continues to receive medical treatment. Plaintiff seeks relief for pain, suffering and loss of life's pleasures.

**(c)     Claims**

Plaintiff has not waived any claims.

**(d)     Statements of Established Facts**

1.     Defendant Jay Cashman, Inc., is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business in Boston, Massachusetts.

2.     On or about April 5, 2001, defendant was involved in a work project in the Barnegat Inlet, New Jersey.

3.     Defendant operated the Dredge Wood I on or about April 5, 2001.

4.     Plaintiff was employed by defendant on or about April 5, 2001 at a certain agreed rate of pay.

**(e)     Contested Issues of Facts**

1.     On or about April 5, 2001, the plaintiff, Steven Ramsey, was employed by defendant, Jay Cashman, Inc., as a mate/engineer aboard the cutter head dredge Wood I

2.     The Wood I was moored approximately 75 to 100 feet off the south shore of Barnegat Inlet. Attached to the Wood I was the deck barge SEI-11.

3.     Plaintiff was operating a steel skiff carried by the Wood I to pick up parts for the cutter head from shore and deliver them to the Wood I.

5

4.     The skiff was approximately 18 feet long and powered by a single forty horsepower Mercury outboard motor.

5.     This work boat had been built by the defendant.

6.     As plaintiff piloted the skiff from the shore toward the starboard side of the dredge, the skiff's motor stalled causing the skiff to drift to the stern of the dredge and under the mooring lines.

7.     Plaintiff was able to throw a line to a hand on the dredge who caught the line and held it.

8.     After a number of attempts, plaintiff was able to restart the motor on the skiff.

9.     Defendant's supervisor aboard the dredge, Kenneth King, then directed plaintiff to bring the skiff to the bow of the dredge where the parts would be used.

10.     As Mr. Ramsey attempted to maneuver the skiff away from the stern of the dredge, while trying to keep clear of the stern mooring lines in the swift current which exists at Barnegat inlet, the skiff stalled.

11.     The current trapped the stalled skiff and forced it under the rake of the material barge which was moored along side the dredge.

12.     Due to the low freeboard of the skiff and the high tidal current, the port side of the skiff was forced under water by the downward slope of the barge's rake and began to sink.

13.     Plaintiff abandoned the skiff and attempted to climb aboard the Wood I by means of fender tires which hung on the side of the dredge.

14.     As Mr. Ramsey clung to the tire, the sinking skiff struck Mr. Ramsey across his back, pinning him to the hull and fenders of the dredge.

15.     Two individuals aboard the Wood I were able to climb down and grab plaintiff and pull him free.

16.     Approximately one month prior to this accident, the skiff had sunk in a storm.

17.     The skiff was raised and the outboard motor was taken to Hochstrasser's Marina for repair.

18.    Repair invoices show that the motor was flushed with fresh water, the carburetors and fuel lines cleaned and the lube oil replaced.

19.    The invoice contains a note that states "Stator, voltage regulator, switch boxes, starter solenoid were not changed. Advised doing so since it sank in salt water".

20.    Further notations states, "do not change any electronics, starter, etc."

21.    Defendant's Superintendent acknowledged that he subsequently had problems with the boat stalling but left it in service.

22.    The stalling of the skiff, which directly lead to the skiff's contacting the dredge at the stern under the mooring lines and subsequently directly lead to the vessel being swept under the rake of the barge were caused by the failure of defendant to follow the recommendations of the marina mechanics and replace the electrical components on the motor.

23.    The skiff was too heavy for the motor for operation in the swift currents that existed at Barnegat Inlet.

24.    The skiff did not possess reserve stability sufficient to keep it afloat should it become swamped.

25.    On the date of the accident, April 5, 2001, plaintiff was airlifted to the Atlantic City Medical Center.

26.    His pains became progressively worse with onset of severe back and neck pain. He was not able to work and was driven home to Massachusetts.

27.    On or about April 7, 2001 plaintiff made an appointment with his primary care physician Dr. Stroud who was able to see him on April 12, 2001.

