# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

STEVEN RAMSEY
      Plaintiff

Vs.                             **Civil Action Number**
                                 **04-CV-10699-RCL**

JAY CASHMAN, INC.
      Defendant

## DEFENDANT'S PRETRIAL MEMORANDUM

Now comes the defendant, Jay Cashman, Inc., in the above captioned matter, by and through its undersigned attorney, Holbrook & Murphy, and respectfully files its pretrial memorandum.

**(a)**     **Trial Counsel**

1.     *Plaintiff's Counsel*

        Samuel Rosenthal
        Rudolph V. DeGeorge
        Barish ♦ Rosenthal
        1601 Cherry Street
        Philadelphia, Pennsylvania  19102
        215-923-8900

2.     *Defendant's Counsel*

        Robert J. Murphy
        Holbrook & Murphy
        238 Lewis Wharf
        Boston, Massachusetts  02110
        617-428-1151

**(b)**     **Defendant's Concise Summary of its Position**

    *1.*     *Liability*

On April 5, 2001, Jay Cashman, Inc., (Cashman) was involved in shore protection revetment repair for the Barnegat Inlet Lighthouse.  The Dredge Wood I served as a work

platform for the construction workers involved in the project. Earlier, Cashman towed the Dredge to the work site, as it had no means of sustained self-propulsion. Once at the work site, the Dredge has some limited ability to move, using its winches and spuds. The Dredge Wood I was moored by two anchor lines forward and two lines aft.

The plaintiff worked aboard the Dredge WOOD I as a dredge engineer/mechanic. His job duties included servicing and maintaining the Dredge's equipment. The plaintiff, as well as the other construction workers, resided ashore.

Cashman used the Tug Gunny to transport the workers between the Dredge and shore and to assist the Dredge as needed. The workers also utilized a second vessel referred to as the "skiff." The skiff is a steel-hulled open boat powered by a 40-horse power outboard motor. The workers used the skiff to perform various errands.

On April 5, 2001, the plaintiff allegedly used the skiff to transport another worker ashore to purchase lunch. After reaching shore, a land-based worker informed the plaintiff that certain shackles and bolts needed on the Dredge had arrived. The plaintiff loaded the parts onto the skiff to transport them to the Dredge. The plaintiff maneuvered the skiff approximately 25 feet from shore when the skiff's outboard motor stalled. The plaintiff attempted to restart the engine without success. He allowed the skiff to drift for 5 minutes in the current safely back the Dredge. The Dredge was only a short distance from shore, with the skiff between shore and the Dredge. As such, the plaintiff testified he felt "safe" and that he knew where he was headed. He secured the skiff by tying it to the Dredge's port side.

With the skiff safely secured alongside the Dredge, the plaintiff set to work to repair the skiff's outboard motor. The plaintiff testified he was well qualified for this task. At deposition, the plaintiff testified that he was "absolutely" familiar with outboard motors. Of course, he had been hired as an engineer/mechanic and part of his job was to insure the maintenance of equipment at the job site. The plaintiff managed to get the motor running again. He observed the running motor for a time and satisfied himself that it was safe to proceed. On his own initiative, and over the cautions of his supervisor, the plaintiff decided to move the skiff. He moved the skiff to the Dredge's starboard side to unload the bolts and shackles. Moving the skiff in this manner would minimize the distance that the plaintiff would be required to carry the bolts and shackles.

The plaintiff's supervisor warned the plaintiff not to move the skiff out of a position of safety (between the dredge and shore) to a position of danger (in front of the dredge). At deposition, the plaintiff's supervisor opined that the plaintiff was negligent in choosing this course. The plaintiff carelessly maneuvered the skiff from the Dredge's stern, allowing the skiff's outboard motor to strike an anchor line, causing the outboard motor to stall. The United States Coast Guard, who subsequently investigated the incident, opined in its written report that the incident's cause was "POOR JUDGMENT BY OPERATOR" (emphasis in the original).

The plaintiff alleges that the skiff drifted in heavy current, striking the rake of a nearby material barge. The current's force caused the skiff's starboard rail to dip and take on water. When it appeared the skiff was sinking, the plaintiff abandoned the skiff and swam approximately 5-8 feet to the Dredge. The plaintiff grabbed hold of the Dredge's

fenders, intending to climb to safety.  However, the tide apparently sucked the skiff under water and propelled it toward the plaintiff, pinning him between the skiff and the Dredge.

The plaintiff's fellow workers immediately responded to the situation.  They took hold of the plaintiff's arms and pulled him from between the skiff and the Dredge to safety.

