Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

---

```
                    VOLUME:   I
                    PAGES:    1-102
                    EXHIBITS: See Index

            UNITED STATES DISTRICT COURT
         Civil Action No. 04-CV-10699 (RCL)

------------------------------------
                                   x
STEVEN RAMSEY                      x
                                   x
         Plaintiff,                x
   v.                              x
                                   x
JAY CASHMAN, INC.                  x
                                   x
         Defendant.                x
------------------------------------

         DEPOSITION of ARTHUR C. SARGENT, taken
pursuant to the Massachusetts Rules of Civil
Procedure, before Elizabeth A. Hayes, a
Professional Court Reporter and Notary Public
in and for the Commonwealth of Massachusetts,
held at the law offices of Holbrook & Murphy,
15 Broad Street, Boston, Massachusetts, on
Thursday, March 16, 2006, commencing at 9:15
a.m.



           -------------------------------
                    REPORTERS, INC.
          GENERAL & TECHNICAL COURT REPORTING
           23 MERRYMOUNT ROAD, QUINCY, MA  02169
             617.786.7783/FACSIMILE 617.786.7723
```

---

```
APPEARANCES OF COUNSEL:

For the Plaintiff:
BARISH ROSENTHAL
Three Parkway, Suite 1320
1601 Cherry Street
Philadelphia, Pennsylvania  19102
   BY:  SAMUEL J. ROSENTHAL, ESQUIRE


For the Defendant:
HOLBROOK & MURPHY
15 Broad Street, Suite 900
Boston, Massachusetts  02109
   BY:  ROBERT J. MURPHY, JR., ESQUIRE
```

---

```
                      INDEX
Testimony of:                              Page

ARTHUR C. SARGENT
   Examination by MR. MURPHY                  5
   Examination by MR. ROSENTHAL              82
   Examination by MR. MURPHY                 88
   Examination by MR. ROSENTHAL              97
   Examination by MR. MURPHY                 98


                INDEX OF EXHIBITS

NO.     DESCRIPTION                        PAGE

1    Fax cover sheet; report dated
     2/15/05; fax transaction report;
     two-page C.V.; and eight pages
     of appendices.                            4
```

---

```
                S T I P U L A T I O N S

     It is hereby stipulated and
agreed by and between counsel for the
respective parties that all objections,
except as to form, and motions to strike
will be reserved until the time of trial
or pre-trial hearing.
     It is further agreed that the
witness will read and sign the deposition
transcript, under the pains and penalties
of perjury, within 30 days of receipt of
the deposition transcript; otherwise the
deposition transcript will be deemed
signed.
     ARTHUR C. SARGENT, first having
been satisfactorily identified by the
production of his driver's license, and
duly sworn, testifies as follows:

     (Exhibit No. 1, Fax cover
sheet; report dated 2/15/05; fax
transaction report; two-page C.V.;
and eight pages of appendices,
```

**33**

```
 1 Q.  So that would be implicated when you're
 2     starting the motor?
 3 A.  Yes.
 4 Q.  And how about the voltage regulator, what
 5     does that do?
 6 A.  Similar to what you have onboard an
 7     automobile, to when you're charging your
 8     battery, it keeps the charge to the
 9     battery at a constant voltage.  Rather
10     than just going up to extreme high
11     levels, it keeps it at a reasonable level
12     to charge your battery.
13 Q.  The switch boxes, what does that do?
14 A.  That's just an on and off switch
15     someplace on the motor.
16 Q.  And the starter solenoid, what does that
17     do?
18 A.  When you push something, it will then
19     activate the starter motor.
20 Q.  Okay.  Now, what evidence, or what
21     support do you have for the idea that any
22     of those issues caused the vessel to
23     stall, caused the motor to stall?
24 A.  They're all electrical parts.  The
```

**34**

```
 1     voltage regulator -- if the voltage drops
 2     for any reason or other, you don't get
 3     the voltage to the sparkplug, and it'll
 4     stall on you.
 5 Q.  Do you know whether that happened in this
 6     case?
 7 A.  I have no idea.
 8 Q.  One way or another?
 9 A.  Have no idea.  I did not see the motor in
10     the condition it was after it left
11     Hochstrasser before the casualty
12     occurred, before it was dumped the second
13     time, or the third time, to make some
14     determination.  But, without that, you
15     can't do it.
16        I would assume that these people
17     -- I say, "these people" -- the
18     Hochstrasser mechanic, tested out these
19     parts and said, "This is no good, we
20     should change it," or, "This is no good,
21     we should change it."
22 Q.  You haven't spoken to anyone from there?
23 A.  No, I have not spoken --
24 Q.  Has anyone informed you of their
```

