Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

---

**Page 1**

```
 1                    VOLUME:    I-102
 2                    PAGES:     I-102
                      EXHIBITS:  See Index
 3            UNITED STATES DISTRICT COURT
 4        Civil Action No. 04-CV-10699 (RCL)
 5
 6 -------------------------------------
 7 STEVEN RAMSEY                        x
                                        x
 8             Plaintiff,               x
                                        x
 9 v.                                   x
                                        x
10 JAY CASHMAN, INC.                    x
                                        x
11             Defendant.               x
11 -------------------------------------
12
          DEPOSITION of ARTHUR C. SARGENT, taken
13 pursuant to the Massachusetts Rules of Civil
   Procedure, before Elizabeth A. Hayes, a
14 Professional Court Reporter and Notary Public
   in and for the Commonwealth of Massachusetts,
15 held at the law offices of Holbrook & Murphy,
   15 Broad Street, Boston, Massachusetts, on
16 Thursday, March 16, 2006, commencing at 9:15
   a.m.
17
18
19
20
21
22           REPORTERS, INC.
23   GENERAL & TECHNICAL COURT REPORTING
24   23 MERRYMOUNT ROAD, QUINCY, MA  02169
25      617.786.7783/FACSIMILE 617.786.7723
```

---

**Page 2**

```
 1            APPEARANCES OF COUNSEL:
 2
 3   For the Plaintiff:
 4   BARISH ROSENTHAL
 5   Three Parkway, Suite 1320
 6   1601 Cherry Street
 7   Philadelphia, Pennsylvania  19102
 8     BY:  SAMUEL J. ROSENTHAL, ESQUIRE
 9
10
11   For the Defendant:
12   HOLBROOK & MURPHY
13   15 Broad Street, Suite 900
14   Boston, Massachusetts  02109
15   BY:  ROBERT J. MURPHY, JR., ESQUIRE
16
17
18
19
20
21
22
23
24
```

---

**Page 3**

```
 1                   INDEX
 2   Testimony of:                        Page
 3
 4   ARTHUR C. SARGENT
 5   Examination by MR. MURPHY            5
 6   Examination by MR. ROSENTHAL        82
 7   Examination by MR. MURPHY           88
 8   Examination by MR. ROSENTHAL        97
 9   Examination by MR. MURPHY           98
10
11
12            INDEX OF EXHIBITS
13
14 NO.   DESCRIPTION          PAGE
15
16  1    Fax cover sheet; report dated
17       2/15/05; fax transaction report;
18       two-page C.V.; and eight pages
19       of appendices.                   4
20
21
22
23
24
```

---

**Page 4**

```
 1            S T I P U L A T I O N S
 2
 3       It is hereby stipulated and
 4   agreed by and between counsel for the
 5   respective parties that all objections,
 6   except as to form, and motions to strike
 7   will be reserved until the time of trial
 8   or pre-trial hearing.
 9       It is further agreed that the
10   witness will read and sign the deposition
11   transcript, under the pains and penalties
12   of perjury, within 30 days of receipt of
13   the deposition transcript; otherwise the
14   deposition transcript will be deemed
15   signed.
16       ARTHUR C. SARGENT, first having
17   been satisfactorily identified by the
18   production of his driver's license, and
19   duly sworn, testifies as follows:
20
21       (Exhibit No. 1, Fax cover
22   sheet; report dated 2/15/05; fax
23   transaction report; two-page C.V.;
24   and eight pages of appendices,
```

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

5

1   *marked.)*
2   EXAMINATION BY MR. MURPHY:
3 Q.  We've been chatting off the record.  Let
4      me reintroduce myself.  I'm Bob Murphy,
5      and I represent the defendant in this
6      case.
7         We've had your report marked as
8      the first Exhibit, and I'd like to go
9      over that with you.
10 A.  Do you want to identify me for the
11     record?
12 Q.  She's done that already.
13        MR. MURPHY:  Haven't you?
14     Could you tell us all who you are?
15 A.  I'm Arthur C. Sargent.  The last name is
16     S-a-r-g-e-n-t.
17 Q.  Okay, and she made you show ID, so we
18     know it's really you.  Would you tell me
19     where you live?
20 A.  Yes, New Orleans.
21 Q.  You've provided us with your report that
22     we've marked as Exhibit 1, a CV?
23 A.  Yes, sir.
24 Q.  And that accurately describes your

6

1      education?
2 A.  Yes.
3 Q.  And experience?
4 A.  Yes.
5 Q.  Let me ask you, is this your most recent
6      and up-to-date CV?
7 A.  Yes.
8 Q.  And let me direct your attention to
9      appendix two, which is entitled
10     *"Publications authored by Arthur
11     Sargent."*
12 A.  Yes.
13 Q.  Is that up to date, as well?
14 A.  Yes.
15 Q.  Appendix three is a rate schedule.
16 A.  Yes.
17 Q.  Is that up to date?
18 A.  Yes.
19 Q.  Is four up to date?
20 A.  I don't know.
21 Q.  It only goes up to 2004.
22 A.  Probably pretty close up to date.  There
23     might be one or two that should be added
24     to that.

7

1 Q.  Do you know whether you've testified at
2      deposition or trial since August of --
3 A.  Yes, it just hasn't been brought up to
4      date.
5 Q.  Okay, can you tell me the cases?
6 A.  No, I don't have my file with me.  But, I
7      can get my secretary to bring you up to
8      date.
9 Q.  Okay.  No problem with that.
10 A.  Remember, this goes back to probably some
11     time very early.  This was faxed to you
12     February of '05.
13 Q.  Sure.
14 A.  And we're now a year later.
15 Q.  Fine.  But, no problem updating that?
16 A.  No.
17 Q.  Okay, you can get that to me.  Great.  I
18     just want to go through documents you may
19     have.  You're a principal of Sargent and
20     Herkes -- is that how it's --
21 A.  Herkes.
22 Q.  Herkes.
23 A.  Yes, I'm president.
24 Q.  Can you tell me what advertising you do,

8

1      if any?
2 A.  Yes, Maritime Reporter and Marine Log.
3 Q.  Do you have any -- well, I trust you have
4      promotional materials that you provide to
5      prospective clients.
6 A.  Well, I do in the office, yes.
7 Q.  Okay.  Do you have any list of references
8      that you give people?
9 A.  Probably there's something in the
10     promotional information.
11 Q.  And those are documents that you can
12     obtain for me?
13 A.  Yes, they're in my office.
14 Q.  Sure.
15 A.  I'll be happy to provide advertising
16     materials.
17 Q.  What kind of work do you do; you?
18 A.  I'm basically a naval architect.  I'm a
19     designer.
20 Q.  Okay.
21 A.  When I say designer, if you go to my
22     resume, I design all types of vessels
23     that float.  I do not design submarines,
24     for example, that go underneath, nor do I

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

9

1  design buildings.  I'm a naval architect.
2  I design offshore supply boats, offshore
3  drilling rigs, river barges, offshore
4  barges, chemical carriers, just about any
5  type of structure or vessel that's on
6  water.
7      I've designed wave machines,
8  devices to extract energy from waves.
9  And again, they float, and they extract
10  energy.  But, basically I'm a naval
11  architect.  I design things.
12      However, I also consult with
13  attorneys and underwriters and others who
14  are involved in the marine field.
15 Q.  What percent of your business does that
16  make up?
17 A.  Probably 50% right now.
18 Q.  About half?
19 A.  Yes.  In other words, the design is half,
20  and this consulting with others is about
21  half.
22 Q.  Okay.  And who do you mostly work for,
23  plaintiffs, defendants?
24 A.  Mostly for defense.  And I think it's

10

1  obvious my clients are normally defense.
2  I work, oh, probably 90% of the time for
3  defense, 10% of the time for plaintiffs.
4  Well, I have to say, "plaintiffs or
5  defense," I assume we're talking about
6  personal injury cases rather than, for
7  example, collision cases.  The plaintiff
8  in a collision case is the one who gets
9  to the court first.
10 Q.  Right.
11 A.  And to make anything meaningful, you have
12  to talk in terms of personal injury
13  cases.
14 Q.  That's what I meant.
15 A.  Personal injury cases, probably 90% of
16  the time on defense, 10% plaintiff.  And
17  why is that so?  Well, I work and do all
18  my major work for firms that would
19  normally be involved with defense cases,
20  oil companies, contractors, shipyards,
21  rather than individuals who get hurt
22  someplace.
23      However, the biggest problem, I
24  think, is in many cases, plaintiffs'

11

1  attorneys don't know how to contact me.
2  I don't advertise where plaintiffs'
3  attorneys would look.  I don't have
4  something that advertises in plaintiffs'
5  law reviews and things of that sort.  I
6  don't go out seeking plaintiff-type
7  cases.
8      However, if they're generally
9  outside my area -- and I say, "area,"
10  physical area, New Orleans, or Gulf
11  Coast, -- I can handle them.  Why?  I
12  know all the defense attorneys in New
13  Orleans.  And there's nothing worse than
14  all of a sudden getting to a trial and
15  you find your fellow who hires you all
16  the time sitting across the way from you.
17      So I stay away from working
18  plaintiff cases in New Orleans, although
19  I have had a few.  But, generally, I make
20  certain that there is no conflict of
21  interest, I don't see a defense attorney
22  I do a lot of work for, for example.
23 Q.  What history, if any, do you have with
24  Barish Rosenthal, or anybody in that

12

1  office?
2 A.  I think I've worked three cases with
3  them, or been involved with three cases.
4 Q.  And how recent were they?
5 A.  Probably within the last two years.
6 Q.  Do you remember the names of the cases?
7 A.  This one.  And another one had to do with
8  a fellow by the name of King.  But, it's
9  not the same King as this.
10 Q.  Right.
11 A.  And then another one that had to do with
12  a vessel down there in Florida getting
13  caught in some unusual conditions.
14 Q.  Was it a personal injury case?
15 A.  Personal injury cases.  The vessel sank,
16  as I remember.
17 Q.  How many employees in your firm?
18 A.  Four.
19 Q.  Can you name them for me?
20 A.  Sure.  John Pierce, my naval architect;
21  my secretary; and John Williams.
22 Q.  Is Herkes gone?
23 A.  Yes, Herkes retired.
24 Q.  Can you estimate for me, the firm's

REPORTERS, INC.
617.786.7783/FACSIMILE 617.786.7723

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

13

1  annual receivables?
2 A.  I was going to say a half mil.
3 Q.  And about half of that would be for
4     litigation and litigation support type of
5     things?
6 A.  Probably.
7 Q.  And can you tell me your annual pay?
8 A.  Sure, probably around eighty-five.
9 Q.  And about half of that would be from --
10 A.  Probably.
11 Q.  Okay.
12 A.  Remember, when we say, *"half of it,"* --
13     yeah, I guess that's the easiest way to
14     handle it.  I don't know how you can
15     break it down, unless I went down case by
16     case.
17 Q.  I'm just looking for a ballpark.
18       I notice on your resume, you've
19     got a broad description of what you did
20     at Breit & Garcia.
21 A.  Breit & Garcia, yes.
22 Q.  Yeah, but not under this Sargent &
23     Herkes?
24 A.  No.

