## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEVEN RAMSEY | : | |
| | : | |
| Plaintiff, | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | **NO. 04-CV-10699(RCL)** |
| JAY CASHMAN, INC. | : | |
| | : | |
| Defendant | : | |

### PLAINTIFF'S RESPONSE TO THE MOTION IN *LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S DESIGNATED LIABILITY EXPERT

Plaintiff, Steven Ramsey, by and through his undersigned counsel, hereby respectfully responds to the Motion In *Limine* To Exclude The Testimony Of Plaintiff's Designated Liability Expert, and in opposition hereof, responds as follows:

**I.    FACTS**

This is a Jones Act, 46 USCS § 688, et. seq., and general maritime law case brought by Plaintiff, Steven Ramsey, against his employer, Jay Cashman, Inc.("Cashman"). On April 5, 2001, Plaintiff was injured in the course and scope of his employment for Cashman at a work site located at Barnegate, New Jersey. See Deposition of Steven Ramsey, relevant portions of which have been attached as Exhibit "A" at 54. Mr. Ramsey was a mate/engineer aboard the Dredge, Wood I. Exhibit "A" at 55. As a mate/engineer, he was responsible for fueling the engines for the dredge's crane and winches; starting up that machinery; running the winches; and handling lines. Exhibit "A", at 63 - 64, 66. He has never held a Coast Guard license. Exhibit "A" at 65. Mr. Ramsey was injured while aboard a small steel work boat or skiff used by the crewmen of the Wood I (primarily by the

Captain/Superintendent of the Wood I, Kenneth King) to perform errands. Exhibit "A" at 69, 72 -

73. The skiff was approximately 18 feet long and powered by a single forty horsepower Mercury

outboard motor. Exhibit "A" at 87 - 88. This work boat had reportedly been built or assembled by

the Defendant.

### A.   PRIOR SINKING

In March 2001, the skiff had sunk in a major storm, and the engine submerged in salt water.

Exhibit "A" at 79 - 81. The Defendant's Captain/Superintendant, Kenneth King, a licensed Captain

who worked around marine equipment for over twenty years, testified that after seeing the engine he

could tell that "it was submerged enough that it had probably damaged the starter and electronics on

it that it needed to be looked at." Deposition of Kenneth King, relevant portions of which have been

attached hereto as Exhibit "C" at 26, 31. Accordingly, the engine was sent to a nearby facility called

Hochstrasser's Marina to be repaired. Exhibit "A" at 79 - 81; see also Hochstrasser's Marina records

attached hereto as Exhibit "B" Invoices show that the repair consisted of the engine being flushed

with fresh water, the carburetors and fuel lines cleaned and the lube oil replaced. Exhibit "B". One

invoice contains a note that states: "Stator, voltage regulator, switch boxes, starter solenoid were not

changed. Advised doing so since it sank in salt water". Further notation states, "do not change any

electronics, starter, etc." Exhibit "B".

Captain King confirms that, after the engine was returned to Cashman, he knew the skiff had

a stalling problem, but that he continued to keep the work boat in service. Exhibit "C" at 33 - 37, 44.

He acknowledged that he personally had problems with the boat stalling, but continued to use it

when he figured out how to keep it from stalling. Exhibit "C" at 33 - 37, 44. After the skiff was

placed back into service, however, Steven Ramsey had no occasion to be on that vessel until April 5,

–2–

2001, the day of his casualty.  Exhibit "A" at 76, 84 - 85.

## B.     INCIDENT OF APRIL 5, 2001

On April 5, 2001, the Wood I was moored approximately 75 to 100 feet off the south shore of

Barnegate Inlet (Exhibit "A" at 94 - 95), by two lines forward and two lines aft.  Exhibit "A" at 104,

118 - 121.    Attached to the Wood I was a material deck barge.  Exhibit "A" at 107.  On April 5,

2001, Captain King received a call from shore that teeth necessary to repair the Wood I's dredge

bucket were soon to be arriving.  Exhibit "A" at 58, 60, 67 - 68, 74.  Captain King asked Mr. Ramsey

to retrieve the teeth when they arrived, and Mr. Ramsey agreed.  Exhibit "A" at 74.  Shortly

thereafter, Mr. Ramsey was asked by the vessel's safety officer to transport him to shore for lunch.

Exhibit "A", at 69, 86.  Mr. Ramsey took the officer to shore via the skiff.  Exhibit "A" at 69, 72 -

73.  As he was about to return to the Wood I, Mr. Ramsey was informed by the superintendent on

shore that the teeth for the crane's bucket were ready for pick-up.  Exhibit "A" at 69 - 70, 88.  After

loading up the aforesaid teeth, he began the return trip to the dredge.    Exhibit "A" at 93.

As plaintiff began to pilot the skiff from the shore toward the starboard side of the dredge,

the skiff's motor stalled causing the skiff to drift to the stern of the dredge and under the mooring

lines.  Exhibit "A" at 93, 97.  Plaintiff was able to throw a line to a hand on the dredge who caught

the line and held it.  Exhibit "A" at 94 - 96, 97.  After a number of attempts, Plaintiff was able to

restart the motor on the skiff.  Exhibit "A" at 96, 97 - 98.  Defendant's dredge Captain, Ken King,

then instructed Plaintiff to bring the parts to the bow of the dredge where they would be used.

