EXHIBIT "F"

```
                              VOLUME:    I
                              PAGES:     1-102
                              EXHIBITS:  See Index
```

UNITED STATES DISTRICT COURT

Civil Action No. 04-CV-10699 (RCL)

---

```
STEVEN RAMSEY                            X
                                         X
                                         X
            Plaintiff,                   X
V.                                       X
                                         X
JAY CASHMAN, INC.                        X
                                         X
            Defendant.                   X
```
---

DEPOSITION of *ARTHUR C. SARGENT*, taken pursuant to the Massachusetts Rules of Civil Procedure, before Elizabeth A. Hayes, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, held at the law offices of Holbrook & Murphy, 15 Broad Street, Boston, Massachusetts, on Thursday, March 16, 2006, commencing at 9:15 a.m.

---

REPORTERS, INC.

GENERAL & TECHNICAL COURT REPORTING

23 MERRYMOUNT ROAD, QUINCY, MA   02169

617.786.7783/FACSIMILE 617.786.7723

APPEARANCES OF COUNSEL:

<u>For the Plaintiff:</u>

BARISH ROSENTHAL

Three Parkway, Suite 1320

1601 Cherry Street

Philadelphia, Pennsylvania   19102

    BY:   <u>SAMUEL J. ROSENTHAL, ESQUIRE</u>


<u>For the Defendant:</u>

HOLBROOK & MURPHY

15 Broad Street, Suite 900

Boston, Massachusetts   02109

    BY:   <u>ROBERT J. MURPHY, JR., ESQUIRE</u>


3

## INDEX

*Testimony of:*                                       *Page*

**ARTHUR C. SARGENT**

| | |
|---|---|
| Examination by MR. MURPHY | 5 |
| Examination by MR. ROSENTHAL | 82 |
| Examination by MR. MURPHY | 88 |
| Examination by MR. ROSENTHAL | 97 |
| Examination by MR. MURPHY | 98 |

## INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Fax cover sheet; report dated 2/15/05; fax transaction report; two-page C.V.; and eight pages of appendices. | 4 |

S T I P U L A T I O N S

1
2
3       It is hereby stipulated and
4   agreed by and between counsel for the
5   respective parties that all objections,
6   except as to form, and motions to strike
7   will be reserved until the time of trial
8   or pre-trial hearing.
9       It is further agreed that the
10  witness will read and sign the deposition
11  transcript, under the pains and penalties
12  of perjury, within 30 days of receipt of
13  the deposition transcript; otherwise the
14  deposition transcript will be deemed
15  signed.
16      *ARTHUR C. SARGENT*, first having
17  been satisfactorily identified by the
18  production of his driver's license, and
19  duly sworn, testifies as follows:
20
21      *(Exhibit No. 1, Fax cover*
22  *sheet; report dated 2/15/05; fax*
23  *transaction report; two-page C.V.;*
24  *and eight pages of appendices,*

```
 1         marked.)
 2         EXAMINATION BY MR. MURPHY:
 3    Q.   We've been chatting off the record.  Let
 4         me reintroduce myself.  I'm Bob Murphy,
 5         and I represent the defendant in this
 6         case.
 7              We've had your report marked as
 8         the first Exhibit, and I'd like to go
 9         over that with you.
10    A.   Do you want to identify me for the
11         record?
12    Q.   She's done that already.
13              MR. MURPHY:  Haven't you?
14         Could you tell us all who you are?
15    A.   I'm Arthur C. Sargent.  The last name is
16         S-a-r-g-e-n-t.
17    Q.   Okay, and she made you show ID, so we
18         know it's really you.  Would you tell me
19         where you live?
20    A.   Yes, New Orleans.
21    Q.   You've provided us with your report that
22         we've marked as Exhibit 1, a CV?
23    A.   Yes, sir.
24    Q.   And that accurately describes your
```

```
 1           education?
 2   A.      Yes.
 3   Q.      And experience?
 4   A.      Yes.
 5   Q.      Let me ask you, is this your most recent
 6           and up-to-date CV?
 7   A.      Yes.
 8   Q.      And let me direct your attention to
 9           appendix two, which is entitled
10           "Publications authored by Arthur
11           Sargent."
12   A.      Yes.
13   Q.      Is that up to date, as well?
14   A.      Yes.
15   Q.      Appendix three is a rate schedule.
16   A.      Yes.
17   Q.      Is that up to date?
18   A.      Yes.
19   Q.      Is four up to date?
20   A.      I don't know.
21   Q.      It only goes up to 2004.
22   A.      Probably pretty close up to date.  There
23           might be one or two that should be added
24           to that.
```

```
1   Q.   Do you know whether you've testified at
2        deposition or trial since August of --
3   A.   Yes, it just hasn't been brought up to
4        date.
5   Q.   Okay, can you tell me the cases?
6   A.   No, I don't have my file with me.  But, I
7        can get my secretary to bring you up to
8        date.
9   Q.   Okay.  No problem with that.
10  A.   Remember, this goes back to probably some
11       time very early.  This was faxed to you
12       February of '05.
13  Q.   Sure.
14  A.   And we're now a year later.
15  Q.   Fine.  But, no problem updating that?
16  A.   No.
17  Q.   Okay, you can get that to me.  Great.  I
18       just want to go through documents you may
19       have.  You're a principal of Sargent and
20       Herkes -- is that how it's --
21  A.   Herkes.
22  Q.   Herkes.
23  A.   Yes, I'm president.
24  Q.   Can you tell me what advertising you do,
```

