UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEVEN RAMSEY | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| JAY CASHMAN, INC. | : | NO. 04-CV-10699(RCL) |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S RESPONSE TO THE MOTION IN *LIMINE*
TO EXCLUDE THE PROPOSED EXHIBIT OF HOCHSTRASSER'S
MARINA, INC. RECORDS FROM MARCH 2001**

Plaintiff, Steven Ramsey, by and through his undersigned counsel, hereby respectfully responds to the Motion In *Limine* To Exclude The Proposed Exhibit Of Hochstrasser's Marina, Inc. Records From March 2001, and in opposition hereof, responds as follows:

1.    Denied as stated. It is admitted that on April 5, 2001, Plaintiff was employed by the Defendant as an engineer. By way of further answer, Plaintiff asserts that, on April 5, 2001, he was a mate/engineer aboard the Dredge, Wood I. See Deposition of Steven Ramsey, relevant portions of which have been attached as Exhibit "A" at 55. As a mate/engineer, he was responsible for fueling the engines for the dredge's crane and winches; starting up that machinery; running the winches; and handling lines. Exhibit "A", at 63 - 64, 66.

2.    Denied as stated. It is admitted that the Plaintiff and coworkers would travel back and forth to the job site via the Tugboat Gunny. It is also admitted that a small work boat or skiff was, at certain times, available to the Plaintiff and certain other workers to perform errands. By way of

further response, the skiff was out of service on at least one occasion (due to sinking) and was used primarily by the Captain/Superintendent of the Wood I, Kenneth King. Exhibit "A" at 69, 72 - 73. The skiff was approximately 18 feet long and powered by a single forty horsepower Mercury outboard motor. Exhibit "A" at 87 - 88. This work boat had reportedly been built or assembled by the Defendant.

3.     Denied as stated. It is denied that Plaintiff was a "marine construction worker" or that he utilized the Wood I as a floating work platform. To the contrary, the Wood I was a dredge or vessel, and the Plaintiff was a seaman working upon navigable waters assigned to that vessel as a member of its crew.

4.     Denied as stated. It is denied that Plaintiff was "responsible" for all machinery and engines on the Wood I. To the contrary, as a mate/engineer, Plaintiff was responsible for fueling the engines for the dredge's crane and winches; starting up that machinery; running the winches; and handling lines. Exhibit "A" at 63 - 64, 66. Plaintiff was never "responsible" for the skiff at issue. To the contrary, the skiff was the responsibility of the dredge Captain, Ken King. See Deposition of Kenneth King, relevant portions of which have been attached hereto as Exhibit "C" at 25 - 26. By way of further response, Plaintiff's testimony speaks for itself.

5.     Denied as stated. Plaintiff's testimony speaks for itself.

6.     Denied. Plaintiff testified that for approximately one month prior to his casualty (for the period of time after the skiff sank and it's engine was returned from Hochstrasser's Marina), he had no occasion to be on the skiff at issue. Exhibit "A" at 76, 84 - 85.

7.     Denied as stated. It is admitted that in March 2001, the skiff had sunk in a major storm, and the engine had been submerged in salt water; after which the skiff was raised and the

engine sent to be repaired at a nearby facility called Hochstrasser's Marina. Exhibit "A" at 79 - 81; see also Hochstrasser's Marina records attached hereto as Exhibit "B". By way of further response, the invoices show that the repair consisted of the engine being flushed with fresh water, the carburetors and fuel lines cleaned and the lube oil replaced. Exhibit "B". One invoice contains a note that states: "Stator, voltage regulator, switch boxes, starter solenoid were not changed. Advised doing so since it sank in salt water". Further notation states, "do not change any electronics, starter, etc." Exhibit "B".