28.    Dr. Stroud ordered a cervical MRI on July 16, 2001 which showed a left para-central disc herniation at C5-6 and a right sided protrusion at C6-7.

29.    Plaintiff was referred to a spinal surgeon Dr. Leaver who reviewed the cervical MRI and recommended surgery to the C5-6 disc level.

30.    Dr. Leaver performed an anterior discectomy and interbody fusion at C5-6 on September 13, 2001.

31.    Plaintiff also continued to have lower back pain and Dr. Leaver ordered an MRI scan which was performed on February 17, 2002. This MRI showed evidence of recurrent herniation of the L3-4 disc.

32.    At the L4-5 level the disc was bulging into the lower aspect of the left L4 neuro foramen. Dr. Leaver noted that the findings at the L3-4 level were new and that left leg pain was now plaintiff's major problem.

33.    Dr. Leaver noted that plaintiff had the lumbar problem, which were permanent and plaintiff underwent disc surgery at L3-4 on October 5, 2006.

34.    Plaintiff was examined by medical expert Robert R. Pennell, M.D. on January 31, 2005. Dr. Pennell's diagnoses were as follows:

    1.    Traumatic herniation of the left C5-6 disc with left radiculopathy;
    2.    Status post excision of C5-6 disc with fusion;
    3.    Residuals of numbers 1 and 2 with chronic neck pain and numbness left hand;
    4.    Traumatic small recurrent disc herniation at the L3-4 level with low back and left lower extremity pain; and
    5.    Crush injury of the pelvis and right lower extremity.

35.    Dr. Pennell has opined that the diagnoses are the result of the work accident of April 5, 2001.

36.    Plaintiff is totally disabled as a result of the accident of April 5, 2001.

37.    Plaintiff did suffer prior back injuries and undergo surgical procedures in 1991 and 1997.

38.    Plaintiff had fully recovered from each of these prior conditions and returned to heavy duty work.

39.    Plaintiff performed heavy duty work with no problem for several years prior to his injury of April 5, 2001.

40.    As a result of the subject injuries, the Plaintiff was precluded from returning to his job as a dredge mate or dredge deck hand and is totally occupationally disabled.

41.    Plaintiff will sustain past lost earnings, loss of future earning capacity, and past and future loss of fringe benefits ranging from $1,490,688.00 to $1,814,593.00.

42.    At the time of the accident, plaintiff was 36 years old. As a result of his injuries, he has required major neck and back surgery, treatment with powerful pain medications and been considered for implantation of a spinal stimulator.

43.    He is extremely limited in his ability to perform the active endeavors which he previously enjoyed including household tasks and recreational activities with his teenage children.

44.    Plaintiff has experienced irritability and anxiety as a result of his inability to go back to work. He continues to receive medical treatment.

**(f)    Jurisdictional Questions**

None.

**(g)    Pending Motions**

Motion to Reopen Discovery and Expert Deadlines due to Plaintiff's Surgery of October 5, 2006.

**(h)    Issues of Law**

1.    Is plaintiff a Jones Act Seaman?

2.    Was defendant negligent?

3.    Did the defendant's negligence play any part, even in the slightest, in causing plaintiff's injuries?

4.    Was the defendant's vessel unseaworthy?

5.    Did the unseaworthiness of defendant's vessel cause plaintiff's injury.

**(i)    Requested Amendments to the Pleadings**

None.

**(j)    Additional Matters**

None.

9

(k)    **Length of Trial**

Plaintiff anticipates 5-6 days for Trial.