Clearly, the plaintiff caused his own incident by negligently choosing a course that moved the skiff from a position of safety into a position of danger and exposed the skiff broadside to the current and by carelessly maneuvering the skiff to allow the skiff's outboard motor to contact the Dredge's anchor wire.  It is undisputed that an outboard motor will routinely stall if its prop strikes a stationary object.  Moreover, one would not typically expect the outboard motor to readily restart following a stalling situation caused by impact.

The plaintiff attempts to avoid responsibility for his own negligence by suggesting the skiff stalled prior to the vessel striking the anchor wire.  However, the incontrovertible physical evidence clearly proves that the outboard motor was running, and the prop turning, when the vessel struck the anchor wire.  Following the incident, Cashman brought the outboard motor to Hochstrasser's Marina for repair.  The records set forth that the incident destroyed the prop and cavitation plate, and likely bent the crank.  As such, it is beyond dispute that the outboard motor was running and had not stalled prior to the plaintiff striking the anchor wire.  Even the plaintiff's expert witness admitted that a perfectly functioning outboard motor may stall if it strikes a stationary object with sufficient force to cause the aforementioned damage.  Additionally, one would not expect the motor to readily restart considering this type of damage.

The plaintiff alleges that Cashman was aware of certain electronic problems that had caused the vessel to stall in the past. However, any alleged electronic problems are unrelated to the instant case. The history of stalling, starting again, stalling, starting again is inconsistent with a short circuit or electrical issue. Clearly, the outboard motor stalled when it struck a stationary object, the anchor line.

The plaintiff was of course aware that the vessel had previously stalled when he returned from shore with the shackles and bolts. The plaintiff testified that he alleviated the problem by squeezing a ball on the fuel tank. These facts are inconsistent with an electronic problem causing the stalling. The plaintiff's ability to restart the engine indicates that the issue did not involve electronic components.

Despite the skiff having previously stalled, the plaintiff testified that he had no concern when he chose to next maneuver the vessel. Prior to his injury, the plaintiff was the last person to work on and examine the outboard motor. The plaintiff should not have used the skiff if there was any question as to the motor's suitability. Considering the plaintiff's experience, he was certainly capable of making this determination. Moreover, the Tug GUNNY was available for use if the skiff was unavailable.

The plaintiff attempts to avoid responsibility for his own actions by alleging that his supervisor ordered him to move the skiff. Cashman (and the supervisor) vigorously contest this allegation. Ultimately, this dispute is inconsequential because Mr. Ramsey testified that he disregarded the supervisor's direction and refused to move the skiff until he believed it was safe to do so. At deposition, the following exchange occurred:

Q.     …If Kenny King, or anyone else for that reason tells you to do anything
        that you think is unreasonably safe [sic] you're not going to do--…
A.     I'm not going to do it.

Q.     And that's so when Kenny King told you to move the vessel the first time,
       the skiff—

A.     Right.

Q.     --You didn't think it was safe to do it so you didn't

A.     I didn't right.

Q.     But when you did move it, you thought it was safe to move?

A.     Right

Immediately prior to the plaintiff's incident, on the defendant's behalf, the outboard motor was thoroughly examined and worked upon by a qualified mechanic who was well familiar with the vessel's history; namely, the plaintiff himself. If the plaintiff had any question, concern or misgivings as to the vessel's fitness he should have refrained from using the vessel.

    2.    *Damages*

The defendant respectfully contends that the plaintiff's claims of damages must be viewed in light of the following:

    1.    <u>*Plaintiff's Prior Injuries*</u>

Prior to the incident alleged in the Plaintiff's Complaint, the plaintiff experienced numerous, well-documented prior back injuries. The plaintiff sustained these injuries while working various jobs, beginning at the age of 23. <u>They include back surgery on three occasions over a several year period.</u>

    2.    <u>*The Defendant Has Obtained a Favorable IME*</u>

A reputed neurosurgeon, Dr. Ronald Birkenfeld has performed an independent medical examination of the plaintiff. Dr. Birkenfeld opines that all of the plaintiff's difficulties are the result of prior injuries, NOT the incident alleged herein. "I believe that any limitations he has…are attributable to his long and well documented history of

significant lumbar disc disease at more than one level, requiring multiple surgeries, and, as such, are unrelated to the incident of [April 5, 2001]".

In his more recent report of January 22, 2007, Dr. Birkenfeld opined, "It is my opinion to a reasonable medical certainty as a neurosurgeon licensed to practice in the Commonwealth of Massachusetts that Mr. Ramsey did not suffer a spinal injury on the date of the accident….He did not have any specific complaint of lower back pain and there was no documentation of any radicular-type pain on the date of the accident."

Additionally, Dr. Birkenfeld opined that Mr. Ramsey's issues were, "almost certainly a consequence of extensive preexisting degenerative disc disease treated on three separate occasions by surgery, two of them in the same location and side as [the plaintiff's recent surgery]."