**35**

```
 1     position?
 2 A.  Nope.
 3 Q.  So, that's just a --
 4 A.  Right.
 5 Q.  -- guess on your part?
 6 A.  No, not a guess.  Remember, the vessel
 7     got under water, and I guess the rain --
 8     and it sotted out.
 9 Q.  Uh-huh.
10 A.  And it was taken over to Hoffstrasser --
11     or Hochstrasser -- to make certain it's
12     put in the proper operating condition.
13     And someone decided to do it, as far as I
14     can see, on the cheap.  And when I say,
15     "on the cheap," not do a couple of items
16     here, and changing out the electrical end
17     of it.
18        When you have something dunked in
19     salt water, normally you change out
20     everything to do with the electrical.
21 Q.  And why is that?
22 A.  The electrical can short out.  It's
23     damaged, rusted, corroded.  It's just
24     general good practice, marine practice,
```

**36**

```
 1     when you dunk something, to submerge it
 2     in salt water, to replace it immediately
 3     thereafter, if you want to go back in
 4     operation with it.  That's the general
 5     practice, and not to try to see, "Well,
 6     can we get by this, or not?"
 7        The cost of replacing this was
 8     nominal, as I remember.  In this
 9     particular case, they decided not to do
10     it.  And it's quite clear what they
11     indicated, "stator, voltage regulator,
12     switch boxes, starter solenoid were not
13     changed." -- and we had that underlined,
14     were not changed -- "Advise doing so
15     since it sank in salt water."
16        So here's a marina that does
17     repairs on engines saying, "Look, this
18     thing sank in salt water; you'd better do
19     something about it."  And someone decided
20     not to do it.
21 Q.  Do you know how long it would take to
22     effect those repairs, typically?
23 A.  I would think they'd be able to get those
24     repairs done in a week.  I mean, it's a
```

Page 37

1  Mercury outboard. It's a common outboard
2  motor. Someone must be a distributor of
3  an outboard. And I guess if you pushed
4  these fellows to do it, you could get it
5  done in a couple of days. But, certainly
6  no more than a week.
7 Q. And do you have an idea of what the cost
8  would be for those kind of repairs?
9 A. I think someone basically did the same
10  repairs, or was telling about the same
11  repairs. Here it is, "A harness, relay,
12  solenoid." It looks like about $120
13  worth. And it would be about the same
14  thing here, $120 worth. So, really it
15  should only have been $120 more than
16  $350.
17     So, it would add up to less than
18  $500 for the entire change-out of
19  everything on this engine to make it as
20  -- I wouldn't say it's as good as new --
21  but, as good as it was before, and
22  suitable to operate.
23 Q. Let me ask you this. Let's just assume
24  hypothetically, you'd been called in the

Page 38

1  day this happened. You'd go look at the
2  boat, I take it, and look at the motor?
3 A. Uh-huh.
4 Q. And what would you be looking for? What
5  would you do?
6 A. Oh, I'd just -- when you say, "I'm
7  looking at it," as what, sort of an
8  owner, or --
9 Q. Let's say I called you up and said, "Hey,
10  I represent Cashman," or Mr. Rosenthal
11  called you up and said, "I represent
12  Steve Ramsey, and we've had a problem
13  with this boat, and we want you to go
14  look at it and tell us what you think,"
15  what would the drill be?
16 A. I'd check out all of these pieces and
17  find out whether they were bad, at that
18  point. But, I wouldn't know whether they
19  were bad because of a condition that
20  preexisted, or this time in the salt
21  water. So, probably I couldn't do very
22  much with it. It's been damaged a second
23  time, and we cannot separate out the
24  damage before from the damage after, very