14

1 Q.  Is it the same type of stuff?
2 A.  Same type of stuff.  It would be a repeat
3     of their same type of material.
4 Q.  Okay.  And is it current that you're
5     still designing vessels?
6 A.  Oh, yes, surely; modifications.  I'm
7     still a naval architect.  That's what I
8     do.  That's what I've done·my entire
9     life.  I would not know how to, for
10     example, go out and open up a restaurant.
11     I've never been in the restaurant
12     business.  I'd close within 30 days,
13     probably.  But, I know the naval
14     architecture business.
15 Q.  So, on a daily basis, you're still in
16     there designing?
17 A.  I'm still a naval architect.
18 Q.  Okay.  Maybe you could run me through
19     your experience with small boats, and
20     specifically, outboard motors?
21 A.  I've been involved with many of these
22     cases that have to do with people being
23     thrown from small boats.  That's probably
24     the most viable case I can think of with

15

1  small vessels.  Generally what happens,
2  someone buys a vessel in the range of,
3  perhaps, 20 -- I'd say 16 to 25 feet.  He
4  buys it with, let's say a 40 horsepower
5  motor.  And it doesn't go fast enough.
6  So what he does, he puts a 200 horsepower
7  motor on it.  He goes fast.  He loses
8  control.  And he gets in a turn of some
9  sort and he goes [onomatopoeia] flying
10  out of the boat.  And those generally are
11  death cases in some way or other.
12     I've also designed these small
13  boats, similar to this one, for cargo
14  carriers.  And they're an operator on the
15  river, and they needed a little boat to
16  handle 55 gallon drums, oil, lube oil,
17  waste oils, to towboats.  And they wanted
18  an aluminum vessel.  And I designed an
19  aluminum vessel for them that was about
20  30 feet long, powered by a couple of
21  outboard motors.  And this goes back
22  about 20 years ago, or so.
23     But, mainly I'm involved with
24  those from a standpoint of people being

16

1  injured on the boats.  Also collisions.
2  They're involved with collisions of
3  towboats.  They run into the side of
4  towboats.  They run into the wires on
5  towboats.  They get hit or get damaged by
6  going over the waves in towboats such
7  that there's a situation where someone on
8  the smaller boat, for example, is suing
9  someone I'm involved with who is the
10  owner of the towboat.
11     So that's how I normally get
12  involved with these cases.  And collision
13  cases, personal injury cases, also
14  design.
15 Q.  This case involved the outboard motor
16  stalling out, --
17 A.  Yes.
18 Q.  -- the one we're here for today?
19 A.  Well, other things happened too.
20 Q.  Sure did, yeah.
21 A.  That's just part of it, the outboard
22  motor --
23 Q.  What experience do you have with that,
24  the mechanical aspect?

17

1 A.  A number of cases where something goes
2     wrong.  Generally, they're talking about
3     steering of the outboard motors.  Every
4     time there's a failure or something goes
5     wrong with an outboard motor, someone
6     looks at the steering company, because
7     steering is inherently involved with
8     these outboard motors.  And normally
9     they're steered from a console, and
10    there's a wire, a Teleflex cable, for
11    example, and they're generally brought
12    in.  I've been involved with representing
13    Teleflex on certain cases.
14        And also in certain cases the
15    outboard motor malfunctions.  But, in
16    general, we don't have too many troubles
17    with outboard motors.  They're quite
18    reliable if they're maintained.  However,
19    in this case, we're talking about an
20    outboard motor that was emerged in salt
21    water, and was not brought back as it
22    should have been for maintenance of the
23    outboard motor.
24 Q.  So, maintenance of the outboard motor is

18

1     important, --
2 A.  Absolutely.
3 Q.  -- in your mind?
4 A.  Certainly.
5 Q.  And what sort of maintenance are we
6     talking about?  And I'm speaking
7     generally now.  We'll get to our case
8     specifically.
9 A.  Seeing it's in good repair, for example;
10    the oil is changed; the sparkplugs are
11    changed.  At the beginning of the season
12    you can take it to someone if it's not
13    performing properly, and have it checked
14    over.  And certainly if it's dunked,
15    getting the salt water emersion, you want
16    it repaired.
17 Q.  Other things than salt water emersion can
18    cause you to have problems with an
19    outboard motor; is that fair to say?
20 A.  Oh, yeah they wear out under certain
21    conditions.  Teleflex cables, for
22    example, wearing out.
23 Q.  How about things that would cause the
24    motor to stall?

19

1 A.  Well, you can get water in the fuel.
2     That would cause a motor to stall.
3 Q.  Could the oil, problems with the oil,
4     cause it to stall?
5 A.  Well, if you don't put any oil in it, you
6     can have some real problems.  It'll
7     seize.
8 Q.  Sure.
9 A.  Yeah, lots of things can happen to a
10    motor.
11 Q.  Okay.
12 A.  However, this particular case is a little
13    bit different because we have an outboard
14    motor repairer suggesting, or
15    recommending, that certain electrical
16    pieces of equipment be changed out that
17    would have to do with possible failure of
18    the motor.
19 Q.  Your report lists the documents that you
20    reviewed before you came -- before you
21    wrote your report.  Have you reviewed
22    additional -- and I understand you've
23    also reviewed the deposition of Mr. King.
24 A.  Yes.

20

1 Q.  You've made that clear.  Have you
2     reviewed any other documents?
3 A.  Yes, a number of other documents.
4 Q.  Okay, can you tell me what?
5 A.  Sure.  Two additional depositions.
6     [Looking through documents.]  Deposition
7     of Alex Dick.  And it's not here.  It
8     should be here.
9 Q.  Wagner is it?
10 A.  Yeah, and Nicholas Wagner.
11    MR. ROSENTHAL:  Also, just for
12    the record, I wanted to just put
13    something on the record.  A number of
14    documents were just handed to me at the
15    beginning of the deposition that Mr.
16    Sargent has not had a chance to look
17    through, including what appear to be
18    daily labor reports and a standard diary,
19    a copy of which was handed to my hotel
20    room last night.
21    And Mr. Sargent has not had a
22    chance to look through any of those
23    documents yet.
24 A.  I think that's about it.

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

21

1 Q. Okay, you didn't get a chance to look at
2    the diary last night?
3 A. No.  And the only other information that
4    I have in my file are the two things I
5    got from the Web.
6 Q. Okay, the two depositions that you
7    referenced, did that cause you to change
8    your opinion at all?
9 A. No.
10 Q. Was there anything in there that
11    solidified your opinion?
12 A. Yes, I think Mr. Dick talks about also he
13    knew about the engine stalling.  In other
14    words, there were others who knew about
15    the condition of the engine.  I'm reading
16    directly from his deposition, page 36,
17    "Do you know whether the engine stalled
18    or not?  I heard that it did.  Who told
19    you that?  I don't remember who told me
20    that.  I heard various accounts."
21        So, he knew about the stalling.
22 Q. Well, because he's talking about the
23    engine stalling in the incident that
24    caused the personal injury.

22

1 A. Yes, yeah, right.
2 Q. But not preexisting stalling.
3 A. No, he heard about the stalling.
4 Q. The fact that the engine had stalled --
5 A. Right.
6 Q. -- in connection with the incident Mr.
7    Ramsey's brought the suit for.
8 A. That was my reading of it.
9 Q. Well, that'll speak --
10        MR. ROSENTHAL:  Well, the
11    testimony will speak for itself.
12        MR. MURPHY:  Sure it will.  Okay.
13 Q. Let's forge ahead.  Like Sam says, it is
14    what it is.
15 A. It's there or it's not there.
16 Q. Exactly.  Have you interviewed Mr.
17    Ramsey?
18 A. No.
19 Q. Have you spoken to him at all?
20 A. No.
21 Q. Would you be able to pick him out of a
22    lineup?
23 A. No.
24 Q. Okay, even on the phone?

23

1 A. Even on the phone.
2 Q. Have you consulted any treatises or
3    professional documents, standards, regs.,
4    that sort of thing?
5 A. No, not in this particular case.
6 Q. You've got your report in front of you,
7    and I'm not trying to keep us here longer
8    than we've got to, so --
9 A. Brevity is your middle name.
10 Q. So, soul of wit, right?
11        So it's fair to say you
12    understand that Mr. Ramsey was employed
13    aboard the Wood 1.
14 A. No, I just understood he's employed by
15    Jay Cashman.  Yeah, aboard the vessel.
16 Q. Okay, do you have any understanding as to
17    what his job or duties aboard the vessel
18    were?
19 A. Well, he was employed as a mate engineer.
20    And he did practically anything that he
21    was required.  He ran the boat, although
22    he was not a captain.  He did maintenance
23    work.  He handled lines whenever
`4    necessary; whatever.  He was not a crane

24

1    operator, though.
2 Q. And it's your understanding as well that
3    the incident occurred at Barnegat Inlet
4    Lighthouse on the coast of New Jersey?
5 A. That's correct.
6 Q. Have you ever been there?
7 A. No.
8 Q. And it's fair to say you haven't reviewed
9    any documents concerning the tides or
10    charts or current information; that sort
11    of thing?
12 A. Yeah, I went to the charts.  I tried to
13    pick out some tide information, but there
14    was no tide information I could get.  I
15    tried it from the Internet, the Web.  I
16    tried to find out whether there was
17    anything published.  I could not find
18    anything published about the tides.
19 Q. Okay.
20 A. I was looking for that specifically.  And
21    I think what it would require is talking
22    to local fisherman, for example, local
23    operators, marine operators in that area.
24    And that would require, perhaps, a trip

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

25

1  up to Barnegat, and I just never made it.
2 Q.  Okay.
3 A.  So, we have to go to the best source of
4    information.  And the best source of
5    information are the fellows who testify
6    about this in the depositions.  And they
7    range anywhere from 6 to 12 knots,
8    current conditions.  And if you want
9    other information you go to the -- as I
10   remember -- the Coast Guard or Corp of
11   Engineers accident report.  And that
12   talks about 4 to 5, or more, knots.
13 Q.  And why were you looking for the -- you
14   mentioned you did some things to try and
15   find that information.
16 A.  Well, it goes back to trying to find out
17   what horsepower might be required on this
18   little boat to have the proper
19   maneuverability conditions.  And I found
20   that 40 horsepower is not sufficient.  It
21   should have been more than 40 horsepower.
22 Q.  So, as far as quantifying the tidal
23   conditions or the current, the condition
24   of the current, you just relied on other

26

1    sources?
2 A.  Yes.
3 Q.  Okay.  And as far as the skiff itself
4    that you mentioned, you've never seen
5    that?
6 A.  No.  Way back I originally requested that
7    I visit the skiff and inspect it, find
8    out its size, dimensions, how much it
9    weighs, in terms of type construction.  I
10   was advised, however, the skiff had been
11   taken out of service and was no longer
12   available.  *Taken out of service,* could
13   have meant anything like, *"We don't know
14   where it is,"* to *"We cut it up for
15   scrap."*  But, it was not available for
16   inspection.
17 Q.  And why, specifically, did you want to
18   inspect it?
19 A.  Oh, I wanted to find out what size it
20   was.  All we know is it ranges 17, 18, to
21   23 feet long.  I think it's probably 17
22   or 18.  How wide is it?  I have to look
23   at the photographs, and possibly 5 feet
24   wide.  I have to know how deep it is.