Exhibit "A" at 99 - 102.

As Mr. Ramsey attempted to maneuver the skiff away from the stern of the dredge, while

trying to keep clear of the stern mooring lines in the swift current which exists at Barnegate inlet, the

skiff repeatedly stalled. Exhibit "A" at 103 - 107. The fast current then trapped the stalled skiff and forced it against the rake of the barge which was moored along side the dredge. Exhibit "A" at 107 - 110  The port side of the skiff was forced under water by the downward slope of the barge's rake and began to sink. Exhibit "A" at 107 - 110. As the skiff was about to sink, Plaintiff abandoned ship by jumping off it's bow and then he attempted to climb aboard the Wood I by means of fender tires which hung on the side of the dredge. Exhibit "A" at 110 - 111. As Mr. Ramsey clung to the tire, the sinking skiff flipped over and struck Mr. Ramsey across his back, pinning him to the hull and fenders of the dredge and pulling him under the surface of the water. Exhibit "A" at 111 - 112. Two individuals aboard the Wood I were able to climb down and grab plaintiff and pull him free after much struggling. Exhibit "A" at 114. Plaintiff was then administered medical care and evacuated to Atlantic City for treatment of his injuries.

### C.    POST-INCIDENT

Following the incident, although the Defendant knew or should have known that Plaintiff was injured and that litigation was likely, instead of protecting the vessel and engine at issue, the Defendant subsequently lost them both. See Deposition of David C. DuBois, relevant portions of which are attached hereto as Exhibit "D" at 24. As a result, neither Plaintiff nor his representatives have ever seen, weighed, measured, inspected or examined the skiff or the engine. Moreover, Defendant claims to have no blueprints or specifications available for the skiff.

### D.    LIABILITY EXPERT, ARTHUR C. SARGENT

In support of his claim, Plaintiff retained the services of Naval Architect, Arthur C. Sargent, to review documents and provide opinions pertaining to liability and the causality of the incident at issue. See February 15, 2005 Report of Arthur C. Sargent, attached as Exhibit "E". Mr. Sargent is a

1953 graduate in Naval Architecture and Marine Engineering from the Webb Institute of Naval Architecture in Glen Cove, New York. See Resume of Arthur C. Sargent, attached to Defendant's Motion as Document 3. In addition, he holds a Master's Degree from the Stevens Institute of Technology in Hoboken, New Jersey. See Sargent Resume. He is a licensed Professional Engineer and a member of the American Society of Naval Engineers, the Fluid Power Society and the Society of Naval Architects and Marine Engineers. See Sargent Resume.

Mr. Sargent has over fifty years of experience in the field of Naval Architecture and Marine Engineering. Following service in the United States Navy, where he served aboard a destroyer tender, qualified as a deck watch officer, taught naval architecture to Naval Officers, and was discharged with the rank of Lieutenant, Mr. Sargent worked for various employers as a marine surveyor, Naval Architect and vessel designer. See Sargent Resume. In this regard, he has designed all sorts of boats and water-bound vessels, including small boats similar to the skiff here at issue. See Deposition of Arthur C. Sargent, attached as Exhibit "F" at p. 8 - 9, 15. His other relevant maritime work included consultation with marine insurance companies on issues relating to ship maintenance, repair and operation. See Sargent Resume. In addition, Mr. Sargent has over forty years experience performing and being responsible for design, stability, weight, and feasibility studies of various sized vessels and water transportation systems, including inland craft and passenger vessels. See Sargent Resume. As such, he is expert in the maneuvering characteristics of vessels, a Naval Architectural issue relevant here (Exhibit "F" at 79, 97), and has been qualified as an expert in numerous federal courts. See Sargent Resume.

Prior to rendering his final opinions in this case, Mr. Sargent reviewed all of the witness depositions as well as the statement of Steven Ramsey, photographs of the skiff at issue, repair

invoices from Hochstrasser's Marina, reports prepared by the U.S. Coast Guard, the U.S. Army

Corps of Engineers and the New Jersey State Police, and the report of the Defendant's expert, David

C. DuBois. Exhibit "E". Mr. Sargent has opined that the skiff was underpowered and therefore

unsuitable for the swift current conditions present at the Barnegate Inlet location. Exhibit "E". He

also opined that the skiff was improperly maintained. Following the March 2001 sinking event, the

skiff's electrical system should have been completely checked and/or changed out since electrical

and electronic components can be damaged or destroyed when immersed in salt water. Exhibit "E".

In this regard, the failure of the electronics on the motor on April 5, 2001 explains why the motor

ran intermittently before the incident and why Mr. Ramsey was unable to start the engine later. See

June 27, 2006 Report of Arthur C. Sargent, attached hereto as Exhibit "G". In Mr. Sargent's

opinion, the stalling of the skiff, which directly lead to the skiff's contacting the dredge at the stern

under the mooring lines and subsequently directly lead to the vessel being swept under the rake of

the barge could have been caused by the failure of defendant to follow the recommendations of the

marina mechanics and replace the electrical components on the motor. Exhibit "E". Further,

testimony regarding the circumstances of the skiff capsizing and sinking suggests that the freeboard

was too low to keep water out of the interior of the vessel after it had become pinned by the current.