1          if any?
2    A.    Yes, Maritime Reporter and Marine Log.
3    Q.    Do you have any -- well, I trust you have
4          promotional materials that you provide to
5          prospective clients.
6    A.    Well, I do in the office, yes.
7    Q.    Okay. Do you have any list of references
8          that you give people?
9    A.    Probably there's something in the
10         promotional information.
11   Q.    And those are documents that you can
12         obtain for me?
13   A.    Yes, they're in my office.
14   Q.    Sure.
15   A.    I'll be happy to provide advertising
16         materials.
17   Q.    What kind of work do you do; you?
18   A.    I'm basically a naval architect. I'm a
19         designer.
20   Q.    Okay.
21   A.    When I say designer, if you go to my
22         resume, I design all types of vessels
23         that float. I do not design submarines,
24         for example, that go underneath, nor do I

|    |    |    |
|----|----|----|
| 1  |    | design buildings.  I'm a naval architect. |
| 2  |    | I design offshore supply boats, offshore |
| 3  |    | drilling rigs, river barges, offshore |
| 4  |    | barges, chemical carriers, just about any |
| 5  |    | type of structure or vessel that's on |
| 6  |    | water. |
| 7  |    | I've designed wave machines, |
| 8  |    | devices to extract energy from waves. |
| 9  |    | And again, they float, and they extract |
| 10 |    | energy.  But, basically I'm a naval |
| 11 |    | architect.  I design things. |
| 12 |    | However, I also consult with |
| 13 |    | attorneys and underwriters and others who |
| 14 |    | are involved in the marine field. |
| 15 | Q. | What percent of your business does that |
| 16 |    | make up? |
| 17 | A. | Probably 50% right now. |
| 18 | Q. | About half? |
| 19 | A. | Yes.  In other words, the design is half, |
| 20 |    | and this consulting with others is about |
| 21 |    | half. |
| 22 | Q. | Okay.  And who do you mostly work for, |
| 23 |    | plaintiffs, defendants? |
| 24 | A. | Mostly for defense.  And I think it's |

```
 1        obvious my clients are normally defense.
 2        I work, oh, probably 90% of the time for
 3        defense, 10% of the time for plaintiffs.
 4        Well, I have to say, "plaintiffs or
 5        defense," I assume we're talking about
 6        personal injury cases rather than, for
 7        example, collision cases.  The plaintiff
 8        in a collision case is the one who gets
 9        to the court first.
10   Q.   Right.
11   A.   And to make anything meaningful, you have
12        to talk in terms of personal injury
13        cases.
14   Q.   That's what I meant.
15   A.   Personal injury cases, probably 90% of
16        the time on defense, 10% plaintiff.  And
17        why is that so?  Well, I work and do all
18        my major work for firms that would
19        normally be involved with defense cases,
20        oil companies, contractors, shipyards,
21        rather than individuals who get hurt
22        someplace.
23              However, the biggest problem, I
24        think, is in many cases, plaintiffs'
```

```
 1      attorneys don't know how to contact me.
 2      I don't advertise where plaintiffs'
 3      attorneys would look.  I don't have
 4      something that advertises in plaintiffs'
 5      law reviews and things of that sort.  I
 6      don't go out seeking plaintiff-type
 7      cases.
 8              However, if they're generally
 9      outside my area -- and I say, "area,"
10      physical area, New Orleans, or Gulf
11      Coast, -- I can handle them.  Why?  I
12      know all the defense attorneys in New
13      Orleans.  And there's nothing worse than
14      all of a sudden getting to a trial and
15      you find your fellow who hires you all
16      the time sitting across the way from you.
17              So I stay away from working
18      plaintiff cases in New Orleans, although
19      I have had a few.  But, generally, I make
20      certain that there is no conflict of
21      interest, I don't see a defense attorney
22      I do a lot of work for, for example.
23  Q.  What history, if any, do you have with
24      Barish Rosenthal, or anybody in that
```

```
1              office?
2       A.     I think I've worked three cases with
3              them, or been involved with three cases.
4       Q.     And how recent were they?
5       A.     Probably within the last two years.
6       Q.     Do you remember the names of the cases?
7       A.     This one.  And another one had to do with
8              a fellow by the name of King.  But, it's
9              not the same King as this.
10      Q.     Right.
11      A.     And then another one that had to do with
12             a vessel down there in Florida getting
13             caught in some unusual conditions.
14      Q.     Was it a personal injury case?
15      A.     Personal injury cases.  The vessel sank,
16             as I remember.
17      Q.     How many employees in your firm?
18      A.     Four.
19      Q.     Can you name them for me?
20      A.     Sure.  John Pierce, my naval architect;
21             my secretary; and John Williams.
22      Q.     Is Herkes gone?
23      A.     Yes, Herkes retired.
24      Q.     Can you estimate for me, the firm's
```

```