8.    Denied as stated. After the engine was returned to the dredge and the skiff placed back into service, Steven Ramsey had no occasion to be on that vessel until April 5, 2001, the day of his casualty. Exhibit "A" at 76, 84 - 85. As such, the Plaintiff did not experience any "difficulties" with the skiff until the time of the casualty. The first "difficulty" experienced occurred as he was about to return to the Wood I, after picking up the teeth for the crane's bucket. Exhibit "A" at 69 - 70, 88, 93. As plaintiff began to pilot the skiff from the shore toward the starboard side of the dredge, the skiff's motor stalled causing the skiff to drift to the stern of the dredge and under the mooring lines. Exhibit "A" at 93, 97. Plaintiff was able to throw a line to a hand on the dredge who caught the line and held it. Exhibit "A" at 94 - 96, 97. After a number of attempts, plaintiff was able to restart the motor on the skiff. Exhibit "A" at 96, 97 - 98. Defendant's dredge Captain, Ken King, then instructed plaintiff to bring the parts to the bow of the dredge where they would be used. Exhibit "A" at 99 - 102. As Mr. Ramsey attempted to maneuver the skiff away from the stern of the dredge, while trying to keep clear of the stern mooring lines in the swift current which exists at Barnegate inlet, the skiff repeatedly stalled. Exhibit "A" at 103 - 107. The fast current then trapped the stalled skiff and forced it against the rake of the barge which was moored along side the dredge.

Exhibit "A" at 107 - 110   The port side of the skiff was forced under water by the downward slope of the barge's rake and began to sink.   Exhibit "A" at 107 - 110.  As the skiff was about to sink, Plaintiff abandoned it by jumping off it's bow and then he attempted to climb aboard the Wood I by means of fender tires which hung on the side of the dredge.  Exhibit "A" at 110 - 111.  As Mr. Ramsey clung to the tire, the sinking skiff flipped over and struck Mr. Ramsey across his back, pinning him to the hull and fenders of the dredge and pulling him under the surface of the water. Exhibit "A" at 111 - 112.  Two individuals aboard the Wood I were able to climb down and grab plaintiff and pull him free after much struggling.   Exhibit "A" at 114.  Plaintiff was then administered medical care and evacuated to Atlantic City for treatment of his injuries. By way of further response, Plaintiff's testimony speaks for itself.

9.     Denied as stated. By way of further response, being "familiar with" a type of engine, and being qualified to *repair* such an engine are most assuredly two different things.  By way of further response, Plaintiff's testimony speaks for itself.  Also see answer to Paragraphs 4 and 8, above.

10.     Denied as stated.  By way of further response, Plaintiff's testimony speaks for itself. Also see answer to Paragraphs 4, 8 and 9, above.

11.     Denied as stated.  By way of further response, Plaintiff's testimony speaks for itself. Also see answer to Paragraphs 4, 8 and 9, above.

12.     Denied as stated.  In the opinion of Plaintiff's liability expert, Arthur C. Sargent, the skiff was improperly maintained.  Following the March 2001 sinking event, the skiff's electrical system should have been completely checked and/or changed out since electrical and electronic components can be damaged or destroyed when immersed in salt water.   Exhibit "E".   In Mr.

Sargent's opinion, the stalling of the skiff, which directly lead to the skiff's contacting the dredge at the stern under the mooring lines and subsequently directly lead to the vessel being swept under the rake of the barge could have been caused by the failure of defendant to follow the recommendations of the marina mechanics and replace the electrical components on the motor. Exhibit "E". Mr. Sargent also opined that the skiff was underpowered and therefore unsuitable for the swift current conditions present at the Barnegate Inlet location. Exhibit "E". In addition, he opined that By way of further response, Plaintiff's testimony speaks for itself. Also see answer to Paragraphs 4, 8 and 9, above.