(l)    **Witnesses**

1.    Steven Ramsey
      plaintiff

2.    Kenneth King
      65 McKinley Street
      Revere, MA 02151

3.    Francisco Pilarte
      559 Branch Ave.
      Providence, RI

4.    Joe Knowlton
      7 18th Street
      Onset, MA 02558

5.    Richard Knowlton
      North Falmouth, MA

6.    Michael Murphy
      238 South William Cope Blvd.
      Manasquan, NJ

7.    Joe Martinez
      97 Oak Glen Road
      Toms River, NJ 08753

8.    David Bell
      421 7th Street
      Waretown, NJ 08758

9.    Jim Bauers
      110 17th Street
      Belford, NJ 07718

10.   Alex Dick
      c/o defendant

11.     Nick Wagner
        110 Nestles Lane
        Acushnet, MA 02743

12.     Bruce Lockhart
        c/o On Site

13.     Rick Hughes
        11 Nancy Road
        S. Easton, MA

14.     Louis Hochstrasser
        401 W. 8th Street
        Ship Bottom, NJ 08008

**Witnesses 1-14 above are factual.**

15.     Achilles Papavailiou, M.D.
        40 Quinlan Way
        Hyannis, MA 02601

16.     Robert C. Leaver, M.D.
        40 Quinlan Way
        Hyannis, MA 02601

17.     David Stroud, M.D.
        53 Marion Road
        Warcham, MA 02571

18.     Milan Stojanovic, M.D.
        27 Park Street
        Hyannis, MA

**Witnesses 15-18 above are Medical Care Providers.**

19.     Arthur Sargent
        225 Baronne Street
        New Orleans, LA 70112
        Liability Expert  - Mr. Sargent is a Professional Engineer, Naval Architect and
        Marine Engineer with 50 years experience.

20.     Robert R. Pennell, M.D.
        225 Boston Street

Lynn, MA
Medical Expert - Dr. Pennell is a Board Certified Orthopaedic Surgeon and Medical Evaluation Specialist.  He graduated Medical School in 1967.

21.    Emmanuel Green, Ph.D., C.R.E.
1674 Beacon Street
Brookline, MA 02445
Vocational Expert - Dr. Green is a licensed Psychologist, Vocational and Rehabilitation Counselor working in these fields since 1965.  He became a Board Certified Vocational Expert in 1984.

22.    Royal A. Bunin and/or David Bunin
300 East Lancaster Ave.
Wynnewood, PA 19096
Actuarial-Economic Experts
*Royal Bunin* is an Actuarial-Economic Consultant who has worked in the field since 1983.  He received his MBA in 1990 and has been qualified as an expert in State and Federal Courts in Pennsylvania, New Jersey, New York, Maryland and Delaware.
*David Bunin* is an Actuarial-Economic Consultant who is a Fellow, Society of Actuaries since 1961.  He has been qualified as an expert in State and Federal Courts in Pennsylvania, New Jersey, New York, Maryland, Delaware, Massachusetts, Connecticut, West Virginia, Texas and Florida.

**(m)    Proposed Exhibits**

1.    Deposition of Kenneth King
2.    Photographs of skiff
3.    Report of Marine accident
4.    New Jersey State Police report
5.    Corps of Engineers Accident Report
6.    Coast Guard Report
7.    Dredge Log
8.    Daily Reports
9.    Photographs of Dredge
10.    Hochstrasser Marina Records
11.    Cashman payroll records of Ramsey
12.    Pay stubs of Richard Knowlton
13.    Plaintiff's Tax Returns, W-2's 1999-2001
14.    Operative Reports  - Cape Cod Hospital
15.    MRI films
16.    Records of Cape Cod Hospital
17.    MRI report of July 16, 2001
18.    MRI report of February 17, 2002

19.     Deposition of Alex Dick
20.     Deposition of Nick Wagner

**(n)     Proposed Jury Instructions**

See attached Appendix.

**(o)     Proposed Voir Dire and Verdict Form**

See Attached.

The plaintiff,                                      The plaintiff,
Steven Ramsey                                   Steven Ramsey
By his attorneys,                                 By his attorney,
/s/ Samuel J. Rosenthal, Esq.
/s/ Rudolph V. DeGeorge, II, Esq.        /s/  Ronald M. Davids, Esquire
                                                        49 Washington Street, Suite 20
BARISH ◆ROSENTHAL                     Wellesley, MA  02481
Three Parkway, Suite 1320               (718)416-5055
1601 Cherry Street                           BBO#115110
Philadelphia, PA  19102
(215) 923-8900

13