3.     *The Plaintiff's Medical Expert Lacks Credibility*

At deposition, the plaintiff's medical expert testified untruthfully.  He testified that he had been rejected as a medical expert only once in Massachusetts (apparently on procedural grounds) and that he had never been rejected in any other jurisdiction.  (Please see attached Exhibit E, Excerpts of Deposition of Robert R. Pennell, M.D).  He additionally denied a court ever rejecting or criticizing his methodology.  (Id.)  However, in *Randal John Uribe v. Sofamor Danek Group*, 1999 U.S. Dist. LEXIS 18854 (Neb. 1999), the court found "Dr. Pennell's opinion too speculative, conclusory, and unreliable to be admissible under the standards of Daubert and Kuhmo."  Id. at 39.  In *David Conger, et al v. Danek Medical, Inc., et al*, 1998 U.S. Dist. LEXIS 21038 (N.D. Tex 1998), Dr. Pennell's testimony was similarly found unreliable.  Id. at 20.  A Kentucky court found Dr. Pennell's conclusion to be without foundation and his opinion to be

without supporting facts. *James Clark et al v. Danek Medical, Inc.*, 1999 U.S. Dist. LEXIS 4480 at 11 (W.D. KY 1999). A Minnesota court also held that Dr. Pennell's testimony could not establish a link between the injury suffered and the defendants. *Barbara Bruzer et al v. Danek Medical, Inc.*, 1999 U.S. Dist. LEXIS 4483 at 27 (MN 1999).

Of course, these opinions reflect poorly on the plaintiff's expert. However, his lack of veracity and his attempts to conceal the opinions is even more damaging to the plaintiff's case.

The medical expert's testimony also contains other discrepancies. For example, in response to questioning, the witness indicated that the only reason for his delay in becoming board certified was his time spent in military service. In fact, the witnesses' failing the examination on his first attempt caused the delay. These discrepancies will call the witness's credibility into question.

4.    *The Plaintiff is Malingering*

The evidence will show that the plaintiff's complaints of disability are exaggerated. For example, during the independent medical examination of February 2, 2006, the plaintiff was "unable to flex whatsoever because of pain." (See attached Report of Dr. Birkenfeld). Likewise, at every meeting with the defendant's representatives (i.e. plaintiff's statement, plaintiff's deposition, plaintiff's IME, plaintiff's vocational examination) the plaintiff walked gingerly and with a pronounced limp. However, surveillance video taken of the plaintiff on March 2, 2006, shows the plaintiff walking freely without restriction. The video also shows the plaintiff bending over to shovel snow from his residence during a snowstorm.

5.     *The Defendant Disputes the Plaintiff's Claims of Damages*

The defendant disputes the nature, cause and extent of the plaintiff's alleged

damages.

**(c)     Claims and Defenses**

The defendant has not waived any defenses.

**(d)     Established Facts**

On April 5, 2001, the defendant was involved in shore protection revetment repair

for the Barnegat Inlet Lighthouse.

On April 5, 2001, the plaintiff was employed by the defendant as an engineer.

**(e)     Contested Issues of Fact**

1.     Whether the plaintiff was a seaman at the time of his alleged incident.

2.     Whether the defendant was negligent in failing to provide the plaintiff

with a safe place to work and if so whether said negligence was a proximate cause of the

plaintiff's injury.

3.     Whether the defendant failed to proved the plaintiff with a seaworthy

vessel and if so whether such unseaworthiness was the proximate cause of the plaintiff's

alleged injury.

4.     Whether the plaintiff was contributorily negligent and if so the extent of

the contributory negligence.

5.     The nature, cause, scope and extent of the plaintiff have alleged

injuries/damages.

6.     Limitation of Liability, should it become an issue after trial.

**(f)     Pending Motions**

The defendant does not object to the Plaintiff's Motion to Reopen Discovery and Expert Deadlines due to Plaintiff's Surgery of October 5, 2006, provided of course that the defendant is allowed a reasonable amount of time to respond to said expert opinion.

The parties will file a joint motion to refer the matter to mediation. The matter was previously referred to mediation but the case was not mediated. At the time of the mediation, the plaintiff's surgery was imminent. As such, the file was returned to the District Court without being mediated.

**(G)    Issues of Law**

1.    The legal status of the plaintiff at the time of the incident.

2.    If the plaintiff is a seaman at the time of the incident, which is denied, which vessel is he attached to?

3.    Limitation of liability, should same be an issue after trial. Specifically:

(a)    Whether the alleged knowledge of Kenneth King satisfies the "privity of knowledge" of the owner requirement. The defendant respectfully asserts that because Mr. King was not an executive officer or manager his alleged knowledge cannot be imputed to the defendant for limitation of liability purposes. See, In re Hellenic Lines, Ltd., 813 F.2d 634 (4h Cir. 1987); In Re Hellenic, Inc., 252 F.3d 391 (5h Cir. 2001) (position of construction superintendent who supervised spud barge involved in marine construction project not sufficiently elevated in corporate hierarchy to impute negligence to the corporation re: mooring decision).