Page 39

1  easily.
2 Q. I see. And all these pieces wear out on
3  their own at some point regardless of
4  whether they're emerged in salt water?
5 A. Perhaps; perhaps.
6 Q. Nothing lasts forever.
7 A. Right, most things don't. I can't think
8  of very much.
9 Q. And let me ask you, if something had
10  shorted out, would there be telltale
11  signs that this was an electrical
12  problem?
13 A. If something kept shorting out, you could
14  always send it back to Hochstrasser and
15  say, "Figure out what's happening."
16 Q. No, I mean after the fact. Is there a
17  way you could have looked at that motor,
18  and there'd be telltale signs that there
19  was an electrical problem?
20 A. Yeah. You'd find corrosion someplace.
21  You could pull each part, that is, each
22  piece apart, and test it individually. I
23  don't know where this would get you,
24  though, because we had a second dunking,

Page 40

1  a second emersion; whether you could
2  figure out that it had to do with the
3  first emersion or the second emersion. I
4  don't know whether you could find that
5  out.
6     Let's assume the first time you
7  did everything perfectly. You did
8  exactly what Hochstrasser told us to do.
9  You changed everything. And then we had
10  a second dunking, the same pieces
11  probably would be required to be changed
12  out. You'd go through the same drill the
13  second time, because we had a second
14  sinking. So, you change out everything
15  the second time.
16 Q. Okay. Let me ask you this -- I know
17  you've read Mr. Ramsey's testimony. The
18  boat stalled out on him as he returned to
19  the barge; did you understand that?
20 A. Yes.
21 Q. And then you understand that he worked on
22  the boat a little bit?
23 A. Yes. Worked on the boat a little, --
24 Q. Worked on the motor.

Page 41

```
 1 A. Tried to get it started, yes.
 2 Q. Yeah, what do you understand that he did?
 3 A. I don't know.  He was there working on
 4    it.  What he actually did, I don't know.
 5 Q. Okay, but at some point he got it started
 6    up again?
 7 A. He got it started up again.
 8 Q. Does that lead you to believe one way or
 9    the other that it's more likely or less
10    likely that the problem was electrical?
11 A. I don't know what to make of it, because
12    I don't know what he did.
13 Q. Well, if something shorts out, would you
14    be able to start it up again?
15 A. Jiggle a wire, perhaps.  I don't know
16    what he did.
17 Q. How likely would that be?
18 A. I don't know what he did, whether that
19    was the problem or not.
20 Q. What I'm trying to --
21 A. I don't know what the problem is.  I
22    can't answer your question.
23 Q. Okay, let me just ask it in a general
24    sense, then.  If an outboard motor stalls
```

Page 42

```
 1    out because of an electrical problem, how
 2    likely is it that the motor would then --
 3    you'd be able to get it going again?
 4    MR. ROSENTHAL:  Objection to
 5    form.
 6 A. If you change out the electrical problem,
 7    it'll fix the --
 8 Q. No, no, I don't mean that.  I mean, I'm
 9    driving my outboard motor back to the
10    barge and it stalls out.  I drift back to
11    the barge, and then 5 or 10 minutes later
12    I get the motor going again.  How likely
13    is that if it was an electrical problem?
14    MR. ROSENTHAL:  Objection to
15    form.
16 A. I don't know.  I can't answer the
17    question.
18 Q. What's the problem with the question?
19    I'm looking for your answer on this.
20 A. Yeah, I don't really -- he can jiggle
21    something, and all of a sudden it makes
22    good contact again.
23 Q. Would that be for a loose wire?
24 A. Possibly.  I'm thinking the easiest
```

Page 43

```
 1    explanation -- you have a flashlight that
 2    doesn't really work -- I've got it, a
 3    television clicker, changing channels.
 4    It has a couple of batteries in it.  And
 5    all of a sudden you can't change the
 6    channel; it doesn't work.  You open it up
 7    and you rub the batteries, the end of the
 8    batteries; put them back in.  And low and
 9    behold, like magic, it works again.  What
10    have you done?  You've changed some
11    resistant values, or jiggling a wire,
12    maybe is a better way of saying it.
13    But, basically you put back the
14    batteries and you can change the
15    channels.  I assume everyone has done
16    this at some time or other.
17 Q. Sure.
18 A. And that's the same thing I'm talking
19    about here.  He gets in and pushes around
20    something.  And low and behold --
21 Q. But, would you be able to do that with a
22    -- okay, and I understand --
23 A. I don't know.  I really don't know what
24    could have been done.  And that's why I
```