27

1    And the only thing that I have on that is
2    2 1/2 to 3 feet draft, plus a foot
3    freeboard, which means it's somewhere
4    around 3 to 3 1/2 feet deep at the side.
5    And I thought that looking at the
6    photographs might help, but no one has a
7    tape, nor is there anything I can use as
8    a measuring reference point to determine
9    anything about the size of the vessel.
10   So, that I have to look at it when
11   someone says, *"17 or 18 feet long,"* I
12   then have to say, *"Well, is it 2 1/2, 3
13   feet, 3 1/2 feet deep at the side; how
14   wide is it?; it's 4 1/2 feet, 5 feet
15   wide,"* to give me a range.
16   But, I have not measured it, nor
17   does it appear anyplace in the record
18   exactly what size this is.
19 Q.  All right, let's go through your report
20   together, okay?  And why don't we start
21   on page 2, halfway down, it says, *"When
22   Mr. Ramsey reached the stern of the
23   dredge, the captain requested that the
24   parts be brought to the bow."*

28

1    You've seen Ken King's
2    deposition?
3 A.  Right.
4 Q.  And you understand that he disputes that?
5 A.  Yes.
6 Q.  So that was Mr. Ramsey's testimony?
7 A.  Yeah, this is Mr. Ramsey's.  Remember, at
8    this point I did not have Mr. King's
9    deposition?  There are certain
10   differences between the two, but the
11   stories basically are the same.  It's a
12   question of where he told him or did not
13   tell him to bring the skiff.
14 Q.  Well, it's kind of an important point,
15   don't you think?
16 A.  No, I don't think it has anything to do
17   with anything.
18 Q.  Whether he voluntarily took a skiff that
19   he knew was stalling, and moved it around
20   the other side so that he didn't have to
21   carry a box of parts versus somebody
22   ordering him to do it seems --
23 A.  No, I don't think so.  I think that he
24   didn't want to be there in the first

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

29

1  place, at the stern. He got there
2  because the vessel, the skiff, stalled
3  and brought him there. I don't think he
4  would have ever brought the vessel to the
5  stern. He would have brought it to the
6  side. That is, the starboard side of the
7  Wood 1, rather than the stern. It was
8  only because of this vessel -- that is,
9  the skiff -- stalling that he got himself
10  into that position.
11 Q. But, at that point, he knew the skiff was
12  stalling.
13 A. Oh, yes. Everyone did, certainly. When
14  I say, "everyone," Mr. King knew about
15  it, and certainly Mr. Ramsey knew about
16  it, and others knew about it.
17 Q. Do you have any other -- I really just
18  wanted to ask you the source for some of
19  the assertions that are made in the
20  report. So, --
21 A. For example?
22 Q. Well, the idea that the captain ordered
23  him to -- or requested that the parts be
24  brought to the bow.

30

1 A. That's what Mr. Ramsey says.
2 Q. And do you base that on any other source?
3 A. No, Mr. Ramsey is the one who says that.
4 Q. Okay.
5 A. Remember, this report was written at the
6  time I did not have Mr. King's. I had
7  Mr. Ramsey's deposition, and Mr. Ramsey's
8  statement.
9 Q. Sure, sure. Okay, I'm just going to read
10  on; "As Mr. Ramsey was maneuvering away
11  from the stern of the dredge, while
12  trying to keep clear of the stern mooring
13  lines, the skiff struck one of the
14  mooring lines."
15  And, again, you base that on Mr.
16  Ramsey's testimony?
17 A. Yes, that comes from his statement. It
18  does not come from his deposition. It
19  comes from his statement.
20 Q. Okay, and the statement was nearer in
21  time?
22 A. Yes, the statement was what, two months
23  after the accident? While the
24  deposition, I think, was much later than

31

1  that. I know it's much later. The
2  deposition is 2004 and the accident
3  occurred in 2001.
4 Q. So at least at the time you wrote the
5  report, it was your understanding that
6  the vessel hit the mooring line and then
7  stalled out?
8 A. Possibly. It's not quite clear whether
9  the hitting the mooring line stalled it
10  out, or whether it just stalled out by
11  itself.
12 Q. And then hit the mooring line?
13 A. Possibly.
14 Q. Okay. And can that cause the boat to
15  stall, hitting the mooring line?
16 A. Could. If the propeller hit the mooring
17  line it could.
18 Q. Could that cause a well-maintained motor
19  to stall?
20 A. Sure it could.
21 Q. You've got the records from the marina
22  that did the repairs, don't you?
23 A. Yes.
24 Q. You may want to take a look at them, as

32

1  well.
2 A. I think that's Hochstrasser's.
3 Q. Uh-huh.
4 A. Yes.
5 Q. And according to your report, the note
6  states, -- how do you pronounce that,
7  s-t-a-t-o-r?
8 A. Stator.
9 Q. And what does the stator do?
10 A. Stator is a connection with the
11  alternator, generator aboard the
12  outboard.
13 Q. "Stator, voltage regulator, switch boxes,
14  starter solenoid were not changed."
15 A. Uh-huh.
16 Q. I'm just going to ask you to explain some
17  of this to me. And I'm not quite sure I
18  understood you previously. The stator
19  does what?
20 A. Has to do with the generator aboard the
21  motor.
22 Q. And what does it do for the generator?
23 A. Provides the electricity to generate the
24  sparkplug to produce the spark.

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

33

1 Q. So that would be implicated when you're
2    starting the motor?
3 A. Yes.
4 Q. And how about the voltage regulator, what
5    does that do?
6 A. Similar to what you have onboard an
7    automobile, to when you're charging your
8    battery, it keeps the charge to the
9    battery at a constant voltage.  Rather
10   than just going up to extreme high
11   levels, it keeps it at a reasonable level
12   to charge your battery.
13 Q. The switch boxes, what does that do?
14 A. That's just an on and off switch
15   someplace on the motor.
16 Q. And the starter solenoid, what does that
17   do?
18 A. When you push something, it will then
19   activate the starter motor.
20 Q. Okay.  Now, what evidence, or what
21   support do you have for the idea that any
22   of those issues caused the vessel to
23   stall, caused the motor to stall?
24 A. They're all electrical parts.  The

34

1    voltage regulator -- if the voltage drops
2    for any reason or other, you don't get
3    the voltage to the sparkplug, and it'll
4    stall on you.
5 Q. Do you know whether that happened in this
6    case?
7 A. I have no idea.
8 Q. One way or another?
9 A. Have no idea.  I did not see the motor in
10   the condition it was after it left
11   Hochstrasser before the casualty
12   occurred, before it was dumped the second
13   time, or the third time, to make some
14   determination.  But, without that, you
15   can't do it.
16       I would assume that these people
17   -- I say, "these people" -- the
18   Hochstrasser mechanic, tested out these
19   parts and said, "This is no good, we
20   should change it," or, "This is no good,
21   we should change it."
22 Q. You haven't spoken to anyone from there?
23 A. No, I have not spoken --
24 Q. Has anyone informed you of their

35

1    position?
2 A. Nope.
3 Q. So, that's just a --
4 A. Right.
5 Q. -- guess on your part?
6 A. No, not a guess.  Remember, the vessel
7    got under water, and I guess the rain --
8    and it sotted out.
9 Q. Uh-huh.
10 A. And it was taken over to Hoffstrasser --
11   or Hochstrasser -- to make certain it's
12   put in the proper operating condition.
13   And someone decided to do it, as far as I
14   can see, on the cheap.  And when I say,
15   "on the cheap," not do a couple of items
16   here, and changing out the electrical end
17   of it.
18       When you have something dunked in
19   salt water, normally you change out
20   everything to do with the electrical.
21 Q. And why is that?
22 A. The electrical can short out.  It's
23   damaged, rusted, corroded.  It's just
24   general good practice, marine practice,

36

1    when you dunk something, to submerge it
2    in salt water, to replace it immediately
3    thereafter, if you want to go back in
4    operation with it.  That's the general
5    practice, and not to try to see, "Well,
6    can we get by this, or not?"
7       The cost of replacing this was
8    nominal, as I remember.  In this
9    particular case, they decided not to do
10   it.  And it's quite clear what they
11   indicated, "stator, voltage regulator,
12   switch boxes, starter solenoid were not
13   changed." -- and we had that underlined,
14   were not changed -- "Advise doing so
15   since it sank in salt water."
16       So here's a marina that does
17   repairs on engines saying, "Look, this
18   thing sank in salt water; you'd better do
19   something about it."  And someone decided
20   not to do it.
21 Q. Do you know how long it would take to
22   effect those repairs, typically?
23 A. I would think they'd be able to get those
24   repairs done in a week.  I mean, it's a

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

37

1 Mercury outboard. It's a common outboard
2 motor. Someone must be a distributor of
3 an outboard. And I guess if you pushed
4 these fellows to do it, you could get it
5 done in a couple of days. But, certainly
6 no more than a week.
7 Q. And do you have an idea of what the cost
8 would be for those kind of repairs?
9 A. I think someone basically did the same
10 repairs, or was telling about the same
11 repairs. Here it is, "A harness, relay,
12 solenoid." It looks like about $120
13 worth. And it would be about the same
14 thing here, $120 worth. So, really it
15 should only have been $120 more than
16 $350.
17    So, it would add up to less than
18 $500 for the entire change-out of
19 everything on this engine to make it as
20 -- I wouldn't say it's as good as new --
21 but, as good as it was before, and
22 suitable to operate.
23 Q. Let me ask you this. Let's just assume
24 hypothetically, you'd been called in the

38

1 day this happened. You'd go look at the
2 boat, I take it, and look at the motor?
3 A. Uh-huh.
4 Q. And what would you be looking for? What
5 would you do?
6 A. Oh, I'd just -- when you say, "I'm
7 looking at it," as what, sort of an
8 owner, or --
9 Q. Let's say I called you up and said, "Hey,
10 I represent Cashman," or Mr. Rosenthal
11 called you up and said, "I represent
12 Steve Ramsey, and we've had a problem
13 with this boat, and we want you to go
14 look at it and tell us what you think,"
15 what would the drill be?
16 A. I'd check out all of these pieces and
17 find out whether they were bad, at that
18 point. But, I wouldn't know whether they
19 were bad because of a condition that
20 preexisted, or this time in the salt
21 water. So, probably I couldn't do very
22 much with it. It's been damaged a second
23 time, and we cannot separate out the
24 damage before from the damage after, very

39

1 easily.
2 Q. I see. And all these pieces wear out on
3 their own at some point regardless of
4 whether they're emerged in salt water?
5 A. Perhaps; perhaps.
6 Q. Nothing lasts forever.
7 A. Right, most things don't. I can't think
8 of very much.
9 Q. And let me ask you, if something had
10 shorted out, would there be telltale
11 signs that this was an electrical
12 problem?
13 A. If something kept shorting out, you could
14 always send it back to Hochstrasser and
15 say, "Figure out what's happening."
16 Q. No, I mean after the fact. Is there a
17 way you could have looked at that motor,
18 and there'd be telltale signs that there
19 was an electrical problem?
20 A. Yeah. You'd find corrosion someplace.
21 You could pull each part, that is, each
22 piece apart, and test it individually. I
23 don't know where this would get you,
24 though, because we had a second dunking,

40

1 a second emersion; whether you could
2 figure out that it had to do with the
3 first emersion or the second emersion. I
4 don't know whether you could find that
5 out.
6    Let's assume the first time you
7 did everything perfectly. You did
8 exactly what Hochstrasser told us to do.
9 You changed everything. And then we had
10 a second dunking, the same pieces
11 probably would be required to be changed
12 out. You'd go through the same drill the
13 second time, because we had a second
14 sinking. So, you change out everything
15 the second time.
16 Q. Okay. Let me ask you this -- I know
17 you've read Mr. Ramsey's testimony. The
18 boat stalled out on him as he returned to
19 the barge; did you understand that?
20 A. Yes.
21 Q. And then you understand that he worked on
22 the boat a little bit?
23 A. Yes. Worked on the boat a little, --
24 Q. Worked on the motor.