Exhibit "G". The testimony also suggests that the skiff did not possess reserve stability sufficient to

keep it afloat should it become swamped. Exhibit "G".

## II.    ARGUMENT

### A.    DEFENDANT'S MOTION SHOULD BE DISMISSED AS IT IS IN VIOLATION OF THE LOCAL RULES OF THIS COURT

In its motion, Cashman for the first time raises it's objection to the qualifications of Arthur C.

Sargent.  Pursuant to District of Massachusetts Local Rule 26.4:

> A party who intends to object to the qualifications of an expert witness...shall give
> written notice of the grounds of objection, together with supporting authority, to all
> other parties no later than the time for such objections provided in LR 16.5c [relating
> to Disclosures Preliminary to the Pretrial Conference].

No such objections were ever lodged in the instant case.  Nor did the Defendant's Pretrial Memorandum contain any notice whatsoever that Cashman objected to the qualifications of Mr. Sargent.  As such, the Defendant's Motion is untimely, and in violation of the Local Rules of this Honorable Court, and it should be dismissed on this basis alone.

### B.    ARTHUR C. SARGENT IS WELL QUALIFIED TO RENDER OPINIONS ON ISSUES RELEVANT TO NAVAL ARCHITECTURE AND MARINE ENGINEERING

Cashman claims that Arthur Sargent's testimony should be precluded as Mr. Sargent is not qualified to render opinions about the maintenance and repair of the 40 horsepower motor at issue. Assuming *arguendo* that this Honorable Court decides to address Cashman's Motion in *Limine* on the merits, the Defendant's Motion should be denied as Mr. Sargent is easily well qualified to render opinions on issues relating to Naval Architecture and Marine Engineering.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise.

This rule imposes a gate-keeping role on the trial judge to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (holding that Daubert applies to all expert testimony). Expert testimony must be reliable, such that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. The proffered expert testimony must also be relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 80 (1st Cir. 1998) (citing Daubert, 509 U.S. at 591-92) (citations omitted). In this regard, "[t]he ultimate purpose of the Daubert inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue." Cipollone v. Yale Indus. Prod., Inc., 202 F.3d 376, 380 (1st Cir. 2000).

Before accepting expert testimony, a district court must act as gatekeeper and ensure that the expert is qualified to testify. Poulis-Minott v. Smith, 388 F.3d 354 (1st Cir. 2004); Correa v. Cruisers, a Div. of KCS Intern., Inc., 298 F.3d 13, 24 (1st Cir. 2002); Diefenbach v. Sheridan Transp., 229 F.3d 27, 30-31 (1st Cir. 2000)(setting forth the requirements of Rule 702). It is not required that experts be "blue-ribbon practitioners" with optimal qualifications. United States v. Mahone, 453 F.3d 68, 71 (1st Cir. 2006). Nor must an expert be required to satisfy an "overly

narrow test" of his own qualifications.[1]  Expert exclusion is improper simply because the witness

does not have "the degree of training" or "specialization" the court deems "most appropriate."[2]  In

_____

[1]See, for example, Lindsey v. Louisville & Nashville R.R. Co., 775 F.2d 1322 (5th Cir. 1985)(expert could testify to safety of loading-unloading operation despite unfamiliarity with type of car in accident; he had training in occupational safety and had worked as switchman for many years); Mittlieder v. Chicago & Northwestern Ry., 413 F.2d 77 (8th Cir. 1969) (experienced railroad engineer could testify to train's required stopping distance; whether he had operated similar trains in same situation went to weight of testimony); Southern Cement Co. v. Sproul, 378 F.2d 48 (5th Cir. 1967) (witness with practical mining experience could testify as expert; fact that he never mined limestone or worked in mine of same size did not disqualify him); Roth v. Bird, 239 F.2d 257 (5th Cir. 1956) (court erroneously required witness show experience in loading lost or similar vessel to opine that negligent loading caused accident); Gindville v. Am.- Hawaiian Steamship Co., 224 F.2d 746 (3d Cir. 1955) (master mariner with substantial sea service could testify to safety of vessel's storage method despite lack of experience with loading steel rods); Hanna v. Fletcher, 261 F.2d 75 (D.C.Cir. 1958), cert. denied, Gichner Iron Works, Inc. v. Hanna, 359 U.S. 912 (1959) (court erred precluding testimony of iron worker on standard of reasonable care in repair of handrail; fact he had only worked on one staircase like that in case went to weight not admissibility of testimony);Bunt v. Altec Indus., Inc., 962 F. Supp. 313, 317-18 (N.D.N.Y. 1997) (court improperly excluded engineer's opinion digger derrick was defective; his lack of familiarity with derrick involved in incident affected only weight of testimony).