1            annual receivables?
2       A.   I was going to say a half mil.
3       Q.   And about half of that would be for
4            litigation and litigation support type of
5            things?
6       A.   Probably.
7       Q.   And can you tell me your annual pay?
8       A.   Sure, probably around eighty-five.
9       Q.   And about half of that would be from --
10      A.   Probably.
11      Q.   Okay.
12      A.   Remember, when we say, "half of it," --
13           yeah, I guess that's the easiest way to
14           handle it.  I don't know how you can
15           break it down, unless I went down case by
16           case.
17      Q.   I'm just looking for a ballpark.
18                I notice on your resume, you've
19           got a broad description of what you did
20           at Breit & Garcia.
21      A.   Breit & Garcia, yes.
22      Q.   Yeah, but not under this Sargent &
23           Herkes?
24      A.   No.
```

```
1    Q.   Is it the same type of stuff?
2    A.   Same type of stuff.  It would be a repeat
3         of their same type of material.
4    Q.   Okay.  And is it current that you're
5         still designing vessels?
6    A.   Oh, yes, surely; modifications.  I'm
7         still a naval architect.  That's what I
8         do.  That's what I've done my entire
9         life.  I would not know how to, for
10        example, go out and open up a restaurant.
11        I've never been in the restaurant
12        business.  I'd close within 30 days,
13        probably.  But, I know the naval
14        architecture business.
15   Q.   So, on a daily basis, you're still in
16        there designing?
17   A.   I'm still a naval architect.
18   Q.   Okay.  Maybe you could run me through
19        your experience with small boats, and
20        specifically, outboard motors?
21   A.   I've been involved with many of these
22        cases that have to do with people being
23        thrown from small boats.  That's probably
24        the most viable case I can think of with
```

```
 1    small vessels.  Generally what happens,
 2    someone buys a vessel in the range of,
 3    perhaps, 20 -- I'd say 16 to 25 feet.  He
 4    buys it with, let's say a 40 horsepower
 5    motor.  And it doesn't go fast enough.
 6    So what he does, he puts a 200 horsepower
 7    motor on it.  He goes fast.  He loses
 8    control.  And he gets in a turn of some
 9    sort and he goes [onomatopoeia] flying
10    out of the boat.  And those generally are
11    death cases in some way or other.
12          I've also designed these small
13    boats, similar to this one, for cargo
14    carriers.  And they're an operator on the
15    river, and they needed a little boat to
16    handle 55 gallon drums, oil, lube oil,
17    waste oils, to towboats.  And they wanted
18    an aluminum vessel.  And I designed an
19    aluminum vessel for them that was about
20    30 feet long, powered by a couple of
21    outboard motors.  And this goes back
22    about 20 years ago, or so.
23          But, mainly I'm involved with
24    those from a standpoint of people being
```

```
 1           injured on the boats.  Also collisions.
 2           They're involved with collisions of
 3           towboats.  They run into the side of
 4           towboats.  They run into the wires on
 5           towboats.  They get hit or get damaged by
 6           going over the waves in towboats such
 7           that there's a situation where someone on
 8           the smaller boat, for example, is suing
 9           someone I'm involved with who is the
10           owner of the towboat.
11                 So that's how I normally get
12           involved with these cases.  And collision
13           cases, personal injury cases, also
14           design.
15      Q.   This case involved the outboard motor
16           stalling out, --
17      A.   Yes.
18      Q.   -- the one we're here for today?
19      A.   Well, other things happened too.
20      Q.   Sure did, yeah.
21      A.   That's just part of it, the outboard
22           motor --
23      Q.   What experience do you have with that,
24           the mechanical aspect?
```

```
1    A.   A number of cases where something goes
2         wrong.  Generally, they're talking about
3         steering of the outboard motors.  Every
4         time there's a failure or something goes
5         wrong with an outboard motor, someone
6         looks at the steering company, because
7         steering is inherently involved with
8         these outboard motors.  And normally
9         they're steered from a console, and
10        there's a wire, a Teleflex cable, for
11        example, and they're generally brought
12        in.  I've been involved with representing
13        Teleflex on certain cases.
14             And also in certain cases the
15        outboard motor malfunctions.  But, in
16        general, we don't have too many troubles
17        with outboard motors.  They're quite
18        reliable if they're maintained.  However,
19        in this case, we're talking about an
20        outboard motor that was emerged in salt
21        water, and was not brought back as it
22        should have been for maintenance of the
23        outboard motor.
24   Q.   So, maintenance of the outboard motor is
```