13.     Denied. Mr. Sargent plans to testify about Cashman's failure to follow general maritime industry standards and practice. At his deposition, for example, Mr. Sargent testified that it was "general good practice, marine practice, when you dunk something, to submerge it in salt water, to replace it immediately thereafter, if you want to go back in operation with it. That's the general practice..." Exhibit "F" at 36. The Defendant's Captain, Ken King, testified that after the engine had been immersed in salt water, he could tell that "it was submerged enough that it had probably damaged the starter and electronics on it that it needed to be looked at." Exhibit "C" at 31. As a result, the engine was sent to Hochstrasser's Marina. Hochstrasser's Marina advised Cashman in early March, 2001, that as a result of the engine's immersion in salt water certain repairs were necessary. Mr. Sargent agreed with this prescription, stating: "[w]hen you have something dunked in salt water, normally you change out everything to do with the electrical [because] the electrical can short out. It's damaged, rusted corroded." Exhibit "F" at 35. These recommendations were not followed. If Cashman had authorized the necessary repairs recommended by Hochstrasser's Marina, Cashman would have learned whether or not the engine had an electrical problem, as Hochstrasser's

–5–

Marina could have taken the engine apart and tested each piece individually for corrosion. Exhibit "F" at 39. That was never done.

## I.    CONTESTED FACTS

1.    Plaintiff, Steven Ramsey, is a seaman.

2.    This is a Jones Act, 46 USCS § 688, <u>et. seq.</u>, and general maritime law case brought by the Plaintiff against his employer, Jay Cashman, Inc.("Cashman").

3.    On April 5, 2001, Plaintiff was injured in the course and scope of his employment for Cashman at a work site located at Barnegate, New Jersey. See Deposition of Steven Ramsey, relevant portions of which have been attached as Exhibit "A" at 54.

4.    Mr. Ramsey was a mate/engineer aboard the Dredge, Wood I. Exhibit "A" at 55. As a mate/engineer, he was responsible for fueling the engines for the dredge's crane and winches; starting up that machinery; running the winches; and handling lines. Exhibit "A" at 63 - 64, 66. He has never held a Coast Guard license. Exhibit "A" at 65.

5.    Mr. Ramsey was injured while aboard a small steel work boat or skiff used by the crewmen of the Wood I (primarily by the Captain/Superintendent of the Wood I, Kenneth King) to perform errands. Exhibit "A" at 69, 72 - 73. The skiff was approximately 18 feet long and powered by a single forty horsepower Mercury outboard motor. Exhibit "A" at 87 - 88. This work boat had reportedly been built or assembled by the Defendant.

### A.    PRIOR SINKING

6.    In March 2001, the skiff had sunk in a major storm, and the engine submerged in salt water. Exhibit "A" at 79 - 81.

7.      The Defendant's Captain, Kenneth King, a licensed Captain who worked around marine equipment for over twenty years, testified that after seeing the engine he could tell that "it was submerged enough that it had probably damaged the starter and electronics on it that it needed to be looked at." Exhibit "C" at 26, 31.

8.      The engine was sent to a nearby facility called Hochstrasser's Marina to be repaired. Exhibit "A" at 79 - 81; see also Exhibit "B"

9.      Invoices show that the repair consisted of the engine being flushed with fresh water, the carburetors and fuel lines cleaned and the lube oil replaced. Exhibit "B". One invoice contains a note that states: "Stator, voltage regulator, switch boxes, starter solenoid were not changed. Advised doing so since it sank in salt water". Further notation states, "do not change any electronics, starter, etc." Exhibit "B".

10.      Captain King confirms that, after the engine was returned to Cashman, he knew the skiff had a stalling problem, but that he continued to keep the work boat in service. Exhibit "C" at 33 - 37, 44. He acknowledged that he personally had problems with the boat stalling, but continued to use it when he figured out how to keep it from stalling. Exhibit "C" at 33 - 37, 44.

11.      After the skiff was placed back into service, however, Steven Ramsey had no occasion to be on that vessel until April 5, 2001. Exhibit "A" at 76, 84 - 85.