(b)    If Limitation of Liability is appropriate, whether the limitation is to the value of the skiff, the Tug, the Dredge or the barge.

4.    The admissibility of Hochstrasser's Marina's records.  The defendant respectfully asserts that these records are inadmissible as the plaintiff has failed to establish that the cause of the skiff stalling was more likely than not an electrical problem.  In the absence of such evidence, these records are irrelevant and unfairly prejudicial.

**(h)    Amendments to the Pleadings**

None.

**(i)    Additional Matters.**

None.

**(j)    Length of Trial**

The defendant anticipates six (6) days of trial.

**(k)    Witnesses**

In addition to those witnesses listed by the plaintiff, the defendant reserves the right to call the following witnesses:

1.    Kenneth King
      Revere, MA

2.    Francisco Pilarte
      Providence, RI

3.    Joe Knowlton
      Onset, MA

4.    Richard knowlton
      Falmouth, MA

5.    Michael Murphy
      Mansaquan, NJ

6.    Joe Martinez
      Toms River, NJ

7.      David Bell
        Waretown, NJ

8.      Jim Bauers
        Belford, NJ

9.      Alex Dick

10.     Nick Wagner
        Acushnet, MA

11.     Bruce Lockhart
        c/o     On Site

12.     Representative Hochstrasser Marina

13.     Representative U.S. Coast Guard

14.     Representative N.J State Police

15.     Custodians of Records, as required

16.     Plaintiff's prior medical providers

17.     Representative Registry of Motor Vehicles.

18.     Representative Department of Industrial Accidents

19.     Representative Social Security Administration.

20.     Representative Trego Inc.

21.     Dr. James Wepsic
        152 Parker Hill Ave
        Boston, MA  02120

22.     Albert Martins, M.D.
        Cape Cod Medical Center
        Hyannis, MA

23.     Representative of Stop and Shop

24.     Representative Dutra Construction

25.  Dr. Ronald Birkenfeld (expert)
     Milton Hospital
     100 Highland Street
     Milton, MA 02186

26.  Mr. David DuBois (expert)
     26 Water Street
     Fairhaven, MA

27.  Mr. Thomas Farell (expert)
     Newcastle, Me 04553

28.  Deborah Veatch (expert)
     Vocational Rehabilitation Consultant
     11 Chester Street

29.  Dana DellaPorta
     Bay State Investigative Group
     Saugus, MA 01906

30.  Brian Morrissey
     Marine Safety Consultants
     Taunton, MA

**(l) Proposed Exhibits**

In addition to those documents listed by the plaintiff, the defendant reserves the

right to introduce the following documents:

a.  Plaintiff's deposition transcript

b.  Plaintiff's Statement

c.  Photographs of skiff

d.  Photographs of Dredge

e.  Photographs of Barge

f.  Photographs of Work site

g.  Exhibits marked at depositions

h.  The plaintiff's complete medical records

       i.       The plaintiff's medical records regarding prior incidents and prior surgeries

       j.       The plaintiff's complete workers compensation records, including medical records, with regard to the plaintiff's prior incidents/injuries

       k.       The plaintiff's complete tax/earnings/payroll records

       l.       The plaintiff's complete social security records

       m.       Reports of Dr. Birkenfeld

       n.       Cases referencing prior testimony of Dr. Pennell

       o.       Surveillance records/video

       p.       Arrest/conviction records

       q.       U.S. Coast Guard records/report, including USCG 26-92 form

       r.       New Jersey State Police records/report

       s.       Army Corp. of Engineers records/report

       t.       Records showing payment of various medical bills by defendant

       u.       Daily Dredge Log

       v.       Records showing payment of living stipend by defendant

       w.       Records showing payment of advances

       x.       Diagram of vessels at work site

       y.       Expert's curriculum vitae

The Defendant
Jay Cashman, Inc.
By its Attorney


/s/ Robert J. Murphy
BBO# 557659
HOLBROOK & MURPHY
238 Lewis Wharf
Boston, MA  02110
617-428-1151
Holbrook_murphy@msn.com

## CERTIFICATE OF SERVICE

This is to certify that on May 17, 2007, the defendant's pretrial memorandum was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


/s/ Robert J. Murphy
BBO# 557659
HOLBROOK & MURPHY
238 Lewis Wharf
Boston, MA  02110
617-428-1151
Holbrook_murphy@msn.com