Page 44

```
 1    say I can't answer the question.  All I
 2    can say is, by analogy, indeed, there are
 3    conditions I can think of where you just
 4    jiggle something, or make better contact,
 5    and low and behold it works like magic.
 6    And whether it's the same thing
 7    here, if there was, in fact, a loose wire
 8    and does something, he pushed the button
 9    again, and it starts, I don't know what
10    to make of it.
11    But, we also have a different
12    condition here.  We have something where
13    it's not going into reverse.
14 Q. What's that indicative of?
15 A. I don't know.  I don't know the problem
16    with it.
17 Q. Okay.
18 A. I have no idea what the problem is, but
19    they indicated it could not go in
20    reverse, or when they tried going in
21    reverse it would stall on them.
22 Q. Okay.
23 A. And I'd like to believe that these
24    fellows could evaluate and investigate
```

**Page 45**

1 that sort of problem and find out what it
2 was. It was never done.
3 Q. Could you define for me generally, just
4 so we get a starting off point, what a
5 short circuit is? I think you used the
6 term, right?
7 A. Yeah, where something, a live wire goes
8 to ground.
9 Q. And what happens?
10 A. You get a spark, or you run down your
11 battery, or the thing just doesn't work
12 because you have an open circuit.
13 Q. Okay. And just to go back to your
14 analogy with the clicker from the TV, if
15 you had a short circuit, you wouldn't be
16 able to --
17 A. Oh, no, nothing would happen.
18 Q. It'd be fried; you'd be out of luck.
19 A. Well, I don't know whether you'd be out
20 of luck or fried, but your batteries
21 might run down if you have a short
22 circuit.
23 Q. So if the vessel -- if the motor, rather
24 -- stalled out because of a short

**Page 46**

1 circuit, you wouldn't be able to get it
2 going five minutes later, would you?
3 A. Unless you pulled the wire away from
4 where it shorted.
5 Q. Save that, you wouldn't be able to get it
6 going, right?
7 A. No, it should not. If it shorts, it's
8 going to stay that way.
9 Q. So, not to beat this over the head, you
10 don't know one way or the other whether
11 there was an electronic problem that
12 caused the skiff to stall?
13 A. Electric or electronic, no.
14 Q. And I've heard people say, and I think
15 maybe Mr. Ramsey said it, but I'm not
16 positive so I won't -- that he thought
17 the engine needed air?
18 A. No, I think he said it needed fuel. He
19 squeezed the bulb.
20 Q. Thanks. Okay, I didn't --
21 A. And squeezing the bulb would force
22 gasoline into the engine.
23 Q. And an engine will stall, and --
24 A. If you don't get any fuel to it. You can

**Page 47**

1 run out of gasoline in your car and it
2 stalls.
3 Q. Or you could have a problem with the fuel
4 line and it would stall?
5 A. Fuel pump, yes.
6 Q. My idea of equipment is a fork, okay?
7 That's my idea of machinery that I use.
8 Obviously, this sounds obvious, but if
9 the engine isn't getting fuel, it's going
10 to stall out?
11 A. Correct.
12 Q. And that's if you don't put fuel in it?
13 A. Correct.
14 Q. If the fuel is somehow blocked from
15 getting to the engine?
16 A. Correct. You have a fuel filter. A fuel
17 filter -- even an automobile has a fuel
18 filter. Or, generally on a diesel
19 engine, if the fuel filters are not
20 changed, the engine will stop.
21   If you get a clog in the line,
22 the engine will stop. You run out of
23 fuel, engines will stop. There are lots
24 of reasons engines will stop. However,

**Page 48**

1 this one was doing it on a continual
2 basis. We're not talking about just this
3 one time. It was doing that days before,
4 according to Mr. King.
5 Q. Yeah, Mr. King's testimony was you kind
6 of had to gun it or something. Didn't he
7 say that?
8 A. He indicated in order to change into
9 reverse, you had to make certain that you
10 kept the engine up to speed, as I
11 remember feeling. You say, "gun it."
12 All of this is indicative of an engine
13 that's not in good repair. Something's
14 wrong with it. It should have been taken
15 out of service and repaired.
16 Q. Okay. I just want to focus on this a
17 little more then. If the idea of fuel
18 needs to get to the engine to keep it
19 running, that's separate from the
20 electrical.
21 A. Absolutely.
22 Q. They're two different things.
23 A. Surely.
24 Q. So, if you've got a -- I think when I was