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

41

1 A. Tried to get it started, yes.
2 Q. Yeah, what do you understand that he did?
3 A. I don't know. He was there working on
4    it. What he actually did, I don't know.
5 Q. Okay, but at some point he got it started
6    up again?
7 A. He got it started up again.
8 Q. Does that lead you to believe one way or
9    the other that it's more likely or less
10   likely that the problem was electrical?
11 A. I don't know what to make of it, because
12    I don't know what he did.
13 Q. Well, if something shorts out, would you
14    be able to start it up again?
15 A. Jiggle a wire, perhaps. I don't know
16    what he did.
17 Q. How likely would that be?
18 A. I don't know what he did, whether that
19    was the problem or not.
20 Q. What I'm trying to --
21 A. I don't know what the problem is. I
22    can't answer your question.
23 Q. Okay, let me just ask it in a general
24    sense, then. If an outboard motor stalls

42

1    out because of an electrical problem, how
2    likely is it that the motor would then --
3    you'd be able to get it going again?
4       MR. ROSENTHAL: Objection to
5    form.
6 A. If you change out the electrical problem,
7    it'll fix the --
8 Q. No, no, I don't mean that. I mean, I'm
9    driving my outboard motor back to the
10   barge and it stalls on it. I drift back to
11   the barge, and then 5 or 10 minutes later
12   I get the motor going again. How likely
13   is that if it was an electrical problem?
14      MR. ROSENTHAL: Objection to
15   form.
16 A. I don't know. I can't answer the
17   question.
18 Q. What's the problem with the question?
19   I'm looking for your answer on this.
20 A. Yeah, I don't really -- he can jiggle
21   something, and all of a sudden it makes
22   good contact again.
23 Q. Would that be for a loose wire?
24 A. Possibly. I'm thinking the easiest

43

1    explanation -- you have a flashlight that
2    doesn't really work -- I've got it, a
3    television clicker, changing channels.
4    It has a couple of batteries in it. And
5    all of a sudden you can't change the
6    channel; it doesn't work. You open it up
7    and you rub the batteries, the end of the
8    batteries; put them back in. And low and
9    behold, like magic, it works again. What
10   have you done? You've changed some
11   resistant values, or jiggling a wire,
12   maybe is a better way of saying it.
13      But, basically you put back the
14   batteries and you can change the
15   channels. I assume everyone has done
16   this at some time or other.
17 Q. Sure.
18 A. And that's the same thing I'm talking
19   about here. He gets in and pushes around
20   something. And low and behold --
21 Q. But, would you be able to do that with a
22   -- okay, and I understand --
23 A. I don't know. I really don't know what
24   could have been done. And that's why I

44

1    say I can't answer the question. All I
2    can say is, by analogy, indeed, there are
3    conditions I can think of where you just
4    jiggle something, or make better contact,
5    and low and behold it works like magic.
6       And whether it's the same thing
7    here, if there was, in fact, a loose wire
8    and does something, he pushed the button
9    again, and it starts, I don't know what
10   to make of it.
11      But, we also have a different
12   condition here. We have something where
13   it's not going into reverse.
14 Q. What's that indicative of?
15 A. I don't know. I don't know the problem
16   with it.
17 Q. Okay.
18 A. I have no idea what the problem is, but
19   they indicated it could not go in
20   reverse, or when they tried going in
21   reverse it would stall on them.
22 Q. Okay.
23 A. And I'd like to believe that these
24   fellows could evaluate and investigate

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

45

1   that sort of problem and find out what it
2   was.  It was never done.
3 Q. Could you define for me generally, just
4   so we get a starting off point, what a
5   short circuit is?  I think you used the
6   term, right?
7 A. Yeah, where something, a live wire goes
8   to ground.
9 Q. And what happens?
10 A. You get a spark, or you run down your
11   battery, or the thing just doesn't work
12   because you have an open circuit.
13 Q. Okay.  And just to go back to your
14   analogy with the clicker from the TV, if
15   you had a short circuit, you wouldn't be
16   able to --
17 A. Oh, no, nothing would happen.
18 Q. It'd be fried; you'd be out of luck.
19 A. Well, I don't know whether you'd be out
20   of luck or fried, but your batteries
21   might run down if you have a short
22   circuit.
23 Q. So if the vessel -- if the motor, rather
24   -- stalled out because of a short

46

1   circuit, you wouldn't be able to get it
2   going five minutes later, would you?
3 A. Unless you pulled the wire away from
4   where it shorted.
5 Q. Save that, you wouldn't be able to get it
6   going, right?
7 A. No, it should not.  If it shorts, it's
8   going to stay that way.
9 Q. So, not to beat this over the head, you
10   don't know one way or the other whether
11   there was an electronic problem that
12   caused the skiff to stall?
13 A. Electric or electronic, no.
14 Q. And I've heard people say, and I think
15   maybe Mr. Ramsey said it, but I'm not
16   positive so I won't -- that he thought
17   the engine needed air?
18 A. No, I think he said it needed fuel.  He
19   squeezed the bulb.
20 Q. Thanks.  Okay, I didn't --
21 A. And squeezing the bulb would force
22   gasoline into the engine.
23 Q. And an engine will stall, and --
24 A. If you don't get any fuel to it.  You can

47

1   run out of gasoline in your car and it
2   stalls.
3 Q. Or you could have a problem with the fuel
4   line and it would stall?
5 A. Fuel pump, yes.
6 Q. My idea of equipment is a fork, okay?
7   That's my idea of machinery that I use.
8   Obviously, this sounds obvious, but if
9   the engine isn't getting fuel, it's going
10   to stall out?
11 A. Correct.
12 Q. And that's if you don't put fuel in it?
13 A. Correct.
14 Q. If the fuel is somehow blocked from
15   getting to the engine?
16 A. Correct.  You have a fuel filter.  A fuel
17   filter -- even an automobile has a fuel
18   filter.  Or, generally on a diesel
19   engine, if the fuel filters are not
20   changed, the engine will stop.
21   If you get a clog in the line,
22   the engine will stop.  You run out of
23   fuel, engines will stop.  There are lots
24   of reasons engines will stop.  However,

48

1   this one was doing it on a continual
2   basis.  We're not talking about just this
3   one time.  It was doing that days before,
4   according to Mr. King.
5 Q. Yeah, Mr. King's testimony was you kind
6   of had to gun it or something.  Didn't he
7   say that?
8 A. He indicated in order to change into
9   reverse, you had to make certain that you
10   kept the engine up to speed, as I
11   remember feeling.  You say, "gun it."
12   All of this is indicative of an engine
13   that's not in good repair.  Something's
14   wrong with it.  It should have been taken
15   out of service and repaired.
16 Q. Okay.  I just want to focus on this a
17   little more then.  If the idea of fuel
18   needs to get to the engine to keep it
19   running, that's separate from the
20   electrical.
21 A. Absolutely.
22 Q. They're two different things.
23 A. Surely.
24 Q. So, if you've got a -- I think when I was

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

49

1   like 18, I had a car that you had to keep
2   giving it the gas or it would stall out.
3   That's not an electrical problem?
4 A.   That's not an electrical problem.
5 Q.   That's a fuel pump problem?
6 A.   Or the engine is just not properly
7   maintained, or the engine has rings and
8   they're not seating properly.  You don't
9   have enough oil.  Lots of things.  But,
10   it needed lots of gas in order to keep
11   running.  And you could have set the gas
12   line -- that is, getting the fuel to the
13   engine -- up a little higher and you
14   wouldn't have to keep stomping on the
15   starter.
16      But again, that's indication to
17   me of something that's in poor repair,
18   poor condition for operation.  And it's a
19   hazard.  All of a sudden you have an
20   automobile that's going to stall on you
21   someplace.  Thankfully, you're still
22   here.
23      And the same thing with Mr.
24   Ramsey.  He had something that was not

50

1   operating properly and should have been
2   brought in for proper repair.
3 Q.   Mr. Ramsey's testimony that the engine
4   wasn't getting enough fuel, does that
5   lead you to think that it's more likely
6   that it was a fuel issue than electrical?
7 A.   I don't know whether he said --
8      MR. ROSENTHAL:  Objection to
9   form.
10 A.   -- it was not getting the fuel, or
11   whether that's Mr. King who sort of
12   suggests that it did not get fuel.
13 Q.   Wasn't Mr. Ramsey's testimony that he was
14   squeezing the bulb?
15 A.   But, I think Mr. King was also saying you
16   had to keep the speed up when you were
17   changing into reverse.
18 Q.   Right, so put Mr. King aside.  Mr.
19   Ramsey's testimony was that he was --
20 A.   He was squeezing the bulb.
21 Q.   -- squeezing the bulb because he didn't
22   think the engine was getting fuel.
23 A.   Right.
24 Q.   Does that lead you to believe that it's

51

1   more likely -- and I understand your
2   testimony; there's a problem with the
3   engine.  I'm just trying to narrow it
4   down more.
5      Does his testimony, the
6   plaintiff's testimony, make it more
7   likely in your opinion that the problem
8   with the outboard motor was a fuel
9   problem versus an electrical problem?
10 A.   Could have been, yes.
11      MR. ROSENTHAL:  Objection to the
12   form.
13 A.   Yes, I mean, when you're not getting
14   fuel, there's a problem with the fuel
15   pump, fuel lines, fuel filter.  I don't
16   think running out of fuel is the problem.
17   I'd like to believe that that's the first
18   thing; they make certain they have enough
19   fuel.
20 Q.   Right.
21 A.   So, something's wrong with the fuel line,
22   carburation, whatever.  Perhaps not
23   changed out properly.  I don't know the
24   answer to that.  But, that could have all