[2]Karmelich v. Transportation Maritima Mexicana, 1997 WL 289476 (9th Cir. 1997)(witness could testify that low, unmarked beam created unreasonable danger; though he was not a stevedore, he was experienced cargo vessel master and navel architect); U.S. v. Members of Estate of Boothby, 16 F.3d 19 (1st Cir. 1994)(Army Corps of Engineers worker could testify to navigability of waters; though he lacked nautical training, he was familiar with Corps' regulations and vessels at issue); Habacker v. Copperloy Corp., 893 F.2d 49 (3d Cir. 1990)(court erroneously excluded safety specialist's testimony failure to equip forklift with seat belt caused injury; although not an engineer, witness had masters degree in safety education and doctorate in human factors and product safety design); Hammond v. Int'l Harvester Co., 691 F.2d 646 (3d Cir. 1982) (witness with no engineering or physics degree could testify tractor was defective; he had sold automotive, agricultural, and mechanical equipment and had taught high school automobile maintenance and repair); Gravely v. Providence Part., 549 F.2d 958 (4th Cir. 1977) (witness, though not architect, could testify to safety of spiral staircase; he had extensive experience in stairway construction); Cunningham v. Gans, 507 F.2d 496 (2d Cir. 1974) (court improperly excluded testimony that clamp should have been able to support pipe which fell on plaintiff; though witness had no metallurgy training, he had extensive experience as pipefitter); Frankel v. Styer, 386 F.2d 151 (3d Cir. 1967) (court erred excluding evidence on custom of installing safety releases on doors of insulated truck bodies; witness, though not industrial draftsman or engineer, had experience in business of building commercial truck bodies); Larson v. Straff, 340 F.2d 180 (3d Cir. 1964) (witnesses with no metallurgy training could testify platform on which plaintiff fell was hazardous; they qualified by virtue of their vast

fact, a proffered expert witness need not possess any special *academic* credentials to satisfy Rule 702's inquiry. See Humphries v. Mack Trucks, Inc., 1999 U.S. App. LEXIS 25522 (4th Cir. Oct. 13, 1999) (fact that expert was not an engineer, that he failed to conduct specific tests or studies involving the apparatus at issue, and that he failed to consider various aspects of the industry, was not enough to disqualify him from testifying; testimony did not require him to develop an alternative design or safety device that would require testing or related studies); Hammond, 691 F.2d at 653. Practical experience alone is sufficient to qualify an expert.[3] See Tyus v. Urban Search Mgt., 102 F.3d 256, 263 (7th Cir. 1996); Compton v. Subaru of Am., Inc., 82 F.3d 1513, 1519 (10th Cir.);

---

experience maintaining and inspecting such materials); George v. Morgan Const. Co., 389 F. Supp. 253, 258 (E.D.Pa. 1975) (witness, though not engineer, could testify to safer alternative design as he was experienced bar mill workman).

[3]Hammond, supra n.17; Knight v. Otis Elevator Co., 596 F.2d 84 n.18 (3d Cir. 1979); Frankel, supra n.17; Larkin v. May Dept. Stores, 250 F.2d 948 (3d Cir. 1958) (court improperly excluded contractor's testimony that revolving door's breaking mechanism was defective; he had practical experience with similar doors and was familiar with one in case); Int'l Derrick & Equip. Co. v. Buxbaum, 210 F.2d 384 (3d Cir. 1954), opin. amended, 139 F. Supp. 799 (E.D.Pa. 1955) (witness who erected antenna masts similar to one in case could testify whether lifting operation was negligently performed); Kraft General Foods, Inc. v. BC-USA, Inc., 840 F. Supp. 344 (E.D.Pa. 1993) (Argentinean intellectual property agent could testify as expert though lacking formal education in trademark law). See Circle J. Dairy, Inc. v. A.O. Smith Harvestore Prod., Inc., 790 F.2d 694 (8th Cir. 1986) (soil and feed service owner, though not veterinarian, could testify to physical condition of herd; he had experience with feed-related health problems in dairy cattle); Fed. Crop Ins. Corp. v. Hester, 765 F.2d 723 (8th Cir. 1985)(farmers could state party's probable crop yield; they had experience growing corn on similar land); Cunningham, supra n.17; Santana Marine Service v. McHale, 346 F.2d 147 (5th Cir. 1965) (witness experienced in designing, making, and installing lift devices could testify to cause of ring break); Moran v. Ford Motor Co., 476 F.2d 289, 291 (8th Cir. 1973) (court erroneously excluded body and fender shop owner's testimony ball joint of car's suspension system was defective; witness had experience in auto repair and had frequently examined wrecked cars); Tropea v. Shell Oil Co., 307 F.2d 757 (2d Cir. 1962)(witnesses who had operated gasoline service stations could testify to custom of disposing waste fluid pumped from fuel storage tanks); Western Spring Ser. Co. v. Andrew, 229 F.2d 413 (10th Cir. 1956) (witnesses qualified in art of welding could testify that weld was defective and caused tractor's drive shaft break); Davis v. Brown & Root Int'l, Inc., 1994 WL 34043 (E.D.La. 1994) (witness who was veteran boilermaker could testify to cause of corrosion in pipe); George, supra n.17.