**B.      INCIDENT OF APRIL 5, 2001**

12.      On April 5, 2001, the Wood I was moored approximately 75 to 100 feet off the south shore of Barnegate Inlet. Exhibit "A" at 94 - 95. The Wood I was moored by two lines forward and two lines aft. Exhibit "A" at 104, 118 - 121.    Attached to the Wood I was a material deck barge. Exhibit "A" at 107.

13.    On April 5, 2001, Captain King received a call from shore that teeth necessary to repair the dredge bucket were soon to be arriving. Exhibit "A" at 58, 60, 67 - 68, 74. Captain King asked Mr. Ramsey to retrieve the teeth when they arrived, and Mr. Ramsey agreed. Exhibit "A" at 74.

14.    Shortly thereafter, Mr. Ramsey was asked by the vessel's safety officer to transport him to shore for lunch. Exhibit "A" at 69, 86. Mr. Ramsey took the officer to shore via the skiff. Exhibit "A" at 69, 72 - 73.

15.    As he was about to return to the Wood I, Mr. Ramsey was informed by the superintndent on shore that the teeth for the crane's bucket were ready for pick-up. Exhibit "A" at 69 - 70, 88. After loading up the aforesaid teeth, he began the return trip to the dredge. Exhibit "A" at 93.

16.    As plaintiff began to pilot the skiff from the shore toward the starboard side of the dredge, the skiff's motor stalled causing the skiff to drift to the stern of the dredge and under the mooring lines. Exhibit "A" at 93, 97. Plaintiff was able to throw a line to a hand on the dredge who caught the line and held it. Exhibit "A" at 94 - 96, 97.

17.    After a number of attempts, plaintiff was able to restart the motor on the skiff. Exhibit "A" at 96, 97 - 98. Defendant's dredge Captain, Ken King, then instructed plaintiff to bring the parts to the bow of the dredge where they would be used. Exhibit "A" at 99 - 102.

18.    As Mr. Ramsey attempted to maneuver the skiff away from the stern of the dredge, while trying to keep clear of the stern mooring lines in the swift current which exists at Barnegate inlet, the skiff repeatedly stalled. Exhibit "A" at 103 - 107.

–8–

19.     The fast current trapped the stalled skiff and forced it against the rake of the barge which was moored along side the dredge. Exhibit "A" at 107 - 110  The port side of the skiff was forced under water by the downward slope of the barge's rake and began to sink. Exhibit "A" at 107 - 110.

20.     As the skiff was about to sink, Plaintiff abandoned ship by jumping off it's bow and then he attempted to climb aboard the Wood I by means of fender tires which hung on the side of the dredge. Exhibit "A" at 110 - 111.

21.     As Mr. Ramsey clung to the tire, the sinking skiff flipped over and struck Mr. Ramsey across his back, pinning him to the hull and fenders of the dredge and pulling him under the surface of the water. Exhibit "A" at 111 - 112.

22.     Two individuals aboard the Wood I were able to climb down and grab plaintiff and pull him free after much struggling. Exhibit "A" at 114.

23.     Plaintiff was then administered medical care and evacuated to Atlantic City for treatment of his injuries.

**C.     POST-INCIDENT**

24.     Following the incident, the Defendant knew or should have known that Plaintiff was injured and that litigation was likely.

25.     Instead of protecting the vessel and engine at issue, the Defendant subsequently lost them both. See Deposition of David C. DuBois, relevant portions of which are attached hereto as Exhibit "D", at 24.

26.     As a result, neither Plaintiff nor his representatives have ever seen, weighed, measured, inspected or examined the skiff or the engine.

27.    Defendant claims to have no blueprints or specifications available for the skiff.

## II.    ARGUMENT

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The trial court employs a balancing test to determine whether Rule 403 applies, weighing the probative worth of the evidence against its potentially confusing effects. See Fryar v. Curtis, 485 F.3d 179, 184 (1st Cir. 2007). In making this determination, however, a trial judge should refrain from removing relevant evidence from the jury's universe solely because he finds the evidence unpersuasive. Blake v. Pellegrino, 329 F.3d 43 (1st Cir. 2003).