52

1   been checked when they were having all
2   these problems, and before April 5th.  In
3   other words from the time March 5th, I
4   think when the sinking occurred, and was
5   returned thereafter, to April 5th, there
6   was enough time to figure out what to do
7   with it; send it back to Hochstrasser and
8   have them fix it.
9 Q.   You have also opined that the skiff was
10   underpowered, --
11 A.   Yes.
12 Q.   -- for the swift current at the location.
13   What do you base that opinion on?
14 A.   Well, firstly we have high currents.
15   Let's get back to what he's talking about
16   before.  The question is, how high a
17   current do we have?  Well, if you start
18   looking at currents that are anywhere
19   from 6 to 8 to 12 knots, and when one
20   starts talking about 12 knots, that is
21   huge.  Deep down, I never thought it was
22   12 knots.
23      But then to find out what it was
24   since that's testimony and I had no

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

53

1  better information, then -- when I say,
2  *"better information,"* off the top of my
3  head or personal knowledge of Barnegat
4  Bay -- I went to the Web to try and find
5  out what conditions, current conditions
6  might be there. I could get nowhere with
7  that. I was not able to find anything.
8      So the next answer is, I go back
9  to, *"Let's find out from testimony."*
10 Testimony is 6, 8, 10, 12; big numbers.
11     And two, one goes to either Corp
12 of Engineers or Coast Guard, and you see
13 wind conditions and sea conditions.
14 Someone talks in terms of 4 or 5 knots.
15 Therefore, I assume that that may be
16 someone who's testifying or filling out a
17 Coast Guard and says that this is the
18 number, 4 or 5 knots. And that starts to
19 sound more reasonable.
20     So I then looked, and said,
21 *"Well, let's say 4 or 5 knots, and even 6
22 knots."* And what is that in terms of
23 feet per minute? Well, 6 knots is about
24 10 feet per minute. And knowing the

54

1  speed, that is the velocity, knowing
2  something about the size of the vessel, I
3  can determine something about forces,
4  current forces, pushing on the vessel.
5      And there are little formulas for
6  doing that, but you can come out with
7  somewhere around 1,000 pounds pushing on
8  this vessel, if you have somewhere around
9  10 feet per second, or 6 knots, pushing
10 against the vessel.
11     And where would this be pushing
12 on the vessel? Well, remember, this
13 fellow is trying to back up against the
14 current. When I say, *"this fellow,"*
15 Ramsey.
16 Q. Right.
17 A. He was trying to back up and get away
18 from the Wood 1 to bring the vessel
19 alongside the Wood 1. And he's trying to
20 back up into this current, and you just
21 don't have enough power to back this boat
22 into the current. And what happened, he
23 got pushed around and pushed around to
24 starboard, and pushed around -- sorry --

55

1  to port, because his port side went under
2  the rake of the barge. And once his port
3  side got caught on the rake of the barge,
4  he had no power in his vessel. The
5  vessel was doomed, as I would say. The
6  river, I mean the currents, pushed the
7  starboard side down and flooded the boat.
8  And at that point he decided to take his
9  big leap, and he safely got over to a
10 tire.
11     If he did not get over to the
12 tire, I think we might not have a case,
13 this kind of a case. We might have a
14 death case, because he could have been
15 brought underneath the rake of the barge,
16 and we might not hear from Mr. Ramsey
17 again.
18     So, he was one lucky maritime
19 type that he made his escape.
20 Q. Now, some of that deals with after the
21 vessel had stalled.
22 A. Oh, yes.
23 Q. But, your opinion is that even without
24 the vessel stalling out, the motor's too

56

1  small?
2  A. Yes, the motor's too small to work in
3  that current. Now, you can work,
4  obviously, if it's slack current. In
5  other words, slack tide, no current, you
6  can operate this vessel. There's no
7  problem with that at all. It's when you
8  try to back up against something that's a
9  large current, then you have problems.
10     And I use the same analogy, or
11 the same type engineering approach or
12 analysis on the Mississippi River, or
13 rivers where there's current. A towboat
14 coming down river, in my opinion, has to
15 have the ability to stop his tow, and
16 hold his position. Stopping a tow and
17 holding a position means that basically
18 you have to be in a position to back up.
19 When I say, *"back up,"* to hold your
20 position against the river current.
21     And I've done these calculations
22 before in determining whether vessels are
23 underpowered or not. And I'm using the
24 same analogy here. You have a vessel

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

57

1  that's being caught with a current coming
2  against its stern. Can it back up
3  against the current? And I find that it
4  cannot.
5 Q.  So, how exactly do you go about making
6  the calculation? Is there a book
7  somewhere that tells you?
8 A.  Engineering first principles. You have
9  to know something about the size of the
10  stern. And if one assumes that somewhere
11  around 5 feet wide and 2 feet deep, you
12  have 10 square feet.
13  And you have the speed of the
14  current. And there's some little formula
15  that gives you the force, --
16 Q.  Do you know the formula off the top of
17  your head?
18 A.  Sure. Some coefficient times 1.99 over
19  two.
20 Q.  Why 1.99?
21 A.  You take the weight of salt water, which
22  is 64 pounds per cubic foot, and divide
23  it by gravity, 32.2, and you come out
24  with 1.99.

58

1 Q.  Uh-huh.
2 A.  So, 1.99 -- which is engineering terms,
3  ROW -- ROW over 2, area times velocity
4  squared. Force equals some coefficient.
5  ROW over 2, area times velocity squared,
6  that will give you a force.
7  So, if we look at this -- and
8  this gives you a force in pounds.
9 Q.  And you've got to go slow for me. The
10  force that we're talking about is the
11  force of the current?
12 A.  Force of the current on the stern of the
13  vessel.
14 Q.  Okay.
15 A.  Force of the current on the stern of the
16  vessel, some coefficient, ROW over 2. ROW
17  being 1.99, which is 64 pounds of cubic
18  foot salt water. Remember, fresh water
19  is 62.4; salt water is about 1.28 times
20  heavy; 64 pounds per cubic foot, feet,
21  and divided by 32. The area, 5 by 2,
22  makes it real easy; 10 square feet on the
23  stern of the vessel.
24  And then the velocity --

59

1  remember, we talked about 6 knots. Six
2  knots equates to 10 feet per second,
3  roughly. Multiply 6 times 1.69, and you
4  come out with about 10 feet per second.
5  And 10 by 10 by 10, three tens,
6  area, velocity squared; it's about 1,000
7  times 1.99 over 2; it's about a one. And
8  the coefficient, easy one to use is one.
9  You can get above one, or you can get
10  below one, depending upon the exact shape
11  of the transom. I don't know what that
12  is.
13  So, for good numbers, the force
14  is about 1,000 pounds. A thousand pounds
15  pushing on the stern of the vessel. And
16  a 40 horsepower motor cannot produce
17  1,000 in reverse.
18 Q.  How do you determine the amount of force
19  that the motor can --
20 A.  Well, I have to use again, little
21  analogies. I know what it is on tugs.
22  Big numbers on tugs, 25 pounds per
23  horsepower; big numbers. Remember, big
24  propellers.

60

1 Q.  Right.
2 A.  And this is a little propeller. And it's
3  not built, really, for thrusting. It's
4  built for something else, generally a
5  higher speed operation. So, I would say
6  under any circumstances, we're not going
7  to get more than 20 pounds of horsepower
8  out of it.
9 Q.  Is there a way that you can determine
10  specifically -- is force the right term?
11 A.  Yeah, force.
12 Q.  That the engine's capable of providing?
13 A.  Sure. I need to know something about the
14  propeller --
15 Q.  Does the manufacturer provide that kind
16  of --
17 A.  No, I'd have to know more about the
18  engine and the propeller. And I don't
19  know that.
20 Q.  Okay.
21 A.  If I saw the engine and the propeller, I
22  could do a calculation on it. I don't
23  have the engine. I don't know the size
24  of the propeller. I don't know who could

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

61

1  give me that.
2 Q. And these aren't things that the
3  manufacturer just puts out?
4 A. Yeah, but I'd have to know something
5  about what propeller was on that vessel
6  -- that particular engine.  I don't know
7  that.  All I'd need to do is see the
8  engine.  I could do a calculation on all
9  this.  But, it doesn't make any
10  difference.  All I'd have to do is find
11  out whether or not this engine is capable
12  of pushing or pulling this engine --
13  vessel -- against 1,000 pounds.
14    We're dealing with something
15  going in the reverse.  And engines are
16  not as efficient when going in reverse,
17  compared to going forward.  So, there's
18  no way, in my opinion, that this little
19  40 horsepower engine is going to produce
20  1,000 thrust.
21    So, I therefore say it's
22  incapable of maneuvering that little boat
23  under those conditions.
24 Q. Let me just go through this slowly,

62

1  because I want to understand it.
2 A. Sure.
3 Q. If the vessel's capable of backing up --
4  and I think you said before that it got
5  pushed around.  But, if it's capable of
6  backing up into the current, isn't it by
7  definition exerting more force than the
8  force that's being exerted against it?
9 A. Absolutely, sure.
10 Q. And if your calculation was that it was
11  1,000 pounds against it, but it's able to
12  back up into the current, then the motor
13  is producing 1,000 pounds?
14 A. Sure, yes.  Or my 1,000 pound calculation
15  is in error, or the current force is in
16  error.
17 Q. Okay, all these variables.
18 A. Sure.  Exactly.
19 Q. And we don't know what any of these
20  variables are for the purposes of our
21  discussion right here, do we?  We don't
22  know the current.
23 A. Well, I have some indication of what the
24  current is.  No one went down and

63

1  measured it.
2 Q. Right.  And we don't know the
3  configuration of the stern, specifically.
4 A. Right.  I have photographs of the stern,
5  but nothing specific.
6 Q. I mean, if you went down there you'd do
7  measurements first?
8 A. I would find out what the draft of the
9  vessel is, yes.
10 Q. Okay, and just for a lay juror or a judge
11  that may be reading this, can you tell us
12  what the draft is?
13 A. Yeah, I have to calculate testimony that
14  the draft is 2 to 2 1/2 feet.  And the
15  freeboard is a foot.
16 Q. So we can define our terms, draft is?
17 A. Distance from the water line down to the
18  bottom of the vessel.
19 Q. And the freeboard is?
20 A. The water line to the side of the vessel
21  rail, the rail.  So we add them both
22  together, and we come out with 3 and 3
23  1/2 feet.  And I think that comes from
24  Mr. Ramsey's statement right after the

64

1  casualty.  In fact, let me pull that out
2  and make certain my memory is not failing
3  me.  [Looking through documents.]  No,
4  sorry about that.  She draws 2 1/2 to 3
5  feet of water.
6    So, 2 1/2 and it has a freeboard
7  of 1 foot.  So, 2 1/2 to 3 feet makes it
8  3 1/2 to 4 feet on the side.
9 Q. Okay.
10 A. So, when I say 10 square feet at the
11  stern, it actually could be larger than
12  10 square feet.  When I say 10, 5 feet by
13  2 feet, it could actually be 5 feet by 3
14  feet, which is 15 square feet.
15 Q. Let me ask you to pin down for me what
16  role you think the fact that the engine
17  may have been undersized had to do with
18  causing the casualty.  Because he was
19  certainly able to back up -- well, let me
20  not put words in your mouth --
21 A. No, he wasn't able to back up.
22 Q. Tell me, tell me.
23 A. Because he got broadsided.  In other
24  words, his port side got into the rake.