Hammond, 691 F.2d at 653. See also Notes of Advisory Committee on 2000 amendments.[4] The test

is simply whether the witness' training and experience demonstrate a knowledge of the relevant sub-

ject matter. See Moran, 476 F.2d at 291 (8th Cir. 1973) (relying on Hammond, 691 F.2d at 653). The

witness' relative skill or knowledge goes to the weight, and not the admissibility, of the testimony.

See Holbrook, 80 F.3d at 782.

    Courts also routinely qualify experienced mariners and marine experts in maritime cases. See

Wyler v. Holland Am. Line - United States, Inc., 2003 U.S. Dist. LEXIS 25885, 2004 A.M.C. 1792

---

[4]Notes of Advisory Committee on 2000 amendments state:

In certain fields, experience is the predominant, if not sole, basis for a great deal of
reliable expert testimony. See, e.g., United States v. Jones, 107 F.3d 1147 (6th Cir.
1997) (no abuse of discretion in admitting the testimony of a handwriting examiner
who had years of practical experience and extensive training, and who explained his
methodology in detail); Tassin v. Sears Roebuck, 946 F.Supp. 1241, 1248 (M.D.La.
1996) (design engineer's testimony can be admissible when the expert's opinions "are
based on facts, a reasonable investigation, and traditional technical/mechanical
expertise, and he provides a reasonable link between the information and procedures
he uses and the conclusions he reaches"). See also Kumho Tire Co. v. Carmichael,
[143 L. Ed. 2d 238,] 119 S.Ct. 1167, 1178 (1999) (stating that "no one denies that an
expert might draw a conclusion from a set of observations based on extensive and
specialized experience.").

(W.D. Wash. 2003). In <u>Wyler</u>, for example, the plaintiff a passenger on a cruise ship, was injured

when the vessel lurched in inclement weather. Plaintiff retained an expert whose qualifications were

that he maintained a Master's License; served as Chief Officer on a smaller ocean-going cruise ship,

performed accident survey work for cruise line industry; and investigated many shipboard injuries for

insurance companies. The defendants argued, however, that the expert was not qualified to assess

the foreseeable dangers in the weather conditions with respect to a larger, modern cruise liner. The

Court disagreed, and in doing so held that the defendants failed to posit what background would be

required of a qualified expert, except to suggest that such an expert might have direct experience on a

modern vessel the size of the [one at issue]. As a matter of law, this basis is too narrow to disqualify

plaintiff's expert testimony as unreasonable under Kumho Tire.

<u>Wyler</u>, 2003 U.S. Dist. LEXIS 25885 at *11. <u>See also</u> <u>Diefenbach</u>, 229 F.3d 27 (Court affirmed trial

Court's holding that captain was an expert on docking and undocking, based upon his education at

the Maine Marine Academy, Coast Guard licensing, and years on the water, even though he never

served upon a similar ITB, or integrated tug and barge); <u>Jones v. Globalsantafe Drilling Co.</u>, 2004

U.S. Dist. LEXIS 15954 (E.D. La. July 28, 2004) (in an admiralty/Jones Act case, the Court found

that a licensed professional engineer with over 40 years of engineering experience, and who had

worked as a safety inspector, a safety equipment designer, and an operations supervisor,

"[c]ertainly…has acquired a knowledge in his field beyond that of the ordinary witness").

Cashman claims that Mr. Sargent is not qualified to render opinions as to the lack of proper

maintenance for the skiff's 40 horsepower outboard engine. Specifically, Cashman claims that,

although Mr. Sargent is a licensed professional engineer and despite his own experience repairing

outboard engines,[5] since he is not a professional *mechanic* he cannot claim that the engine at issue was improperly maintained or repaired. But Cashman appears to miss the point of Mr. Sargent's proposed testimony. Mr. Sargent does not plan to testify about the specifics of the engine's operation, other than those areas about which he is professionally familiar (such as engine power, thrust, and vessel maneuverability characteristics). Rather, Mr. Sargent plans to testify about Cashman's failure to follow general maritime industry standards and practice, subjects about which he is well-suited and well-qualified to testify, (1) to properly repair an engine submerged in salt water; and (2) to provide a properly operating engine to its crewmen.

Mr. Sargent has over fifty years experience in the fields of Naval Architecture and Marine Engineer. See Sargent Resume. He has served as a deck officer aboard a Naval vessel and taught Naval Architecture to officers in the United States Military. See Sargent Resume. He has worked for various employers as a marine surveyor, Naval Architect and vessel designer. See Sargent Resume. And, he has designed vessels, including small boats similar to the skiff here at issue. See Exhibit "F" at p. 8 - 9, 15. His other relevant maritime work included consultation with marine insurance companies on issues relating to ship maintenance, repair and operation. See Sargent Resume. In addition, Mr. Sargent has over forty years of experience performing design, stability, weight, and feasibility studies of various sized vessels and water transportation systems, including inland craft and passenger vessels. See Sargent Resume. As such, he is expert in issues such as the maneuvering characteristics of vessels (Exhibit "F" at 97), an issue of Naval Architecture (Exhibit

---

[5]Mr. Sargent testified that he has experience repairing small outboard engines, such as 40 horsepower outboard engines. Exhibit "F" at 85. Cashman claims at pages 9 and 10 of its Brief that this Honorable Court should dismiss this, as well as all other opinions based upon Mr. Sargent's "personal experience." This argument, of course, is without either legal or practical support. See

"F" at 79) which is directly relevant and related to the issues he opines about in this case.