It is, of course, axiomatic that "all evidence is meant to be prejudicial; elsewise, the proponent would be unlikely to offer it." Daigle v. Maine Medical Ctr., Inc., 14 F.3d 684, 690 (1st Cir. 1994). The appropriate inquiry under Rule 403, therefore, is whether the evidence results in "unfair prejudice." See Swajian v. General Motors Corp., 916 F.2d 31, 34 (1st Cir. 1990); see also Kelley v. Airborne Freight Corp., 140 F.3d 335, 348 (1st Cir. 1998) (noting that "all probative evidence is prejudicial" and that the relevant question is whether the testimony was unfairly prejudicial). "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed R. Evid. 403 advisory committee's note.

This balancing test, however, should also be viewed in the context of a Jones Act case. The Jones Act provides seamen, like Steven Ramsey, with a cause of action against their employers when "an employer's failure to exercise reasonable care causes a subsequent injury even where the employer's negligence did not render the ship unseaworthy.[1]" Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 453 (1st Cir. 1996) (citing Toucet v. Maritime Overseas Corp., 991 F.2d 5, 10 (1st Cir. 1993)). While a Jones Act Plaintiff must establish all the elements of a common-law negligence

---

[1]Plaintiff has also brought a claim under the general maritime doctrine of warranty of seaworthiness. Unseaworthiness is a separate cause of action and unique from a claim under the Jones Act. Ferrara, 99 F.3d at 452 (1st Cir. 1996) (quoting Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S. Ct. 514, 27 L. Ed. 2d 562 (1971)). The doctrine of unseaworthiness places an absolute duty upon shipowners to furnish a "seaworthy" ship and compensate seamen for injuries caused by any defect in a vessel or its appurtenant appliances or equipment. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 548-49, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960); Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 199 (1st Cir. 1980). Liability based upon a claim of unseaworthiness does not require a showing of negligence, but instead imposes a strict liability regime upon shipowners. Napier, 454 F.3d at 68. For liability to exist, a plaintiff must first establish the existence of an unseaworthy condition on board the vessel and then demonstrate the unseaworthy condition to be the proximate cause of his injury. Ferrara, 99 F.3d at 453.

claim, the burden to prove causation is "featherweight." Napier v. F/V Deesie, Inc., 454 F.3d 61 (1st

Cir. 2006) (citing Toucet, 991 F.2d at 10). A Plaintiff need only demonstrate that the vessel's

"negligence played any part, even the slightest, in producing the injuries for which the plaintiff seeks

damages." Connolly v. Farrell Lines, Inc., 268 F.2d 653, 655 (1st Cir. 1959) (citing Rogers v.

Missouri P. R. Co., 352 U.S. 500, 506, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)[2]).

Importantly, under the Jones Act, liability may be inferred completely from circumstantial

evidence. See Rogers, 352 U.S. at 508; Mendoza v. Southern Pacific Transportation Co., 733 F.2d

631 (9th Cir. 1984); Pekowic v. Erie Lackawanna R.R., 430 F.2d 697 (3d Cir. 1970); Moore v.

Chesapeake & Ohio Ry., 493 F. Supp. 1252 (S.W.Va. 1980), aff'd, 649 F.2d 1004 (4th Cir. 1981).

As such, it may be based exclusively on inferences drawn from the facts and circumstances of the

case which, in light of the jury's ordinary experience, reasonably suggest that the marine employer's

negligence played even the slightest part in producing Plaintiff's injury. See Rogers, 352 U.S. at 508;

Henwood v. Coburn, 165 F.2d 418 (8th Cir. 1948).