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

65

```
 1    He wasn't able to back out.
 2 Q.  Well, is it your understanding that the
 3     motor hadn't stalled at that point?
 4 A.  When the motor stalled, I don't know.
 5     But, in any event, all I know is he got
 6     port side, --
 7 Q.  No, no, but if he's --
 8 A.  He's trying to get back out.  And I think
 9     his testimony is, his bow is to the stern
10     of the barge, that is, the dredge.
11 Q.  Uh-huh.
12 A.  And that's all I hear.  And I don't hear
13     that he got away from it, that he
14     actually backed out.
15 Q.  This is right before it sunk, you mean?
16 A.  Yes, yeah.  Let's go through the
17     testimony again.
18 Q.  Okay, go ahead.
19 A.  He comes in and he actually floats in,
20     originally.  Remember, the current is
21     bringing him in.
22 Q.  That's right.
23 A.  They give him a line, and he ties up at
24     that point.
```

66

```
 1 Q.  Right.
 2 A.  And at that point, depending upon which
 3     story -- somebody says, "Get around to
 4     the other side," and someone says, "Well,
 5     I never said that."  But, in any event,
 6     he decides to get the thing started
 7     again, to bring it around to the other
 8     side.  And he's fooling around with it a
 9     little bit.  And someone else was helping
10     him.  And then they left and he fooled
11     around with it a little bit more.  And he
12     finally got it started.  And at that
13     point, he wanted to back out.  And
14     remember, a couple of wires are crossing.
15     He has to back out.
16        And I don't know at what point,
17     but he says he got the vessel turned
18     around such that his bow is facing the
19     stern of the dredge.
20 Q.  Where he's leaving from, right?
21 A.  Right.  And at that point, something
22     happens and he swings around to port and
23     gets trapped under the rake of the other
24     barge.
```

67

```
 1 Q.  Okay.
 2 A.  And I don't know how far he got away.
 3 Q.  Let me ask you this question -- continue.
 4 A.  As soon as he got trapped, that's the end
 5     of the story.
 6 Q.  Okay, and the engine being undersized
 7     goes to him not being able to get away
 8     from the rake --
 9 A.  Right, right.
10 Q.  -- of the other barge?
11 A.  Right, or do any maneuvering with it.
12 Q.  Okay, if we assume, hypothetically, that
13     the engine had stalled prior to him
14     impacting the rake of the other barge, --
15 A.  The first time or the second time, now?
16     Did he get away or not get away?
17 Q.  Well, we know he didn't get away, right?
18 A.  Right, we know he didn't get away.
19 Q.  And the boat, the skiff, started to
20     capsize.
21 A.  No, it twisted around.  Remember, he's
22     headed -- the bow of his vessel is pushed
23     against the stern of the dredge.  And
24     then it swings around such that his port
```

68

```
 1     side goes under the rake of the other
 2     barge.  It rotates.
 3 Q.  Okay.
 4 A.  And then the --
 5 Q.  Well, let's --
 6 A.  -- forces of current pushed the starboard
 7     side down, his port side goes up the
 8     rake.
 9 Q.  And you mentioned he couldn't get away
10     from the rake of the barge.
11 A.  Right.
12 Q.  If we assume at the point that the skiff
13     impacted the rake of the barge, if we
14     assume that the motor had stalled at that
15     point, whether or not it's undersized had
16     nothing to do with this incident.
17 A.  No.
18 Q.  I just want to make sure there's no
19     other --
20 A.  Once he stalled and he couldn't get it
21     started again, he's trapped.
22 Q.  Okay.
23 A.  And even if he got it started again, I
24     don't think he could have gotten away
```

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

69

1      from the rake.  He was caught under that.
2 Q.   Have you formed any other opinions that
3      you intend to testify to that aren't
4      contained in this report?
5 A.   There's another one that I picked up.
6      And it has to do with the lack of radio
7      communication.  And that comes about in
8      the statement, page 17, "Where there are
9      problems with the radio?"  And he says,
10     "Yeah, the radios were not working.  We
11     couldn't contact each other.  The only
12     radio that worked was my own personal
13     handheld radio."  In this day of modern
14     communications, just about everyone --
15     and certainly on the river, and I'd like
16     to believe on these construction jobs --
17     has a radio so that they can talk to each
18     other.
19 Q.  A handheld radio?
20 A.  Handheld radio.  And he's just indicating
21     they weren't working.
22 Q.  These are the handheld radios?
23 A.  I assume, or one can assume that.
24 Q.  Most skiffs and outboard motors don't

70

1      have -- the skiff that we're talking
2      about, most of them aren't equipped with
3      radios.
4 A.   Oh, no, no.  It would be something you
5      hand held or put on your belt, or
6      something.
7 Q.   You're not a radio expert?
8 A.   No, all I say is that in my opinion when
9      you're working on these commercial
10     ventures, everyone stays in contact with
11     everyone else.
12 Q.  Do you have any understanding that a lack
13     of a radio caused or contributed to the
14     incident?
15 A.  No, I'm just saying that these were all
16     surrounding -- is there a contribution?
17     Possibly somewhere, due to lack of
18     communication.  But outside of that, I
19     don't know what to say about it.  It's
20     basically stalling, in other words, the
21     vessel having an engine that's
22     unseaworthy, or the vessel's unseaworthy
23     because of a lack of a proper engine.
24 Q.  Okay, now --

71

1 A.   And then we have something with the
2      vessel being unseaworthy because it's
3      underpowered for operating in those
4      environmental conditions.
5 Q.   It's fair to say that a well-maintained
6      engine can stall under certain
7      circumstances?
8 A.   Sure, you run out of fuel.
9 Q.   Other reasons, too?  I mean, we've all
10     broken down in our cars, and --
11 A.  Yeah, but a lot of the breaking down in
12     cars has to do with lack of maintenance,
13     for example.  If a fuel filter is torn,
14     that's a lack of maintenance.
15 Q.  Okay, you maintain your car well?  I
16     trust you do?  Give yourself an A for car
17     maintenance?  Have you ever broken down?
18 A.  No, not since I've been 17, --
19 Q.  Really?
20 A.  -- when I ran out of fuel.  Never again
21     did I ever run out of fuel.  My car has
22     never stalled.  I don't have that
23     personal experience, except when I was 17
24     and ran out of fuel.  Never again.

72

1 Q.   But you accept as a general proposition,
2      don't you, that a person who regularly
3      takes their car in, by the book, for
4      maintenance, can still run into a
5      problem?
6 A.   Oh, absolutely you can run into a
7      problem.  I know, personal experience in
8      my family, that these fan belts fail.
9      Actually, it was a timing belt on a
10     foreign car.  And they're supposed to be
11     changed at 75,000 miles.  At 30,000
12     miles, this thing broke on the road, and
13     the engine just stopped on a thruway.  We
14     did not buy foreign cars of that
15     manufacturer thereafter.
16         But, in any event, yes, certainly
17     it can happen.  But, remember, that gave
18     no warning or anything else.  This
19     [indicating] gave warning.  People knew
20     about the problem before it actually led
21     to a serious accident.  This breaking of
22     a timing belt gave no warning,
23     absolutely.  And the manufacturer said,
24     "Don't worry about it until you get

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

73

1   70,000 miles on it."
2       This is not that situation.  This
3   is a situation where it's open and
4   obvious there's a problem.  Fix it.
5 Q.  Have you formed any other opinions?  And,
6   you know, I just don't want to be
7   surprised.
8 A.  No, I don't intend -- I try to write
9   everything in my report the first time.
10 Q.  I appreciate that.
11 A.  And give full disclosure and use my file.
12   And I think it's relatively simple what's
13   going on here; improper repair and
14   operating a vessel with this engine in
15   swift currents of the Barnegat Bay Inlet.
16   And knowing about the problem with the
17   engine, and not doing anything about it,
18   and then having an undersized engine for
19   this particular boat.
20       And that's the story here.  The
21   little thing about the radio, it's just
22   another thing that was not operating
23   properly that adds to the unseaworthiness
24   condition that existed on this vessel.

74

1       But did that cause the actual
2   casualty, or contribute to it?  Perhaps
3   in a minor matter.
4 Q.  Have you been asked to form any further
5   opinions?  Do you anticipate --
6 A.  Well, I haven't read any of the log
7   books, nor the massive documents that
8   were provided this morning.  I don't know
9   whether there's anything in those or not.
10   But, I have not reviewed them.
11 Q.  So, it's fair to say as you sit here
12   right now, no one's asked you --
13 A.  No one's asked me to do anything further,
14   except, I think, certainly Mr. Rosenthal
15   was talking to me in terms of reviewing
16   the log books.
17 Q.  Okay.
18 A.  But, I am not interested in reviewing
19   financial records or things like that,
20   which I understand were also provided.
21       MR. ROSENTHAL:  Not many.
22       THE WITNESS:  Oh.
23       MR. ROSENTHAL:  I mean,
24   basically, it's the labor log and the log

75

1   book.
2 Q.  I think we're winding down.  Is there
3   anything you want to add or you think we
4   ought to know?
5 A.  I try to keep it simple; no.
6       MR. MURPHY:  I'm just going to
7   take one second to check on something out
8   there.
9       MR. ROSENTHAL:  Sure.
10       MR. MURPHY:  I'll be right back.
11       (Recess 10:25 a.m. - 10:30 a.m.)
12 Q.  You're testifying in this case as a naval
13   architect.
14 A.  Correct.
15 Q.  And I understand your previous testimony
16   that you're a designer of vessels and
17   that sort of thing.
18 A.  Yes.
19 Q.  I want to hone in more on your experience
20   with outboard motors.  As a naval
21   architect, you don't design outboard
22   motors, do you?
23 A.  I do not design outboard motors.
24 Q.  And have you ever worked in the

76

1   maintenance and repair of outboard
2   motors?
3 A.  Only my own outboard motors.
4 Q.  So you've never done that professionally?
5 A.  No.
6 Q.  And do you have any training regarding
7   the maintenance and repair of outboard
8   motors?
9 A.  Only to the extent that I'm involved with
10   them in other cases, and one has to be
11   familiar with the particular outboard
12   motor.  At that point, it's generally
13   investigating the motor by seeing it,
14   hands-on with the motor, taking things
15   apart on the motor, having the
16   manufacturer's instructions on the motor
17   and maintenance on the motor.
18 Q.  You mention that you've owned outboard
19   motors.
20 A.  Oh, yeah.
21 Q.  What's that history?
22 A.  Well, Evinrudes, I've had when I was
23   younger.  I don't have them right now.
24 Q.  How many, when?