No doubt it is common knowledge that a vessel that stalls repeatedly in the span of approximately ten minutes it is not in good repair. But the jury will need an expert to explain the relevant general and/or customary maritime industry standards and practice relating to engine submersion, corrosion and repair protocol. Expert testimony on industry standards is common fare in civil litigation. E.g. Levin v. Dalva Bros., 459 F.3d 68, 2006 (1st Cir. Mass. 2006); Ford v. Allied Mut. Ins. Co., 72 F.3d 836, 841 (10th Cir. 1996); Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995); TCBY Sys., Inc. v. RSP Co., Inc., 33 F.3d 925, 928 (8th Cir. 1994). This is true particularly in the context of a Jones Act case, where a jury, when addressing the question of negligence, may consider whether the shipowner's conduct violated its own safety rules or customary practices in the industry. See Armstrong v. Burlington Northern R.R., 139 F.3d 1277 (9th Cir. 1998); Moses v. Union Pacific R.R., 64 F.3d 413 (8th Cir. 1995); DeBiasio v. Illinois Central R.R., 52 F.3d 678 (7th Cir. 1995), cert. denied, 516 U.S. 1157 (1996); Fulton v. St. Louis-San Francisco Ry., 675 F.2d 1130 (10th Cir. 1982); Brown v. Cedar Rapids & Iowa City Ry., 650 F.2d 159 (8th Cir. 1981); Mileski v. Long Island R.R., 499 F.2d 1169 (2d Cir. 1974); Duncan v. St. Louis-San Francisco Ry., 480 F.2d 79 (8th Cir.), cert. denied, 414 U.S. 859 (1973); Boston & Maine R.R. v. Talbert, 360 F.2d 286 (1st Cir. 1966); Johnson v. Erie Lackawanna R.R., 236 F.2d 352 (2d Cir. 1956); Haines v. Reading R.R., 178 F.2d 918 (3d Cir. 1950).

At his deposition, for example, Mr. Sargent testified that it was "general good practice, marine practice, when you dunk something, to submerge it in salt water, to replace it immediately

Notes of Advisory Committee on 2000 amendments; footnotes 3 and 4, supra.

thereafter, if you want to go back in operation with it. That's the general practice..." Exhibit "F" at 36. As a result, once Hochstrasser's Marina told Cashman in early March, 2001, that following the engine's immersion in salt water certain repairs were necessary, it was Cashman's obligation to see that those repairs were effectuated. Exhibit "F" at 34 - 40. Specifically with regard to the electrical system, Mr. Sargent stated: "[w]hen you have something dunked in salt water, normally you change out everything to do with the electrical [because] the electrical can short out. It's damaged, rusted corroded." Exhibit "F" at 35. If it had done performed the necessary repairs recommended by Hochstrasser's Marina, Cashman would have learned whether or not the engine had an electrical problem, as Hochstrasser's Marina could have taken the engine apart and tested each piece individually for corrosion. Exhibit "F" at 39. That was never done.

### C.    ARTHUR C. SARGENT'S PROPOSED TESTIMONY IS BOTH RELIABLE AND RELEVANT

Next, Cashman claims that Mr. Sargent should be precluded from testifying that the skiff was underpowered as his opinion purportedly is not sufficiently reliable or has foundation. As Mr. Sargent's proposed testimony meets the standard set forth in Daubert and its progeny, Cashman's claim is both fallacious and lacking in legal or factual support.

After determining whether the witness is a qualified proponent of a scientific or technical methodology, the Court must then query "whether those principles and methods have been properly applied to the facts of the case." Fed. R. Evid. 702 advisory committee's note. "In other words, Rule 702, as visualized through the Daubert prism, requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" Ruiz-Troche v. Pepsi Cola, 161 F.3d 77, 81 (1st Cir. 1998) (quoting Daubert, 509 U.S. at 592). Daubert imposes on district court judges a special

"gatekeeping" function to "ensure that any and all scientific testimony...is not only relevant, but reliable." Daubert v. Merrell Dow Pharm., 509 U.S. 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

As the gate-keeper, the Court's inquiry is "a flexible one" focusing on the "principles and methodology" employed, not conclusions reached. Daubert, 509 U.S. at 594-95. See also Zachar v. Lee, 363 F.3d 70 (1st Cir. Mass. 2004).

> Daubert does not require that the party who proffers expert testimony carry the
>
> burden of proving to the judge that the expert's assessment of the situation is correct.
>
> . . . It demands only that the proponent of the evidence show that the expert's
>
> conclusion has been arrived at in a scientifically sound and methodologically reliable
>
> fashion.

Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). In this regard, the Court has broad latitude to consider whatever factors bearing on validity the Court feels are useful. Kumho, 526 U.S. at 149-50; United States v. Vargas, 471 F.3d 255 (1st Cir. Mass. 2006). Of course, the particular factors will necessarily depend upon the unique circumstances of the expert testimony at issue. Kumho, 526 U.S. at 151-52. "Whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho, 526 U.S. at 153. The Court noted:

> In other cases, the relevant reliability concerns may focus upon personal knowledge
>
> or experience. As the Solicitor General points out, there are many different kinds of
>
> experts, and many different kinds of expertise. See Brief for United States as Amicus
>
> Curiae, 18-19 n.5 (citing cases involving experts in drug terms, handwriting analysis,
>
> criminal modus operandi, land valuation, agricultural practices, railroad procedures,

attorney's fee valuation, and others) . . . We agree with the Solicitor General that "the

factors identified in <u>Daubert</u> may or may not be pertinent in assessing reliability,

depending on the nature of the issue, the expert's particular expertise, and the subject

of his testimony." Brief for United States as Amicus Curiae, 19. The conclusion in

our view, is that we can neither rule out, nor rule in, for all cases and for all time the

applicability of the factors mentioned in <u>Daubert</u>, nor can we now do so for subsets

of cases categorized by category or expert or by kind of evidence. Too much depends

upon the particular circumstances of the particular case at issue.

<u>Kumho</u>, 526 U.S. at 150. In order to determine whether an expert opinion will, or will not be,

helpful, "[t]here is no more certain test . . . than the common sense inquiry whether the untrained

layman would be qualified to determine intelligently and to the best possible degree the particular

issue without enlightenment from those having a specialized understanding of the subject involved in

the dispute." Fed.R.Evid. 702 advisory committee note (quoting Ladd, Expert Testimony, 5 VAND.

L. REV. 414, 418 (1952)).

    When, as in this case, an expert is "qualified . . . by knowledge, skill, experience, training, or

education," Fed. R. Evid. 702, he need not have had first-hand dealings with the precise type of event

that is at issue. <u>See</u> <u>e.g.</u> <u>Diefenbach v. Sheridan Transp.</u>, 229 F.3d 27, 31 (1st Cir. 2000) (upholding

district court's allowance of sea captain's expert testimony despite captain's lack of familiarity with

the particular type of vessel on which plaintiff's injury took place). Indeed, in cases such as this one,

a Court's emphasis on scientific principles and replicable experiments or studies is misplaced. <u>See</u>

<u>Major v. CSX Transp., Inc.</u>, 278 F. Supp. 2d 597 (D. Md. 2003) (in an FELA action, experts

opinions derived solely from railroad industry practice or custom, and supported by past experiences

–17–

in the rail industry, enough to overcome <u>Daubert</u> challenge that testimony was mere subjective belief or unsupported speculation); <u>United States v. Hankey</u>, 203 F.3d 1160, 1169 (9th Cir. 2000) (peer review, publication, potential error rate not factors applicable when reliability of proposed expert testimony depends heavily on knowledge and experience of expert, rather than methodology or theory behind it).

Mr. Sargent's proposed testimony meets the standard set forth in <u>Daubert</u> and its progeny, as it is reliable and as it will assist the trier of fact in understanding or determining the facts in issue. <u>Daubert</u>, 509 U.S. at 592. Mr. Sargent opines that the vessel was unseaworthy as it was underpowered for the conditions at that time and location, particularly while moving in reverse. Exhibit "F" at 52 - 54, 56, 71. In order to arrive at this conclusion, and employing standard engineering principals (Exhibit "F" at 57), Mr. Sargent first needed to know about the speed of the current and the size of the vessel. Exhibit "F" at 57. For this he scoured the witnesses testimony and available documentation, including Coast Guard and Army Corp of Engineer reports, and learned that the current speed had been estimated at approximately 6 to 12 knots. Exhibit "F" at 25, 53. 6 knots (which incidentally is the *slowest* figure set forth by the Defendant's expert, Mr. DuBois (Exhibit "D" at 40)) mathematically translates into a velocity of 10 feet per second. Exhibit "F" at 59. As for the size of the vessel, as the skiff was never made available for inspection due to the Defendant's failure to adequately preserve it, based upon photographs and witness testimony Mr Sargent estimated that the stern was five feet wide and two feet deep, or ten square feet. Exhibit "F" at 57.[6] From the velocity of the current, and using the standard engineering principal that force

---

[6]Ten square feet is actually an overly conservative estimate as the depth of the stern was more likely closer to 3 feet (Mr. Ramsey testified as to one foot of freeboard [distance from water line to

equals area (ten square feet) times velocity (ten feet per second) squared, he was able to determine

the "force" in pounds pushing against the stern of the vessel: one thousand pounds of force. Exhibit

"F" at 59. Mr. Sargent then opined that a 40 horsepower motor is not adequate to provide the

requisite thrust in reverse to withstand one thousand pounds of force.[7]   Exhibit "F" at 59.

Cashman quibbles with Mr. Sargent's methodology in that he does not know the actual size

of the vessel's propeller.[8]   Again, if not for Cashman's failure to preserve this evidence, Plaintiff

---

railing] and two feet of draft [distance from water line to bottom of vessel]), not 2.  Exhibit "F" at 64.