Cashman claims that the Hochstrasser's Marina documents are "irrelevant." This claim is

wholly without merit. Indeed, the facts speak for themselves. It is undisputed (1) that the 40

horsepower outboard engine at issue was submerged during a storm in early march, 2001 (Exhibit

---

[2]In addition to case law directly interpreting the Jones Act, the statute incorporates and
"adopts 'the entire judicially developed doctrine of liability' under the Federal Employers' Liability
Act ('FELA')," 45 U.S.C. § 51. American Dredging Company v. Miller, 510 U.S. 443, 455-456, 127
L. Ed. 2d 285, 114 S. Ct. 981 (1994); see generally Thomas J. Schoenbaum, 1 Admiralty and
Maritime Law at 312 (2d ed. 1994).

"A" at 79 - 81; see also Defendant's "Factual Background" within it's Motion in *Limine* at _ 7) ; (2) that after the engine was raised and examined, the Defendant's Superintendent/Captain, Kenneth King, a licensed Captain who worked around marine equipment for over twenty years, believed "it was submerged enough that it had probably damaged the starter and electronics on it that it needed to be looked at" (Exhibit "C" at 26, 31); (3) that the engine was then sent to Hochstrasser's Marina to be repaired (Exhibit "B"; see also Defendant's "Factual Background" within it's Motion in *Limine* at _ 7); (4) that Hochstrasser's Marina recommended that certain electrical components be changed out as the engine had been submerged in salt water (Exhibit "B"; see also Defendant's "Factual Background" within it's Motion in *Limine* at _ 7); (5) that certain work was performed upon the engine at Hochstrasser's Marina (Exhibit "B"; see also Defendant's "Factual Background" within it's Motion in *Limine* at _ 7); (6) that the changing out of electrical components recommended by Hochstrasser's Marina was not performed (Exhibit "B"; see also Defendant's "Factual Background" within it's Motion in *Limine* at _ 7); (7) that invoices were prepared by Hochstrasser's Marina evidencing the work performed (and the recommended work not performed) upon the engine and that these invoices were sent to Cashman's main office in Massachusetts (Exhibit "B"; see also Deposition of Nicholas Wagner, relevant portions of which are attached hereto as Exhibit "H" at 20); (8) that upon being placed back into service the engine exhibited troubles including problems shifting into reverse and frequently stalling (Exhibit "C" at 33 - 37, 44); and (9) that on April 5, 2001, during the casualty in question, the engine exhibited problems shifting into reverse and stalling repeatedly (Exhibit "A" at 93 - 107; see also Defendant's "Factual Background" within it's Motion in *Limine* at __ 8, 11, 12). What remains in dispute is the issue of what *caused* the April 5, 2001 casualty.

–13–

Plaintiff alleges that Cashman was negligent, and the skiff unseaworthy, as it was improperly maintained. Not only can the Plaintiff prove that Cashman's failure to properly maintain the skiff and its engine caused his injuries, but he can provide more than enough evidence from which a jury may infer that the Plaintiff was injured as a direct result of the Defendant's failure to properly repair the engine after it was submerged in salt water in early March, 2001. At the time of the casualty, the skiff stalled numerous and repeated times. Obviously, the vessel was experiencing engine troubles. In the opinion of Arthur C. Sargent, Plaintiff's liability expert, the failure of the electronics on the motor explains why the motor ran intermittently before the incident and why Mr. Ramsey was unable to start the engine later. See June 27, 2006 Report of Arthur C. Sargent, attached hereto as Exhibit "G". Mr. Sargent further opined that the stalling of the skiff lead directly to the skiff's contacting the dredge at the stern under the mooring lines and subsequently to the vessel being swept under the rake of the barge. Exhibit "E".