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

77

1 A.  Oh, I've had Evinrudes.  And the most
2     recent one was a Yamaha.  But, those were
3     small boats.  I don't have big outboard
4     motors.
5 Q.  And would you do the work on the engine
6     yourself?
7 A.  Absolutely.
8 Q.  And that's okay?  It's reasonable to do
9     your own work if you know what you're
10    doing?
11 A.  That's my background, engineering.  I'm a
12     fiddler.
13 Q.  You're not a navigational expert, I
14     trust?
15 A.  Well, let's broaden what you mean by
16     navigation.  When I was in the Navy I was
17     a qualified deck watch officer.  So, I
18     have a navigational background on
19     vessels.  I've owned vessels.  And I say,
20     "vessels," -- sailboats, power boats.
21 Q.  I guess I've owned them too.  I wouldn't
22     testify in court as an expert at that, so
23     I'm just trying to --
24 A.  No, I realize that, "Shoemaker, stick to

78

1     your last."  If a navigational expert
2     were required, I think I would suggest to
3     Mr. Rosenthal that he hire someone who is
4     a navigational expert.
5 Q.  Okay.
6 A.  I don't think navigation by itself is
7     involved in this case.
8 Q.  Okay, I'm just -- what about operation of
9     outboards?  And I understand you've done
10    it with your own.
11 A.  Yes.
12 Q.  But, if this was a case limited to the
13     operation of an outboard, would you give
14     Mr. Rosenthal similar advice?
15 A.  I think you have to get down to case by
16     case.  He has his expert.  Mr. Ramsey has
17     done far more operation of an outboard
18     than I have.
19 Q.  Okay, so you don't intend to testify in
20     this case as an operational expert?
21 A.  Only to the extent that this little
22     horsepower, or smaller horsepower, is not
23     suitable for a vessel of this size, under
24     those current conditions.

79

1 Q.  So, based on those equations --
2 A.  If you call that --
3 Q.  No, to me, that's naval architect --
4 A.  Well, that's basically navigation.
5     Maneuvering of vessels, that's naval
6     architecture.  Operation of vessels; I'm
7     an operator, but don't ask me to testify.
8     I'm not the one who does the operation of
9     a vessel for a living.
10 Q.  Okay, so as far as the operation, the
11     maintenance, and the repair of the motor,
12     you've got familiarity with that, but --
13 A.  Well, maintenance, perhaps.
14 Q.  How so?
15 A.  Well, you have to follow some maintenance
16     guides in order to keep your engine in
17     proper operating order.  And if it's not
18     done, something goes awry.
19 Q.  But, let me just stop you there.  Your
20     expertise in naval architect don't
21     really -- all of us who drive cars
22     understand that you have to maintain
23     equipment.
24 A.  Yeah, I'm sure.  I think that what I'm

80

1     saying is -- I wouldn't say common
2     knowledge, but most people recognize it.
3     The Judge would recognize that.  He
4     doesn't need --
5 Q.  And the jury?
6 A.  Probably the jury, too.  They don't need
7     someone to tell them that you have to
8     maintain your vessel, or maintain your
9     engine.  When it's not operating, you
10     take it to the service station.
11     And in this particular case, it
12     was not operating for some period of
13     time, perhaps a month before, and no one
14     took it to the service station.
15 Q.  Okay, but that doesn't particularly get
16     into the naval architecture realm, does
17     it?
18 A.  No, no.
19 Q.  You're saying that based on your owning
20     boats and that sort of thing?
21 A.  Yeah, and I think it's universal
22     knowledge.  Mechanical things, when they
23     don't operate, you fix them.  Or when
24     they don't operate satisfactorily, you

81
1    fix them.  When they stall out all the
2    time, you have them fixed.
3 Q. Have you removed anything from your file?
4 A. No.
5 Q. I notice there's no billing information,
6    or there's only one.
7 A. I haven't billed them.
8 Q. It's time.
9 A. Yeah, well, Katrina came up to stop a lot
10    of things in this world.
11 Q. I understand.  And the rates that you're
12    billing them?  Is that an hourly rate as
13    reflected in the appendix?
14 A. Correct.  I wouldn't have my billing
15    information in here, anyway.  That's
16    separate.  This is the job file, not the
17    billing file.
18 Q. And what about other correspondence with
19    the firm?
20 A. There is none.  You have everything here.
21 Q. Well, was there a letter retaining you?
22 A. No, no letter retaining me.
23 Q. All done over the phone?
24 A. All done over the phone.

82
1 Q. Okay.
2 A. I still work on a handshake.
3 Q. So, they've told you what the case is
4    about, I trust, as well?
5 A. They told me what the case is all about.
6       MR. MURPHY:  Okay, I guess that's
7    a wrap.
8       MR. ROSENTHAL:  I just have a
9    couple of followup questions.
10
11  EXAMINATION BY MR. ROSENTHAL:
12 Q. Is it your opinion that the undersized
13    engine caused and contributed to Mr.
14    Ramsey's accident?
15 A. Yes, it's a contributing factor.
16 Q. And can you explain your opinion?
17 A. Yes.  If, for example, he had something
18    that was able to operate under the swift
19    current, and once the engine was
20    operating, he would have been able to get
21    away from underneath the stern of the
22    dredge.  He would have been able to back
23    away and then go forward and get out.  As
24    long as the engine was still going and

83
1    not stalled.
2       Since it contributes, how much it
3    contributes, I don't know.
4 Q. Is it your opinion that Mr. Ramsey in any
5    way caused his accident?
6 A. No, he --
7       MR. MURPHY:  I'm just going to
8    object.
9 A. I think he was a victim being in a vessel
10    that stalled out, and the swift current
11    grabbed him and put him in the wrong
12    place.
13 Q. Now, is it your opinion that the engine
14    was not properly maintained?
15 A. Yes.
16       MR. MURPHY:  Objection.
17 A. As soon as it came back and someone found
18    out that it was stalling out, they should
19    have sent it back and said, "Fix it."
20    And Hochstrasser would have said, "Well,
21    I told you what to do.  You had to change
22    this, this, and this.  And if you'd done
23    that and we tested it again we'd find out
24    what was wrong with it and we'd send you

84
1    back a vessel that we would give our
2    90-day, or six-month, or a year warranty
3    on it."
4 Q. And what is that opinion on the
5    maintenance of the engine?
6 A. Well, it stalled out.  And then we go
7    back to Hochstrasser's invoice that says
8    that we recommended that you do this,
9    this, and this, and you didn't do it.
10    And I think, really, what that's
11    all about is Hochstrasser saying, "Look,
12    if you have problems, don't come back to
13    me.  I'm not going to warrant your
14    vessel, that is, your engine suitable for
15    your vessel, because you didn't do what
16    I'm suggesting."
17 Q. Like a cover your ass sort of a --
18 A. I think so.
19 Q Mr. Murphy was asking you questions about
20    your experience in the area of vessel
21    maintenance.  What is your experience in
22    that area?
23 A. Well, I'm not a fellow who works in a
24    repair shop.  And if something is wrong,

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

85

1  I tell someone, *"Go out and see your*
2  *repairman, he'll take care of it for*
3  *you."*
4 Q. Can you repair your own vessel, your own
5     engine?
6 A. Sure, an outboard I can.
7 Q. Okay, so you have experience repairing
8     your own outboard engine?
9 A. Yes, but all of a sudden you get into
10    large engines, and they become a little
11    bit more complicated because they're now
12    all electronically fired, all
13    electronically controlled.  And similar
14    to trying to repair your own automobile
15    engine any longer, unless you know the,
16    quote, codes, to get in and provide
17    diagnostic information, you have a rough
18    time of doing repairs on modern engines.
19 Q. Okay, this engine was a 40 horsepower
20    engine.  Would you consider that to be a
21    large engine?
22 A. No.
23 Q. Is that the sort of engine that you had
24    worked on previously?

86

1 A. Oh, yeah, surely.
2 Q. So, you've had experience working on 40
3     horsepower engines?
4 A. Sure.
5 Q. Are the engines that you have at your
6     home 40 horsepower?
7 A. No, I've gotten rid of all those.
8 Q. Why would that be?
9 A. I have a different kind of vessel.  I
10    have one, a 19 foot sailboat that has
11    like a 5 horsepower engine.  And then I'm
12    part owner of a 40 foot sailboat that has
13    like a 90 horsepower, --  I guess maybe
14    it's not 90 -- a 60 horsepower inboard
15    diesel engine.
16 Q. Now, Mr. Ramsey testified in his
17    deposition about -- you read Mr. Ramsey's
18    deposition, right?
19 A. Correct.
20 Q. He testified that he was backing the
21    vessel -- and when I say, *"the vessel,"*
22    -- he was backing the skiff out after he
23    drifted to the dredge.  And he was
24    backing it out and he says, *"The engine*

87

1  *revved up like I had just thrown it in*
2  *neutral, but I didn't.  It was still in*
3  *reverse.  But, it was running and the*
4  *propeller wasn't going."*
5     What do you think could have
6     caused that?
7 A. It either got thrown in neutral or some
8     keyweigh broke.  And when I say,
9     *"keyweigh,"* if we go back to
10    Hochstrasser, you'll see that -- when I
11    say, *"keyweigh,"* a key broke.  In their
12    April 4th, -- I'm sorry, April 6th invoice
13    -- or repair order; I shouldn't say,
14    *"invoice,"* -- they talk about replacing
15    keyweigh key.
16    And that indicates a key broke.
17    I don't know where this key is.  But,
18    something broke, and that would possibly
19    keep the propeller from turning.
20 Q. What could cause a key to break?
21 A. Some large forces that can develop on a
22    shaft.  For example, if the propeller hit
23    the cable, the wire, the mooring wire, it
24    could break a key.

88

1 Q. And could an undersize engine cause a
2     vessel to strike a mooring line?
3 A. Only to the extent that the operator
4     would not be able to maneuver away from
5     the mooring line.
6 Q. So it affects the operation of the
7     vessel?
8 A. Oh, yes.  You can't turn.  You can't
9     speed.  You can't accelerate as quickly.
10    You can't maneuver as quickly with an
11    underpowered vessel, a small horsepower
12    vessel.
13    MR. ROSENTHAL:  That's all I
14    have.
15    MR. MURPHY:  I'll just follow up
16    on that, briefly.
17
18 EXAMINATION BY MR. MURPHY:
19 Q. We talked before about some expert
20    testimony you've given, either in
21    depositions or in court.  Have you ever
22    testified as an expert, either in
23    deposition, or in court, regarding the
24    operation of an outboard motor?