[7]Cashman's criticism that no one had ever complained that the vessel was underpowered (Defendant's Brief at 8) is neither relevant nor entirely accurate. Mr. Sargent has opined that the skiff was underpowered for the conditions then present, a current moving at 6 knots. He has not stated that the vessel could not be maneuvered in slack tide, the conditions under which the vessel was most often used. Moreover, to say that no one "had problems navigating the waters during the months before the incident" completely ignores Captain King's testimony that, even with a good motor, the skiff was difficult to maneuver and a "dangerous operation" in the Barnegate Inlet current. Exhibit "C" at 71 - 72, 74 - 75.

[8]Cashman also questions Mr. Sargent's opinions regarding the broken keyweigh and the broken radio. With regard to the keyweigh, Mr. Sargent addressed the issue upon questioning about Mr. Ramsey's testimony that, as he was backing up the skiff after leaving the stern of the dredge, the skiff's motor sounded as if it was neutral, when in fact it was in reverse. Exhibit "F" at 86 - 87. Mr. Sargent stated that the engine either got thrown into neutral or some keyweigh broke. Exhibit "F" at 87. A keyweigh is an item that holds a piece of equipment, such as a propeller or gear, onto the shaft. Exhibit "F" at 94. Cashman claims that there is no basis or methodology for this opinion. Hochstrasser's Marina invoice reflecting repairs made after the April 4, 2001 casualty show that a keyweigh key was, in fact, replaced. Exhibit "F" at 87. As for the location of the said keyweigh key, an examination of the engine itself may have proven helpful. Of course, such an examination was precluded by the Defendant as it "lost" the skiff and engine at issue. With regard to the broken radio, it does not take a "radio expert" to opine that the custom and practice in the marine industry is for vessels such as the skiff at issue to have a working radio aboard. As Mr. Sargent's opinion is that the skiff was unseaworthy as it was improperly maintained, failure to provide such a working radio obviously may be seen as evidence of this breach. This evidence, therefore, also possesses relevancy as a means of painting the backdrop against which Cashman's maintenance operation was being performed. It as well-settled that such "context" evidence generally is admissible. See e.g. Faigin v. Kelly, 184 F.3d 67 (1st Cir. 1999); United States v. McKeeve, 131 F.3d 1, 13-14 (1st Cir. 1997).

would have had access to this information. In its absence, Mr. Sargent was forced to make certain assumptions based upon his vast experience in the marine industry.

> I have to use again, little analogies. I know what it is on tugs. Big numbers on tugs,
>
> 25 pounds per horsepower; big numbers. Remember big propellers...And this is a
>
> little propeller...not built, really, for thrusting.

Exhibit "F" at 59. In other words, the skiff's propeller would produce some figure *less* than 25 pounds per horsepower. Indeed, based on his experience in Naval Architecture, Mr. Sargent was able to opine that the skiff's engine would be able to produce no more than 20 pounds per horsepower. Exhibit "F" at 60.[9] And probably even less than 20 pounds, as "engines are not as efficient when going in reverse." Exhibit "F" at 61. Nevertheless, assuming 20 pounds per horsepower for a 40 horsepower engine, the engine could produce only 800 pounds of thrust, a figure well short of the 1000 pounds of thrust pushing against the vessel's stern under the conditions present on April 5, 2001. Mr. Sargent then concludes that:

> [T]here's no way, in my opinion, that this little 40 horsepower engine is going to
>
> produce 1000 thrust. So, I therefore say its incapable of maneuvering that little boat
>
> under those conditions.

Exhibit "F" at 61. Bearing in mind that Mr. Sargent (1) could not measure or weigh the skiff at issue, (2) had to rely on photographs and estimates made by witnesses, and (3) was not privy to information relating to the size and thrust characteristics of the vessel's propeller, he was certainly at

---

[9]And probably even less. "[E]ngines are not as efficient when going in reverse." Exhibit "F" at 61.

a disadvantage. But his methodology, nevertheless, remains solid, and undisputed. See <u>McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals</u>, 140 F.3d 288, 302 (1st Cir. 1998) (noting that the failure to include particular variables could diminish the testimony's probativeness, but would not render it "unacceptable"). And any criticism of the facts underlying his opinion is a fertile subject for cross-examination.

## III.    CONCLUSION

Here, under Rule 702, Arthur C. Sargent's proposed testimony rests on a reliable foundation and is relevant to the task at hand. WHEREFORE, Plaintiff Steven Ramsey respectfully requests that this Honorable Court DENY the Defendant's Motion in *Limine* to preclude the testimony of Plaintiff's liability expert, Arthur C. Sargent.

The plaintiff,
Steven Ramsey
By His attorneys,
BARISH ◆ROSENTHAL

/s/ Samuel J. Rosenthal, Esq.
/s/ Rudolph V. DeGeorge, II, Esq.
Samuel J. Rosenthal, Esq.
Rudolph V. DeGeorge, II, Esq.
Bell Atlantic Tower, Suite 4020
1717 Arch Street
Philadelphia, PA  19103
(215) 923-8900

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 19, 2007.

/s/ Ronald M. Davids
Ronald M. Davids