There can be no dispute that the condition of the skiff and engine immediately prior to the casualty at issue is relevant to these proceedings on the issue of causation. Similarly relevant is evidence relating to the condition of the skiff, and the repairs previously performed upon same, following the March 2001 sinking event. Evidence of the repairs made, or not made, one month prior thereto, bear directly on the central disputed issue in the case -- causation. In fact, the documents evidencing the prior repairs, as well as the recommendations made to and ignored by the Defendant, are not only "relevant," but highly probative on this issue.[3] When proffered evidence

---

[3]This evidence also possesses relevancy as a means of painting the backdrop against which Cashman's vessel maintenance for this skiff was being performed. It as well-settled that such "context" evidence generally is admissible. See e.g. Faigin v. Kelly, 184 F.3d 67 (1st Cir. 1999); United States v. McKeeve, 131 F.3d 1, 13-14 (1st Cir. 1997).

relates to the central issue in a case, it is unlikely that the prejudicial effect of that evidence can substantially outweigh its highly probative nature, as Rule 403 requires. See Rubert-Torres ex rel. Cintron-Rupert v. Hospital San Pablo, Inc., 205 F.3d 472 (1st Cir. 2000); Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 8 - 9 (1st Cir. 1994); Swajian, 916 F.2d at 34-35.[4]  As the cause of the April 5, 2001 incident is directly in issue, evidence bearing on that issue should not be excluded.

Next, Cashman claims that use of the Hochstrasser's Marina documents would be "unfairly prejudicial."  In its filing papers, however, Cashman has failed to explain how and/or why the documents are so "unfairly prejudicial."  In fact, no explanation whatsoever is set forth.  See

---

[4]In Swajian, for example, the plaintiff's wife was killed when a truck she had been driving rolled over in an accident. The plaintiff contended that the truck's rear axle was defective and had caused the accident. The automobile manufacturer argued, however, that driver error was the cause. The district court excluded evidence that the decedent had been drinking prior to the accident, finding that the evidence was "unduly inflammatory" and that its prejudicial impact would far outweigh its probative value. Id. at 34.  On appeal, the First Circuit reversed, finding that the evidence was highly probative because it bore directly on the issue of causation, an essential element of the plaintiff's prima facie case. Furthermore, in Swajian as compared to the circumstances of this case, the risk of unfair prejudice was decidedly more pronounced, as a real danger existed that the jury would have taken the evidence of the decedent's drinking as showing that she was at fault and not entitled to compensation, regardless of whether or not the axle failure caused the accident. See Espeaignnette, 43 F.3d at 8 - 9.  In contrast, the evidence proposed to be excluded here poses little, if any, risk of unfair prejudice.

Defendant's Brief at 6. Nowhere, for example, does Cashman claim that usage of the aforesaid documents will lead to "an undue tendency to suggest decision on an improper basis...." Fed R. Evid. 403 advisory committee's note. Nor does the Defendant even claim that introduction of the evidence would confuse or mislead the jury. Instead, Cashman simply argues that the probative value of the records is "limited" since Plaintiff allegedly cannot lay a foundation to support his theory that the skiff stalled due to electrical problems. This, however, is neither true, nor sufficient to support preclusion on the grounds of unfair prejudice. Espeaignnette, 43 F.3d at 8 - 9; Swajian, 916 F.2d at 34-35. As such, the Defendant's preclusion argument should be rejected.

WHEREFORE, Plaintiff Steven Ramsey respectfully requests that this Honorable Court deny the Defendant's motion to exclude repair records obtained from Hochstrasser's Marina.

> The plaintiff,
> Steven Ramsey
> By His attorneys,
> BARISH ◆ROSENTHAL
>
> /s/ Samuel J. Rosenthal, Esq.
> /s/ Rudolph V. DeGeorge, II, Esq.
> Samuel J. Rosenthal, Esq.
> Rudolph V. DeGeorge, II, Esq.
> Bell Atlantic Tower, Suite 4020
> 1717 Arch Street
> Philadelphia, PA 19103
> (215) 923-8900

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 19, 2007.

> /s/ Ronald M. Davids
> Ronald M. Davids