REPORTERS, INC.
617.786.7783/FACSIMILE 617.786.7723

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

89

1  A. I'm just thinking about the ones that
2     have been collision cases, and the ones
3     that have to do with people being thrown
4     out of the vessel, thrown out of the high
5     speed -- to that extent, yes.
6  Q. Okay, but aside from that, no?
7  A. Basically, maneuvering comes down to high
8     speed maneuvering where people are thrown
9     out and that's the casualty, someone's
10    hurt, not just someone -- yes, some other
11    cases.
12       You're all familiar with this
13    little inboard-powered personal
14    watercraft. You sit on these things and
15    go fast.
16 Q. Uh-huh.
17 A. And if you don't steer, or you take your
18    foot of the pedal, there's no power to
19    them, they keep going in the same
20    direction. And all of a sudden you have
21    some serious accidents with them. And
22    that's maneuvering, or trying to
23    maneuver, with lack of power, and lack of
24    power because you took your foot off the

90

1     gas, and the impeller is no longer
2     turning. You don't have the pump
3     squirting out water. And you're trying
4     to maneuver and it doesn't maneuver.
5  Q. Right, but with regard to outboard
6     motors?
7  A. I just can't imagine, or can't think
8     right now where that particular situation
9     has come up.
10 Q. And your testimony with these collisions
11    would be as a naval architect, --
12 A. Yes.
13 Q. -- based on what?
14 A. Maneuvering characteristics of vessels.
15    And that's those little personal
16    watercraft, how they maneuver.
17 Q. So, it's fair to say that you've never
18    testified in court or at deposition
19    regarding maintenance of outboard motors?
20    You're not an outboard maintenance --
21 A. I understand you.
22 Q. -- expert, are you?
23 A. I don't think it's ever come up.
24 Q. Okay, and what about the repair --

91

1  A. I'm talking about coming up in a
2     deposition or trial testimony.
3  Q. So, it's fair to say you've never
4     testified in that capacity before?
5  A. I don't believe so as in someone involved
6     with maintenance.
7  Q. And it's also fair to say you don't
8     consider yourself an expert, if the issue
9     is strictly limited to maintenance of
10    outboard motors?
11 A. Depends upon -- remember, my background
12    is design of things, engines. Not
13    outboards, but real engines that run
14    large ships.
15 Q. Right.
16 A. And from that standpoint, I get involved
17    a little bit with maintenance, but very
18    little. I'm more in design than
19    maintenance.
20 Q. And as far as the repair of outboard
21    motors, you've said you never worked in
22    that capacity, but you've never testified
23    in --
24 A. Well, I --

92

1  Q. Let me just finish the question, please.
2     You've never testified in court or at
3     deposition as to repair of outboard
4     motors, have you?
5  A. No, but my background is -- remember, I
6     worked many years with U.S. Salvage
7     Association, which is the technical arm
8     for the marine underwriters, where I'd go
9     out and see damages to vessels, and write
10    repair specifications to see that they
11    got back in good order.
12       However, at that time, I was not
13    involved, specifically, with outboards.
14    If they'd get dunked, submerged, I'd take
15    them to the shop and have them do them
16    over.
17       But, on large engines, you don't
18    take the engine out and send it to the
19    shop to do over. You'd repair as
20    necessary. You look at the bearings.
21    You look at the fuel injectors. You look
22    at the starters, that is, the air
23    starters, or electrical starters, and
24    determine each particular item that needs

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

93

1  repair on large engines.  Compared with
2  these engines, the engine, you know, a
3  couple of thousand dollars, and you
4  either can buy a new one or have it
5  repaired for something less than that.
6     Large engines, we're talking
7  about hundreds of thousands of dollars.
8 Q.  And how long ago did you do that for the
9     Salvage Association?
10 A.  I worked for the U.S. Salvage Association
11     from 1958 to 1965; seven years.
12 Q.  And you mentioned you've owned some
13     outboard motors.  Have you ever owned one
14     as big as 40 horsepowers?
15 A.  Not specifically 40, something less than
16     that.
17 Q.  How much less?
18 A.  Oh, 25.
19 Q.  And when did you last own --
20 A.  Oh, that goes back many years ago; 20
21     years ago, 30 years ago, that size.
22     Basically, I went into sailboats that had
23     much smaller engines than that.
24 Q.  Okay, so basically you haven't repaired

94

1     or maintained an outboard motor over 20
2     horsepower in 20 years, anyway?
3 A.  That's correct.  A little bit more than
4     20 horsepower, but that's -- probably
5     closer to 30.
6 Q.  Okay.  The keyweigh.  That's a term that
7     came up that we hadn't talked about.  And
8     I understand that that's on the repair.
9     Can you tell us, in a general sense, what
10     the keyweigh is?
11 A.  Yes, it holds something onto a shaft.
12     When I say, "something," it could hold a
13     propeller onto a shaft.  It could hold a
14     gear onto the shaft.
15 Q.  And where's it located on the --
16 A.  I don't know.  It just says, "keyweigh
17     key."  I don't know where it is.  You'd
18     have to find out from the engine
19     manufacturer's part list.  They have a
20     number; you find out where it is on the
21     engine.
22 Q.  And if the keyweigh breaks, can that
23     cause the motor to stall?
24 A.  It could cause it to, possibly, because

95

1     we might be talking about a timing gear.
2 Q.  This wouldn't be an electrical problem,
3     would it?
4 A.  No, it would not be electrical.  This is
5     a mechanical problem.
6 Q.  But, it's a mechanical problem?
7 A.  Yeah.
8 Q.  And I think I cut you off.  How would
9     breaking the keyweigh cause the motor to
10     possibly stall?
11 A.  I don't know what keyweigh this is and
12     where the key is located and what's
13     connected to it for gears, connected to
14     it.  It might affect the timing of the
15     sparkplug, for example.
16 Q.  Okay.
17 A.  I just don't know where this is.
18 Q.  I'm just trying to get a general sense.
19     And I understand your testimony.
20 A.  I just don't know.
21 Q.  And at least one way for a keyweigh to
22     break is the prop striking an object,
23     like a mooring wire?
24 A.  Correct.

96

1 Q.  If that's what happened in this case,
2     hypothetically, that the vessel stalled
3     because the prop hit the mooring wire,
4     then the stalling in this case had
5     nothing to do with the previous
6     stallings; is that fair to say?
7 A.  It may or may not have anything to do
8     with it.
9 Q.  You wouldn't know one way or the other?
10 A.  No.  The vessel could have hit the wire
11     because it stalled, or the vessel could
12     have hit the wire because of lack of
13     maneuverability caused by the small
14     engine.
15 Q.  Or Mr. Ramsey may have driven it into the
16     wire.
17 A.  Or Mr. Ramsey may have driven it into the
18     wire.
19 Q.  And that could cause the keyweigh to
20     break.
21 A.  It could, and the wire.
22 Q.  And that could cause the vessel to stall?
23 A.  Could cause the vessel to stall.  That
24     is, the engine to stall.

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

97

1 Q. Right.
2     MR. MURPHY:  That's all.
3
4 EXAMINATION BY MR. ROSENTHAL:
5 Q. Are you an expert on the maneuvering
6     characteristics of vessels?
7 A. Yes, a naval architect becomes involved
8     with maneuvering of vessels.
9 Q. And that includes the characteristics in
10     different current of water?
11 A. Yes.
12 Q. And with different types of engines?
13 A. Yes.
14 Q. Different horsepower engines?
15 A. Yes.
16 Q. And that is specifically your area of
17     expertise?
18 A. Yes.
19 Q. And is it your opinion that this vessel
20     should have been operating at all in this
21     sort of a current, in a current of 6
22     knots or above?
23 A. No, in my opinion, this vessel, with this
24     horsepower, this size vessel, should not

98

1     have been operating in that current.
2 Q. Ever?
3 A. Ever.
4 Q. Okay, thank you.
5     MR. MURPHY:  I wrote myself a
6     note.  I'm not trying to make this last
7     all day.
8
9 EXAMINATION BY MR. MURPHY:
10 Q. Any requirements to being the operator of
11     an outboard motor such as -- strike that
12     -- the skiff, an outboard motor that
13     we've been talking about?
14 A. Not as far as I know.
15 Q. Driver's license even?  Could my
16     7-year-old get in and legally operate?
17 A. I don't know what happens in
18     Massachusetts.  In Louisiana, probably
19     your 7-year-old could go out and operate
20     a boat.
21 Q. You guys are a little looser than we are
22     here in heavily-regulated Massachusetts.
23 A. Sportsmens' paradise.
24 Q. I love New Orleans.  But, you don't know

99

1     if there's any requirements in New
2     Jersey, where this was, or Massachusetts,
3     for that matter, --
4 A. No.
5 Q. -- as far as -- what about a driver's
6     license?  Is that typically --
7 A. Driver's license is something else; Motor
8     Vehicle Bureau.  That has nothing to do
9     with boats.  Boats are still --
10 Q. Don't some boats, like the fishing boats,
11     in order to be a captain you need a
12     driver's license?
13 A. Not as far as I know.  Fishing vessels
14     you don't.  Up until a couple of years
15     ago, you could do anything you wanted in
16     the fishing industry.  That was sort of
17     protected.  And there were no
18     regulations, no Coast Guard regulations,
19     pertaining to fishing vessels.
20     You needed a couple of things.
21     You needed running lights, for example.
22     And you had to carry life-preservers.
23     But, outside of that, you could do just
24     about anything you want on a fishing

100

1     vessel.
2 Q. Any provision that you're aware of where
3     if your driver's license is suspended or
4     revoked, that it would be unlawful for
5     you to operate a skiff like this?
6 A. Absolutely not.  Again, I'm talking about
7     Louisiana.  Federal law, no.  State law,
8     local, municipal law, may be different.
9     But, I don't know of any.  Massachusetts
10     is always different.
11 Q. Okay.  Good.  Thank you.
12     (Whereupon the deposition concluded @ 11:00 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Steven Ramsey v. Jay Cashman, Inc.
Deposition of ARTHUR C. SARGENT - March 16, 2006

101

```
 1            C E R T I F I C A T E
 2 MIDDLESEX, SS
 3     I, Elizabeth A. Hayes, a Massachusetts Court
 4 Reporter and Notary Public duly commissioned and
 5 qualified in and for the Commonwealth of
 6 Massachusetts, do hereby certify that there came
 7 before me on the 16th day of March, 2006, the
 8 person hereinbefore named who was by me duly
 9 sworn to testify to the truth and nothing but the
10 truth of his knowledge touching and concerning
11 the matters in controversy in this cause; that he
12 was thereupon examined upon his oath, and his
13 examination reduced to transcript; and this is a
14 true record of the testimony given by the
15 witness.
16     I further testify that I am neither attorney
17 or counsel for, nor related to or employed by any
18 of the parties hereto or financially interested
19 in the action.
20     IN WITNESS HEREOF, I have hereunto set my
21 hand and notarial seal this 23rd day of March,
22 2006.
23
24     _____
       Elizabeth A. Hayes
       Commission Expires:  August 9, 2007
```

102

```
 1 DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS
 2     The original of the Errata Sheet has been
 3 delivered to SAMUEL J. ROSENTHAL, ESQUIRE.  When
   the Errata Sheet has been completed by the
 4 deponent and signed, the ORIGINAL should be sent
   to ROBERT J. MURPHY, JR., to whom the original
 5 transcript has been sent.
 6 INSTRUCTIONS TO DEPONENT
 7     After reading this volume of your deposition
   transcript, indicate any corrections or changes
 8 to your testimony below, and sign.  DO NOT make
   marks or notations on the transcript volume
 9 itself.  If more space is needed, please use the
   reverse of this sheet.
10 STEVEN RAMSEY v. JAY CASHMAN, INC.
   DEPOSITION OF ARTHUR C. SARGENT (March 16, 2006)
11
12 Page        Line         Deposition              Should
   Number      Number       Reads                   Read
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 I have read the foregoing transcript of my testimony,
   taken on March 16, 2006.  Except for any corrections
20 or changes noted above, I hereby subscribe to the
   transcript as an accurate record of the statements
21 made by me.
22
   _____          Dated: _____
23 ARTHUR C. SARGENT
24
```